OUT OF COUNTY    Case Number: 2015-CI-12832

2015CI12832 S00001

SIRIUS COMPUTER SOLUTIONS INC

**vs.**

**JASON SPARKS**

(Note:Attached Document May Contain Additional Litigants.)

IN THE DISTRICT COURT
438th JUDICIAL DISTRICT
BEXAR COUNTY, TEXAS

# CITATION

"THE STATE OF TEXAS"

Directed To: JASON SPARKS

"You have been sued. You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you." Said petition was filed on the 6th day of August, 2015.

ISSUED UNDER MY HAND AND SEAL OF SAID COURT ON THIS 6TH DAY OF AUGUST A.D., 2015.

PETITION

ANNALYN GARRETT SMITH
ATTORNEY FOR PLAINTIFF
17806 W INTERSTATE 10 400
SAN ANTONIO, TX 78257-8221



**Donna Kay McKinney**
**Bexar County District Clerk**
**101 W. Nueva, Suite 217**
**San Antonio, Texas 78205**

By: *Lisa Sanchez*, Deputy

---

**OFFICER'S RETURN**

I received this citation on 8-7-15 at 3.10 o'clock P.M. and:(X) executed it by delivering a copy of the citation with the date of delivery endorsed on it to the defendant, Jason Sparks in person on the 8th day of August 2015 at 8.40 o'clock P.M. at: 14706 SE Rivercrest Dr, Vancouver WA 98683 or ( ) not executed because _____ Fees: _____ Badge/PPS #: 5120026

Date certification expires: 8-12-15

_____County, Texas

By: _____

OR:   VERIFICATION   OF   RETURN   (If   not   served   by   a   peace   officer)   SWORN   TO   this

_____.

NOTARY PUBLIC, STATE OF TEXAS

OR:   My name is_____, my date of birth is_____, and my address is _____(County).

I declare under penalty of perjury that the foregoing is true and correct. Executed in _____County, State of Texas, on the _____ day of_____, 20_____.

_____
                              Declarant    ORIGINAL (DK002)

EXHIBIT for Civil Action No.: 5:15-cv-698

OUT OF COUNTY

2015CI12832 S00002

Case Number: 2015-CI-12832

SIRIUS COMPUTER SOLUTIONS INC

VS.

JASON SPARKS

IN THE DISTRICT COURT
438th JUDICIAL DISTRICT
BEXAR COUNTY, TEXAS

# TEMPORARY RESTRAINING ORDER
### With Bond

"THE STATE OF TEXAS"
To: JASON SPARKS

Whereas, in a certain cause pending on the docket of the 438th Judicial District Court of Bexar County, Texas, being cause number 2015-CI-12832, wherein SIRIUS COMPUTER SOLUTIONS INC is Plaintiff and JASON SPARKS is Defendant. In said suit the Plaintiff has filed an Original Petition, asking among other things, for the granting and issuance of a Temporary Restraining Order, to restrain the Defendant, JASON SPARKS as fully set out and prayed for, a copy of which is attached hereto and to which reference is hereby made for the injunctive relief sought by the Plaintiff. Upon presentation and consideration of said petition, the Honorable PETER SAKAI has entered the following, to-wit: copy of order attached to writ served, and whereas, bond (if required) has been filed and approved;

These are therefore, to RESTRAIN, and you the said Defendant, JASON SPARKS , are hereby RESTRAINED as fully set out in the Temporary Restraining Order, a copy of which is attached hereto, made a part hereof, and to which reference is hereby made for a full and complete statement of the injunctive relief ordered by the Court.

And you are further notified that the hearing on the Application for Temporary Injunction is set at the Bexar County Courthouse in the City of San Antonio, Texas on the 19th day of August, 2015, A.D., at 9:00 o'clock A.M. in room 109, Presiding District Court at which time you are required to appear and show cause, if any, why said Injunction should not be granted as prayed for.

HEREIN FAIL NOT TO OBEY THIS WRIT, UNDER THE PAINS AND PENALTIES PRESCRIBED BY LAW! ISSUED AND GIVEN UNDER MY HAND AND SEAL OF OFFICE, AT SAN ANTONIO, TEXAS the 6th Day of August A.D., 2015.

ANNALYN GARRETT SMITH
ATTORNEY FOR PLAINTIFF
17806 W INTERSTATE 10 400
SAN ANTONIO, TX 78257-8221



**Donna Kay McKinney**
**Bexar County District Clerk**

By: *Lisa Sanchez*, Deputy

### RETURN

CAME TO HAND ON THE 7th DAY OF August ,A.D. 2015 AT 3:10 O'CLOCK P .M. AND EXECUTED (NOT EXECUTED) ON THE 8th DAY OF August ,A.D. 2015 BY DELIVERING TO Jason Sparks IN PERSON, A TRUE COPY OF THIS TEMPORARY RESTRAINING ORDER UPON WHICH I ENDORSED THE DATE OF DELIVERY. CAUSE OF FAILURE TO EXECUTE THIS TEMPORARY RESTRAINING ORDER IS _____ .

TOTAL FEES: _____

COUNTY, TEXAS

BY Mike Clark #512026 w/a State

Original (Dk022)

| | | |
|---|---|---|
| SIRIUS COMPUTER SOLUTIONS, INC. | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| V. | § | 438TH JUDICIAL DISTRICT |
| | § | |
| JASON SPARKS, | § | |
| | § | |
| *Defendant.* | § | BEXAR COUNTY, TEXAS |

## TEMPORARY RESTRAINING ORDER AND
## ORDER SETTING HEARING FOR PRELIMINARY INJUNCTION

After considering Plaintiff Sirius Computer Solutions, Inc.'s ("Sirius") Application for Temporary Restraining Order, the pleadings, verification, and arguments of counsel, the Court finds there is evidence that harm is imminent to Sirius, and if the Court does not issue the Temporary Restraining Order, Sirius will be irreparably injured and harmed, particularly in light of the fact that Defendant Jason Sparks ("Sparks") has already solicited customers and employees away from Sirius in violation of the Confidentiality, Protection of Customer Relationships, and Non-Solicitation Agreement ("Agreement") he entered into with Sirius. Unless Sparks is enjoined, Sirius will suffer and will continue to suffer clear, immediate and irreparable injury by Sparks: (a) using and/or disclosing Sirius' pricing, customer lists, proprietary software, proprietary systems, marketing strategies, contract terms, employee information (to include compensation information), records, accounts, business methods, business model, financial data, and technical processes; and (b) soliciting, diverting away, and taking away from Sirius employees and customers in violation of the Agreement between Sparks and Sirius.

An ex parte order, without notice to Defendant Sparks, is necessary because there was not enough time to give notice to Defendant Sparks, hold a hearing, and issue a restraining order before the irreparable injury, loss, or damage would occur.

Due to the exigency of the circumstances, the Court Orders this Temporary Restraining Order be served on Defendant Sparks by hand delivery or electronic mail as soon as practicable.

By this Order, the Court does the following:

A.   Temporarily restrains Defendant Sparks from:

1.   Soliciting, diverting, calling upon, or attempting to solicit, divert, sell, or provide services to any customer or client or prospective customer or client of Sirius who was a customer or client or a prospective customer or client of Sirius within the two years prior to Sparks' separation of employment from Sirius and with whom Sparks had business and direct personal contact as an employee of Sirius.

2.   Disclosing, using, or misappropriating any trade secrets or confidential, proprietary information of Sirius, including but not limited to, customer information and records (including customer files and network information, internal or customer computer configurations, customer buying needs or habits, customer payment practices or histories, lists of contact information), pricing and marketing information, vendor lists and vendor pricing and cost costing; confidential financial data, training and training programs, billing practices, implementation methodologies, marketing plans and strategies, growth strategies, transactional terms and conditions, compensation plans, and discussions regarding competitors;

3.   Using or retaining any copies, including but not limited to electronic copies, of Sirius' confidential data, computer programs, records, customer lists, price lists, marketing programs, customer contracts, customer preferences, proposal history, managerial training manuals and materials, contract terms, forms, employee information, accounts, financial data, or any other confidential or proprietary information and trade secrets belonging to Sirius; and/or

5.   Directly or indirectly hiring, soliciting, or otherwise causing any employee of Sirius to terminate his or her employment with Sirius.

B.   Orders the Clerk to issue notice to Defendant Sparks that a hearing on Sirius's Application for Temporary Injunction is set for Wednesday, August 19, 2015, at 9:00 a.m.   The purpose of this hearing shall be to determine whether this Temporary

Restraining Order should be made a Temporary Injunction pending a full trial on the merits.

C. Sets bond at $ _500 00_ .

This Order expires at midnight on Wednesday, August 19, 2015.

SIGNED and ENTERED on August 6, 2015 at _1:30_ p.m.

Judge Peter Sakai
225th District Court
Bexar County, Texas

_____
PRESIDING JUDGE

Entry Requested By:

SCHMOYER REINHARD LLP
17806 IH 10 West, Suite 400
San Antonio, Texas 78257
Telephone: 210/447-8033
Facsimile: 210/447-8036

_____
Annalyn G. Smith
State Bar No. 18532500
asmith@sr-llp.com
Christine E. Reinhard
State Bar No. 24013389
creinhard@sr-llp.com

**ATTORNEYS FOR PLAINTIFF
SIRIUS COMPUTER SOLUTIONS, INC.**


2015CI12832 -B00001

### Certificate of District Clerk That Plaintiff(s)
### Made Cash Deposit In Lieu Of
### Temporary Restraining Order Bond

FILED
15 AUG -6 PM 1:47
DONNA KAY MCKINNEY
DISTRICT CLERK
BEXAR COUNTY
BY_____ DEPUTY

CRT

The State of Texas
County of Bexar                    438th Judicial District Court

I, Donna Kay McKinney, Clerk of the District Courts in and for Bexar County, Texas, do hereby certify that SIRIUS COMPUTER SOLUTIONS, INC. in Cause No. 2015-CI-12832 , Styled SIRIUS COMPUTER SOLUTIONS INC vs. JASON SPARKS , have this day deposited the sum of FIVE HUNDRED DOLLARS ($ 500.00 ) cash, which is the amount ordered by the Court in lieu of a Temporary Restraining Order Bond.

WITNESS, Donna Kay McKinney, Clerk of the District Courts of Bexar County, Texas. Given under my hand and seal of said Courts of Bexar County, Texas, on August 6, 2015.

Donna Kay McKinney
District Clerk, Bexar County, Texas

BY: _____
Ashley J. Castillo, Deputy

**  RECEIPT REQUIRED FOR REFUND OF FUNDS**

FILED
8/6/2015 11:44:37 AM
Donna Kay McKinney
Bexar County District Clerk
Accepted By: Lisa Morales

CAUSE NO. **2015CI12832**

| | | |
|---|---|---|
| SIRIUS COMPUTER SOLUTIONS, INC, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| V. | § | **438TH** ___ JUDICIAL DISTRICT |
| | § | |
| JASON SPARKS, | § | |
| | § | |
| *Defendant.* | § | BEXAR COUNTY, TEXAS |

### PLAINTIFF'S ORIGINAL VERIFIED PETITION, APPLICATION FOR TEMPORARY RESTRAINING ORDER, INJUNCTIVE RELIEF, AND/OR DAMAGES, & REQUEST FOR EXPEDITED DISCOVERY AND PRESERVATION ORDER

Plaintiff, Sirius Computer Solutions, Inc. ("Sirius"), files this action against its former employee, Defendant Jason Sparks ("Sparks"), as follows:

### I.
### DISCOVERY LEVEL

1.     Sirius intends to conduct discovery under Level 3 of Rule 190.1 of the Texas Rules of Civil Procedure and request an Expedited Discovery and Preservation Order from the Court.

### II.
### INTRODUCTION

2.     Defendant Sparks, a former upper level sales employee for Sirius, has blatantly ignored his contractual and common law obligations subsequent to his voluntary resignation from Sirius. In May 2015, Sparks accepted a position with one of Sirius's competitors, Nordisk Systems, Inc. and has thereafter acted in violation of his Confidentiality, Protection of Customer Relationships, and Non-Solicitation Agreement (hereinafter "Agreement," attached as Exhibit A) with Sirius as well as the common law duties he owes to Sirius. Since leaving Sirius, Sparks has solicited and provided services to customers with whom he worked while with Sirius and solicited employees of Sirius to leave their employment and join the Nordisk workforce, despite

his Agreement with and obligations to Sirius. Sparks' conduct exposes Sirius to substantial risk of further imminent injury in the absence of injunctive relief. As a result, Sirius ask this Court to act immediately to prevent Sparks from continuing his unlawful conduct by issuing a temporary restraining order, followed by a temporary injunction, and ultimately a permanent injunction enjoining Sparks from any further unlawful conduct.

### III.
### PARTIES

3.      Sirius is a Texas corporation with its corporate headquarters located in San Antonio, Texas at 10100 Reunion Place, Suite 500, San Antonio, Texas 78216.

4.      Sparks is an individual residing in Vancouver, Washington who may be served with process at 14706 SE Rivercrest Drive, Vancouver, Washington 98683.

### IV.
### VENUE, JURISDICTION, AND CHOICE OF LAW

5.      Venue is proper in Bexar County, Texas, pursuant to Texas Civil Practice & Remedies Code Section 15.035, due to the Agreement Sparks entered into with Sirius on June 17, 2014 at the outset of his employment. The Agreement reflects Sparks consent to jurisdiction and venue in Bexar County, Texas and provides Texas as the applicable law as reflected below:

> 5.      **Applicable Law and Venue. Sirius and Employee agree that any dispute arising out of or relating to this Agreement or the Plan which cannot be amicably settled, shall be brought solely and exclusively in a court sitting in San Antonio, Bexar County, Texas, and Employee irrevocably accepts the jurisdiction of the federal and state courts of the State of Texas for such disputes. The Plan and the Agreement were entered into and are performable in San Antonio, Bexar County, Texas. The parties further covenant and agree that sole and exclusive venue for any such court proceeding shall be in a court sitting in San Antonio, Bexar County, Texas.**

6.      This Court, thus, has jurisdiction over this action by virtue of the Agreement between the parties (to include Sparks' consent), the relief sought herein, and due to the fact the amount in controversy exceeds the minimum jurisdictional requirements of this Court. Indeed,

in addition to the injunctive relief sought, Sirius seeks monetary damages in excess of $200,000 but less than $1,000,000 for Sparks' contractual violations and unlawful conduct to date.

## V.
## BACKGROUND FACTS

7.    Sirius is a national IT solutions integrator of technology-based business solutions headquartered in San Antonio, Texas. Sirius maintains sales locations throughout the United States, including in the Pacific Northwest. It also has offices in several states, including Lake Oswego, Oregon.

8.    Sales employees with Sirius, such as Sparks, who choose to receive a premium commission rate under the Sirius Incentive Compensation Plan, are required to enter into a "Confidentiality, Protection of Customer Relationships and Non-Solicitation Agreement" (the "Agreement") as a condition of employment with Sirius. The Agreement contains an obligation not to disclose confidential information and not to solicit Sirius' customers and employees, more specifically as follows:

> 2.    **Protection of Customer Relationships.** For purposes of this paragraph, "Sirius' customers" shall include every person, business or other entity which, during Employee's last 24 months of employment at Sirius, either purchased or committed to purchase any service or product from Sirius or its respective subsidiaries, affiliates or successors, and with whom Employee did business and had direct personal contact as an employee of Sirius. For a period of one (1) year after ceasing to be employed by Sirius, regardless of whether Employee's employment ends voluntarily or involuntarily, Employee shall not, directly or indirectly, as an employee or independent contractor, alone or in association, with, on behalf of, or for the benefit of any third party, provide or solicit to provide any service or product to any of Sirius' customers, which service or product is similar to or competitive with any service or product offered by Sirius, or the provision of which could adversely affect Sirius' business relationship with such customer. After Employee's employment with Sirius ceases, to the extent Employee is uncertain as to whether Employee may be violating this paragraph, Employee shall identify in writing to Sirius any person, business or other entity that Employee intends to solicit and request confirmation from Sirius as to whether that particular person, business or other entity qualifies as a Sirius customer and Sirius will confirm to Employee within seven (7) business days of Employee's request whether the contact is a Sirius customer.

3. **Non-Solicitation of Employees.** During Employee's employment with Sirius, and for a period of on (1) year thereafter, Employee will not directly or indirectly contact for the purpose of soliciting employment, solicit, employ or otherwise engage any of the employees of Sirius or any of its respective subsidiaries, affiliates or successors to leave his or her employment to work for any business, individual, company, firm, corporation, or other entity then in competition with the business of Sirius or any subsidiary, affiliate or successor of Sirius (for the purpose of this Paragraph the term "employee' shall include any person having such status with regard to Sirius or any of its respective subsidiaries and affiliates at any time during the six (6) months preceding any solicitation in question). If Employee engages in the solicitation of employees prohibited under this paragraph, it will disrupt, damage or impair Sirius' business or the business of its present of future subsidiaries or affiliates, as the case may be, and will necessarily involve the use of Confidential information which Employee acknowledge Employee are prohibited from disclosing.

9. Sparks was hired as a Storage Solutions Sales Specialist in Sirius' Lake Oswego, Oregon office in June 2014. Until his resignation in May 2015, Sparks was responsible for, among other things, interacting with and soliciting customers, both prospective and current, to purchase IT business solutions in the Pacific Northwest.

10. Sirius' business activities are technology sales focused, including, but not limited to, contacting prospective and existing customers, providing proposals/quotations to customers, and maintaining customer relationships. Sirius' business is highly competitive. As a Storage Solutions Sales Specialist, Sparks was privy to confidential and proprietary information belonging to Sirius, including but not limited to, customer information and records (including customer files and network information, internal or customer computer configurations, customer buying needs or habits, customer payment practices or histories, and lists of contact information), pricing and marketing information, vendor lists and vendor pricing, confidential financial data, training and training programs, billing practices, implementation methodologies, marketing plans and strategies, growth strategies, transactional terms and conditions, compensation plans, and discussions regarding competitors and customers.

11.     Sparks was responsible for soliciting customers for Sirius, which included identifying leads, contacting those leads, formulating proposals based on Sirius' confidential pricing methodology, and preparing presentations for Sirius' customers and/or potential customers, as well as serving as the face-to-face contact for such customers for services and solutions purchased.  Sparks was also charged with maintaining Sirius' relationships with existing customers.

12.     In May 2015, Sparks voluntarily resigned from Sirius.  Sparks immediately thereafter accepted a job with Nordisk Systems, Inc., which is also located in the Portland, Oregon area.

13.     Sirius and Nordisk are direct competitors.  Indeed, Sirius and Nordisk offer many of the same services and storage solutions, and they often bid against each other for the same projects, potential customers, and within the same geographic areas.

14.     As a Storage Solutions Sales Specialist, Sparks was given sensitive, confidential information from the outset of his employment regarding the way Sirius conducts its business, including but not limited to, Sirius' compilation of financial information, Sirius' compilation of customer and sales information, Sirius' process of valuing, pricing, and/or formulating a proposal for a project, including what contract terms are offered to what customers, Sirius' proprietary software, Sirius' training procedures for sales personnel, and the compilation of information Sirius uses to value itself and/or other companies for potential mergers and acquisitions.  Sparks was also privy to the manner in which Sirius formulates bids for projects, compensates its employees, markets and structures its organization, manages its customer relationships.  Furthermore, Sirius was made aware of Sirius' pricing, client preferences and/or proposal history, marketing strategies, employee information, records, accounts, business

methods, and overall business model. All of this foregoing information is confidential, proprietary, and vital to Sirius' business interests. It would provide a significant and substantial advantage for a competitor, such as Nordisk, to have or gain access to this confidential, proprietary information.

15. The integrity and enforcement of the protection of confidential information and customer relationships as well as the non-solicitation clauses contained in the Agreement with Sparks is of utmost importance to Sirius' business interests. Sirius would not have put Sparks in a position of trust and confidence, provided him with such confidential, proprietary data, or paid him a premium commission rate, but for the express written promise and assurance he would not disclose confidential information or solicit customers and employees of Sirius for a period of one year after leaving the employ of Sirius.

16. In now working for Nordisk, Sparks has been working on and will likely continue to work on the same types of projects he did for Sirius. Sparks thus will be in a position to use Sirius' confidential and proprietary information in a manner that benefits Nordisk (and to the detriment of Sirius), both with respect to client development and competitive proposals as well as through other job duties. Moreover, because his acceptance of a position with Nordisk effectively puts confidential and proprietary information at the disposal of a competitor, this puts Sirius at imminent risk of significant and irreparable harm.

17. Sirius has learned recently that Sparks, both prior to and since his resignation of employment, solicited customers of Sirius in direct violation of his Agreement. To date, at least one client, Marion County, has switched some services from Sirius to Nordisk. Furthermore, several Sirius employees were solicited by Sparks to join Nordisk, and upon information and belief, at least two have left employment with Sirius and begun work with Nordisk to date.

# VI.
## CLAIMS

**Count One: Breach of Contract**

18.    Sirius hereby incorporates by reference the allegations contained in paragraphs through 17 above.

19.    Ancillary to and as a condition of his employment, Sparks agreed and promised, among other things, not to solicit Sirius' customers and employees.

20.    The express purpose of the non-solicitation covenants within his Agreement with Sirius was (and is) to protect Sirius' considerable investment in the business goodwill of its customers and employees and its acquisition of trade secrets and/or confidential and proprietary information. In consideration for the above promises and obligations, Sirius gave Sparks confidential trade secrets and proprietary information belonging to Sirius and paid him a premium commission rate.

21.    In soliciting customers of Sirius with whom he worked while at Sirius, Sparks has blatantly breached and may continue to breach the terms of his Agreement. Prior to his resignation, Sparks had access to a pending proposal made to a Sirius customer, Marion County, and, on information and belief, he used Sirius' confidential and proprietary information to model a competitive bid for Nordisk. Nordisk ultimately was awarded the contract based on Sparks' unlawful use of Sirius' confidential and propriety information.

22.    Sparks also solicited employees of Sirius in breach of his Agreement with Sirius. Upon information and belief, at least two employees have left Sirius and gone to work for Nordisk in whole or in part due to Sparks' solicitations.

23.    If Sparks is allowed to continue such solicitations of customers and employees, it is probable he will continue to breach his Agreement with Sirius by, among other things:

a.   misappropriating and misusing Sirius' highly confidential and proprietary information for personal gain or the benefit of his new employer, Nordisk; and/or

b.   violating his contractual and fiduciary obligations of loyalty and confidence in his dealings with Sirius' customers and employees.

24.   Sparks' breaches have caused and will continue to cause Sirius irreparable harm for which there exists no adequate remedy at law. Unless Sparks is enjoined, Sirius will continue to suffer irreparable harm. Moreover, such continuing wrongful conduct will cause Sirius substantial damages in an amount in excess of the minimum jurisdictional limits of the Court.

25.   As a result of the foregoing, Sirius seeks a temporary restraining order, a temporary injunction, a permanent injunction, actual damages, and punitive damages. The Agreement between Sparks and Sirius specifically provides for the injunctive relief sought, and because Sparks' breaches to date have been willful and intentional, Sirius is entitled to recover punitive damages as well. Sirius also seeks damages for any lost revenue and business opportunities resulting from Sparks' solicitation of Sirius' customers as well as the recovery of any damages and expenses related to the loss of employees wrongfully solicited by Sparks.

**Count Two: Breach of Fiduciary Duty, Duty of Confidentiality, and Duty of Loyalty**

26.   Sirius hereby incorporates by reference the allegations contained in paragraphs 1 through 25 above.

27.   As an employee of Sirius, and as an express part of his Agreement, Sirius owed fiduciary duties to Sirius, including the duty of loyalty, the duty not to divert business away from Sirius, and the duty to maintain in confidence all confidential and trade secret information. Sparks breached these foregoing duties by Sirius' using confidential information to solicit customers and employees of Sirius.  If Sparks is allowed to continue his solicitations for Nordisk, his own benefit, or for any other competitor, it is probable he will breach these foregoing duties owed to Sirius by, among other things:

a. using and/or disclosing Sirius' pricing, customer lists, proprietary software, proprietary systems, marketing strategies, contract terms, employee information (to include compensation information), records, accounts, business methods, business model, financial data, and technical processes; and

b. soliciting, diverting away, and taking away from Sirius employees and customers.

28. Sparks' breaches have caused and will continue to cause Sirius irreparable harm for which there exists no adequate remedy at law. Unless Sparks is enjoined, Sirius will continue to suffer irreparable harm.

29. In addition to, and/or in the alternative, such wrongful conduct will cause Sirius substantial damages in an amount in excess of the minimum jurisdictional limits of the Court. Moreover, because Sparks' breaches were willful and intentional, Sirius is entitled to recover punitive damages.

30. As a result of the foregoing, Sirius seeks a temporary restraining order, a temporary injunction, a permanent injunction, actual damages, and punitive damages. The Agreement between Sparks and Sirius specifically provides for the injunctive relief sought, and because Sparks' breaches to date have been willful, malicious, and intentional, Sirius is entitled to recover punitive damages as well. Sirius also seeks damages for any lost revenue and business opportunities resulting from Sparks' solicitation of Sirius' customers as well as the recovery of any damages and expenses related to the loss of employees wrongfully solicited by Sparks.

**Count Three:  Tortious Interference With Contractual Relations, Prospective Business Advantage, and Employment Relations**

31. Sirius hereby incorporates by reference the allegations contained in paragraphs 1 through 30 above.

32.     Sparks was aware of Sirius' expectancies and prospective business advantage with respect to its customers and existing employees.   Sparks willfully and intentionally interfered, without privilege, justification, or authorization, with Sirius' existing contractual and ongoing business relationships with its customers as well as with its relationships with existing employees.

33.     Sirius' contractual and prospective business relationships were well known to Sparks, as was the employment relationship Sirius had with its employees.

34.     Sparks' tortious interference has directly and proximately caused Sirius damage in the loss of one customer contract that would have equated to almost $500,000 in revenue and, upon information and belief, the loss of two employees to date to Sparks' current employer, Nordisk.   Unless enjoined, Sparks' continued tortious interference will cause Sirius irreparable harm for which there exists no adequate remedy at law.

35.     Sparks' wrongful conduct to date has caused and will cause Sirius substantial damages in an amount in excess of the minimum jurisdictional limits of the Court.   Moreover, because Sparks' conduct has been willful and intentional, Sirius is entitled to recover punitive damages.

36.     As a result of the foregoing, Sirius seeks a temporary restraining order, a temporary injunction, a permanent injunction, actual damages, and punitive damages.   The Agreement between Sparks and Sirius specifically provides for the injunctive relief sought, and because Sparks' tortious conduct to date has been willful, malicious, and intentional, Sirius is entitled to recover punitive damages as well.   Sirius also seeks damages for any lost revenue and business opportunities resulting from Sparks' tortious behavior with regard to Sirius' customers

as well as the recovery of any damages and expenses related to the loss of employees wrongfully and tortiously solicited by Sparks.

## Count Six: Attorney's Fees

37.     Sirius hereby incorporates by reference the allegations contained in paragraphs 1 through 36 above.

38.     As a result of Sparks' contractual violations, Sirius was required to employ the law firm of Schmoyer Reinhard LLP to initiate this action. Thus, pursuant to section 38.001 of the Texas Civil Practice & Remedies Code, and/or section 15.51 of Texas Business & Commerce Code, Sirius should recover its reasonable and necessary attorney's fees and costs incurred in the prosecution of this matter.

## Count Seven: Temporary Restraining Order, Temporary and Permanent Injunction

39.     Sirius hereby incorporates by reference the allegations contained in paragraphs 1 through 38 above.

40.     Unless he is enjoined from doing so, Sparks will continue to breach his Agreement with Sirius and his common law duties to Sirius by, among other things, using Sirius' confidential, proprietary information, and, in all probability, Sparks will continue to solicit and divert away from Sirius its customers and employees.

41.     Based on the foregoing, Sirius has shown a probable right to recovery.   In addition, Sirius has no adequate remedy at law. Unless Sparks is enjoined, Sirius will suffer and continue to suffer clear, immediate, and irreparable injury as a result of the (1) misappropriation and/or conversion of Sirius' trade secrets referenced above and confidential, proprietary information; and (2) solicitation of Sirius' customers and employees.

42.     Sirius has suffered and will continue to suffer irreparable harm from Sparks' conduct.  More specifically, as a direct and proximate cause of Sparks' conduct, Sirius has lost

its investment in Sparks and will continue to lose its investments in employees, the goodwill of its customers, and trade secrets and/or proprietary information it holds confidential.

43. The harm and loss will occur and continue unless this Court restrains and ultimately permanently enjoins Sparks' conduct. Sirius is therefore entitled to a temporary restraining order, a temporary injunction, and permanent injunctive relief enjoining Sparks from taking any action inconsistent with the duties and other obligations owed to Sirius and under the common law.

44. Injunctive relief is authorized pursuant to section 15.51(a) of Texas Business & Commerce Code and/or section 65.011 of Texas Civil Practice & Remedies Code.

45. Sirius requests the Court issue a temporary restraining order and then a temporary injunction against Sparks after a hearing, thereafter to be made permanent after a trial on the merits.

46. Sirius is willing to post bond in an amount the Court finds reasonable.

## VII.
## REQUEST FOR EXPEDITED DISCOVERY & PRESERVATION ORDER

47. Sirius hereby incorporates by reference the allegations contained in paragraphs 1 through 46 above.

48. Given the nature of the foregoing claims and the expediency of the matter, Sirius requests the Court enter an Expedited Discovery and Preservation Order. An Expedited Discovery and Preservation Order is necessary to determine the full extent of Sirius' irreparable harm and to promote the mitigation of damages.

49. Sirius has suffered and will continue to suffer irreparable harm from Sparks' solicitation (both in the past and currently) of Sirius' customers and employees, but the full extent of the irreparable harm is unknown. As a result, Sirius needs limited discovery on what

documents and/or information Sparks downloaded, copied, or otherwise retained to ensure it is not distributed in further violation of Sparks' Agreement with Sirius. Sirius also needs limited discovery on his communications with other employees and customers of Sirius both before and since leaving Sirius in May 2014.

50.     Sirius thus asks the Court to enter an order allowing it to: (1) issue requests for production requiring Sparks to respond within three days of service; and (2) obtain a Rule 196 inspection of Sparks' personal computer hard drives, flash and/or jump drives, email accounts, and cell phone within three days of service.

51.     Sirius' requested discovery is narrowly tailored and asks Sparks to respond to a reasonable number of documents requests regarding information readily accessible to him.

52.     Sirius also requests the Court issue a preservation order that would require Sparks to preserve and hold the following:

1) All documents or other tangible things, in paper or electronic form, taken by Sparks from Sirius' premises, including any forms or templates, customer lists, employee lists, proposal drafts, contact information, or any other information described as confidential in the Agreement between Sirius and Sparks;

2) All documents or other tangible things, in paper or electronic form, that refer, relate, or were sent to, or received by, Sirius or Sirius' customers or employees, including any correspondence regardless of form (email, text, etc.);

3) All documents or other tangible things, in paper or electronic form, that came from, once belong to, or were copied from Sirius, or were printed off a Sirius computer or electronic system, or downloaded or transferred to a disk, flash drive, jump drive, or another computer or electronic storage option of any type from a Sirius computer or electronic system, including any computer or system using Sirius-related passwords;

4) All documents, including print outs of all emails sent to or received by Sparks relating to Sirius, including any emails containing information about customers or employees of Sirius or being by, between or about, any customers or employees of Sirius.

5) All computer disks, CDs, DVDs, jump drives, flash drives, key drives, or any other portable electronic devices containing any information that refers or relates to Sirius, its customers, or its employees;

6) Sparks' home and cell phone records since May 1, 2014.

7) Any personal computer owned by Sparks since May 1, 2014.

8) Any personal email account owned or operated by Sparks since May 1, 2014.

## VIII.
## CONDITIONS PRECEDENT

53. All conditions precedent to Sirius' claims for relief have been performed or have occurred.

## IX.
## EXEMPLARY DAMAGES

54. Because Sirius has been injured by Sparks' malicious, willful, and intentional conduct, Sirius is entitled to exemplary damages under Texas Civil Practice & Remedies Code section 41.003(a).

## X.
## EX PARTE RELIEF

55. Sirius does not know whether Sparks is represented by legal counsel. Additionally, there is not enough time to serve notice on Defendant and to hold a hearing on this application for temporary restraining order.

## XI.
## REQUEST FOR RELIEF

58. In light of the foregoing, Sirius requests that judgment be entered in favor of Sirius and against Sparks and that Sirius be granted the following relief pursuant to common law, Texas Business & Commerce Code section 15.50 *et seq.*, and/or section 65.011 of Texas Civil Practice & Remedies Code:

A. A temporary restraining order, followed by a temporary injunction, thereafter to be made permanent, enjoining Defendant Sparks from:

1. For a period of one year form the date of the entry of the injunctive relief, soliciting, diverting, calling upon, or attempting to solicit, divert, sell, or provide services to any customer or client or prospective customer or client of Sirius who was a customer or client or a prospective customer or client of Sirius within the two years prior to Sparks' separation of employment from Sirius and with whom Sparks had business and direct personal contact as an employee of Sirius.

2. Disclosing, using, or misappropriating any trade secrets or confidential, proprietary information of Sirius, including but not limited to, customer information and records (including customer files and network information, internal or customer computer configurations, customer buying needs or habits, customer payment practices or histories, lists of contact information), pricing and marketing information, vendor lists and vendor pricing and cost costing; confidential financial data, training and training programs, billing practices, implementation methodologies, marketing plans and strategies, growth strategies, transactional terms and conditions, compensation plans, and discussions regarding competitors;

3. Using or retaining any copies, including but not limited to electronic copies, of Sirius' confidential data, computer programs, records, customer lists, price lists, marketing programs, customer contracts, customer preferences, proposal history, managerial training manuals and materials, contract terms, forms, employee information, accounts, financial data, or any other confidential or proprietary information and trade secrets belonging to Sirius; and/or

5. Directly or indirectly hiring, soliciting, or otherwise causing any employee of Sirius to terminate his or her employment with Sirius for a period of one year from the date of entry of an order for injunctive relief.

B. An Order granting expedited discovery;

C. A Preservation Order;

D. Judgment against Sparks for actual damages, including lost revenue and business opportunities and losses and expenses related to employees who resigned due to his improper solicitation.

E. Pre-judgment and post-judgment interest.

F. Judgment against Sparks for attorney's fees, court costs, and punitive and/or exemplary damages.

G. Such other and further relief as to which Sirius may be entitled.

Respectfully submitted,

SCHMOYER REINHARD LLP
17806 IH 10 West, Suite 400
San Antonio, Texas 78257
Telephone:    210/447-8033
Facsimile:    210/447-8036

_Annalyn G. Smith_
Annalyn G. Smith
State Bar No. 18532500
asmith@sr-llp.com
Christine E. Reinhard
State Bar No. 24013389
creinhard@sr-llp.com

**ATTORNEYS FOR PLAINTIFF
SIRIUS COMPUTER SOLUTIONS, INC.**


## EX PARTE CERTIFICATION

Pursuant to Bexar County Civil District Court Rule 6(C), Plaintiff's counsel certifies that, to the best of our knowledge, the Defendant is not represented by counsel. Further, it is Plaintiff's counsel belief that notifying the Defendant would cause irreparable harm to the movant.

_Annalyn G. Smith_
Annalyn G. Smith
Christine E. Reinhard

## VERIFICATION

STATE OF OREGON       §
~~COUNTY OF~~ WASHINGTON §
COUNTY OF ~~MULTNOMAH~~ §

Before me, the undersigned notary, on this day personally appeared Brian Pixton, the

Affiant, a person whose identity is known to me and who is a Director and General Manager for

Sirius Computer Solutions, Inc., and who is located in the Lake Oswego, Oregon offices of

Sirius Computer Solutions, Inc. After I administered an oath to Affiant, Affiant testified:

> My name is Brian Pixton. I am capable of making this verification. I have read
> the foregoing Plaintiff's Original Verified Petition and Application for Injunctive
> Relief. The facts stated in the "Background Facts" Section V, paragraphs 7
> through 17, are within my personal knowledge and are true and correct.

SIRIUS COMPUTER SOLUTIONS, INC.

By: Brian Pixton
Director of Sales and General Manager

SWORN TO AND SUBSCRIBED TO on this __6__ day of __August__, 2015, to

certify which witness my hand and seal of office.

Notary Public, State of Oregon

OFFICIAL SEAL
MARK S GERSTNER
NOTARY PUBLIC-OREGON
COMMISSION NO. 475666
MY COMMISSION EXPIRES FEBRUARY 12, 2017

# EXHIBIT A

## ATTACHMENT A

### CONFIDENTIALITY, PROTECTION OF CUSTOMER RELATIONSHIPS AND NON-SOLICITATION AGREEMENT

In consideration for Sirius paying Employee at the premium commission rate pursuant to the Master Sirius Incentive Compensation Plan, as amended from time to time (the "Plan"), Sirius and Employee agree to enter into this Confidentiality, Protection of Customer Relationships and Non-Solicitation Agreement (the "Agreement") and hereby agree as follows:

**1. Confidentiality.** The Employee will be provided Sirius' Confidential Information during the course of Employee's employment. Employee agrees that without the use of Sirius' Confidential Information, Employee will not be able to perform Employee's job duties. In order to avoid any inadvertent or other disclosure of Sirius' Confidential Information, Employee agrees that when Employee's employment with Sirius ends or whenever requested by Sirius, Employee will immediately return any and all Confidential Information of Sirius' in Employee's possession or control, irrespective of the form in which the information is held or maintained.

Specifically, Employee understands that Employee will become knowledgeable of Sirius' Confidential Information through a variety of ways including, without limitation, the training Employee receive (in house or third party), licenses obtained, exposure to Sirius' customers, business practices, and the methodology and process by which it generates sales and leads for new sales. Additionally, Employee agrees to keep secret all Confidential Information of Sirius, and not to disclose this information to anyone outside of Sirius including, without limitation, disclosing this information to any customer, account, vendor, or competitor. Employee will only use Employee's knowledge of Sirius' Confidential Information in the ordinary course of Employee's job duties and Employee will not disclose this information to anyone internally who does not have a need to know, nor will Employee disclose it to any person after Employee's employment ends.

For purposes of this Agreement "Confidential Information" includes, but is not limited to, the following types of information owned by Sirius or its respective subsidiaries, affiliates or successors: customer lists, lists of individual names, post office and e-mail addresses, telephone and telecopy numbers, and other pertinent contact information relating to customers or potential customers; customer files and network information; internal or customer computer configurations; customer buying needs or habits; customer payment practices or histories; lists of contact information; vendor lists and vendor pricing and cost information; implementation methodologies; marketing plans and strategies; transactional terms and conditions; equipment costing; internal financial information; training and training programs; billing practices; compensation plans; plans for future developments; and any information of any kind that is not known generally within Sirius' industry, or any other internal Sirius documentation that is a trade secret, proprietary or confidential.

Employee understands that the information is confidential whether it is on a hardcopy, computer database or other electronic format and even if it is not expressly identified as confidential by Sirius. If Employee has any doubt regarding whether the information is Confidential Information, Employee shall not disclose it. Employee agrees that Employee will disclose Employee's obligations under this Agreement to any future or prospective employers and authorize Sirius to take such action if it deems it necessary.

**2. Protection of Customer Relationships.** For purposes of this paragraph, "Sirius' customers" shall include every person, business or other entity which, during Employee's last 24 months of employment at Sirius, either purchased or committed to purchase any service or product from Sirius or its respective subsidiaries, affiliates or successors, and with whom Employee did business and had direct personal contact as an employee of Sirius. For a period of one (1) year after ceasing to be employed by Sirius, regardless of whether Employee's employment ends voluntarily or involuntarily, Employee shall not, directly or indirectly, as an employee or independent contractor, alone or in association with, on behalf of, or for the benefit of any third party, provide or solicit to provide any service or product to any of Sirius' customers, which service or product is similar to or competitive with any service or product offered by Sirius, or the provision of which could adversely affect Sirius' business relationship with such customer. After Employee's employment with Sirius ceases, to the extent Employee is uncertain as to whether Employee may be violating this paragraph, Employee shall identify in writing to Sirius any person, business or other entity that Employee intends to solicit and request confirmation from Sirius as to whether that particular person, business or other entity qualifies as a Sirius customer and Sirius will confirm to Employee within seven (7) business days of Employee's request whether the contact is a Sirius customer.



3. **Non-Solicitation of Employees.** During Employee's employment with Sirius, and for a period of one (1) year thereafter, Employee will not directly or indirectly contact for the purpose of soliciting employment, solicit, employ or otherwise engage any of the employees of Sirius or any of its respective subsidiaries, affiliates or successors to leave his or her employment to work for any business, individual, company, firm, corporation, or other entity then in competition with the business of Sirius or any subsidiary, affiliate or successor of Sirius (for the purpose of this Paragraph the term "employee" shall include any persons having such status with regard to Sirius or any of its respective subsidiaries and affiliates at any time during the six (6) months preceding any solicitation in question). If Employee engages in the solicitation of employees prohibited under this paragraph, it will disrupt, damage or impair Sirius' business or the business of its present or future subsidiaries or affiliates, as the case may be, and will necessarily involve the use of Confidential Information which Employee acknowledge Employee are prohibited from disclosing.

4. **Remedies.** A breach of this Agreement shall give rise to irreparable injury to Sirius which cannot be adequately measured. Accordingly Sirius may seek and obtain injunctive relief against any breach or threatened breach of this Agreement, in addition to any other legal or equitable remedies which may be available. In the event a court should decline to enforce any provision of this Agreement, this Agreement shall be deemed to be modified to restrict Employee's activities to the maximum extent which the court shall find enforceable; however, in no event shall the provisions of this Agreement be deemed to be more restrictive than expressly set forth.

5. **Applicable Law and Venue.** Sirius and Employee agree that any dispute arising out of or relating to this Agreement or the Plan which cannot be amicably settled, shall be brought solely and exclusively in a court sitting in San Antonio, Bexar County, Texas, and Employee irrevocably accepts the jurisdiction of the federal and state courts of the State of Texas for such disputes. The Plan and the Agreement were entered into and are performable in San Antonio, Bexar County, Texas. The parties further covenant and agree that sole and exclusive venue for any such court proceeding shall be in a court sitting in San Antonio, Bexar County, Texas.

6. **Tolling.** The running of the time period under paragraphs 2 and 3 of this Agreement shall be tolled during any time Employee is in violation of the restrictions under either paragraph and that time of violation shall be added to the end of the one (1) year period once the violation(s) cease.

7. **Notice.** Any notice to Sirius required under this Agreement shall be sent in writing via overnight mail with signature required, to the attention of the Vice President of Human Resources, at the current address of Sirius' Headquarters. If notice to Employee is required under this Agreement or the Plan, it will be provided either through Employee's Sirius email address or Employee's last known mailing address provided by Employee to the Human Resources Department. A different notice procedure may be agreed upon by and between the Vice President of Human Resources and Employee, which change shall not take effect until both Sirius and Employee agree in writing to a different notice procedure.

Effective this _____ day of _____, 2014.


_____

Jason Sparks


_____

Terry V. Johnson
Chief Financial Officer


3809921.5



3. Non-Solicitation of Employees. During Employee's employment with Sirius, and for a period of one (1) year thereafter, Employee will not directly or indirectly contact for the purpose of soliciting employment, solicit, employ or otherwise engage any of the employees of Sirius or any of its respective subsidiaries, affiliates or successors to leave his or her employment to work for any business, individual, company, firm, corporation, or other entity then in competition with the business of Sirius or any subsidiary, affiliate or successor of Sirius (for the purpose of this Paragraph the term "employee" shall include any persons having such status with regard to Sirius or any of its respective subsidiaries and affiliates at any time during the six (6) months preceding any solicitation in question). If Employee engages in the solicitation of employees prohibited under this paragraph, it will disrupt, damage or impair Sirius' business or the business of its present or future subsidiaries or affiliates, as the case may be, and will necessarily involve the use of Confidential Information which Employee acknowledge Employee are prohibited from disclosing.

4. Remedies. A breach of this Agreement shall give rise to irreparable injury to Sirius which cannot be adequately measured. Accordingly Sirius may seek and obtain injunctive relief against any breach or threatened breach of this Agreement, in addition to any other legal or equitable remedies which may be available. In the event a court should decline to enforce any provision of this Agreement, this Agreement shall be deemed to be modified to restrict Employee's activities to the maximum extent which the court shall find enforceable; however, in no event shall the provisions of this Agreement be deemed to be more restrictive than expressly set forth.

5. Applicable Law and Venue. Sirius and Employee agree that any dispute arising out of or relating to this Agreement or the Plan which cannot be amicably settled, shall be brought solely and exclusively in a court sitting in San Antonio, Bexar County, Texas, and Employee irrevocably accepts the jurisdiction of the federal and state courts of the State of Texas for such disputes. The Plan and the Agreement were entered into and are performable in San Antonio, Bexar County, Texas. The parties further covenant and agree that sole and exclusive venue for any such court proceeding shall be in a court sitting in San Antonio, Bexar County, Texas.

6. Tolling. The running of the time period under paragraphs 2 and 3 of this Agreement shall be tolled during any time Employee is in violation of the restrictions under either paragraph and that time of violation shall be added to the end of the one (1) year period once the violation(s) cease.

7. Notice. Any notice to Sirius required under this Agreement shall be sent in writing via overnight mail with signature required, to the attention of the Vice President of Human Resources, at the current address of Sirius' Headquarters. If notice to Employee is required under this Agreement or the Plan, it will be provided either through Employee's Sirius email address or Employee's last known mailing address provided by Employee to the Human Resources Department. A different notice procedure may be agreed upon by and between the Vice President of Human Resources and Employee, which change shall not take effect until both Sirius and Employee agree in writing to a different notice procedure.

Effective this 17th day of June, 2014.

_____
Jason Sparks

_____
Terry V. Johnson
Chief Financial Officer

08/089215



CAUSE NO. 2015CI12832

| | | |
|---|---|---|
| SIRIUS COMPUTER SOLUTIONS, INC. | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| V. | § | 438TH JUDICIAL DISTRICT |
| | § | |
| JASON SPARKS, | § | |
| | § | |
| *Defendant.* | § | BEXAR COUNTY, TEXAS |

## ORDER ON PLAINTIFF'S REQUEST FOR
## EXPEDITED DISCOVERY AND PRESERVATION ORDER

After considering Plaintiff Sirius Computer Solutions, Inc.'s ("Sirius") Request for Expedited Discovery and Preservation Order, the Court finds that Plaintiff's request should be GRANTED. It is accordingly,

ORDERED that

1) Sirius may issue requests for production requiring Defendant to respond within three days of service; and

2) Sirius may obtain a Rule 196 inspection of Defendant's personal computer hard drives, flash and/or jump drives, email accounts, and personal cell phone within three days of service of a request.

IT IS FURTHER ORDERED that Defendant must preserve and hold the following:

1) All documents or other tangible things, in paper or electronic form, taken by Sparks from Sirius' premises, including any forms or templates, customer lists, employee lists, proposal drafts, contact information, or any other information described as confidential in the Agreement between Sirius and Sparks;

2) All documents or other tangible things, in paper or electronic form, that refer, relate, or were sent to, or received by, Sirius or Sirius' customers or employees, including any correspondence regardless of form (email, text, etc.);

3) All documents or other tangible things, in paper or electronic form, that came from, once belong to, or were copied from Sirius, or were printed off a Sirius computer or electronic system, or downloaded or transferred to a disk, flash

drive, jump drive, or another computer or electronic storage option of any type from a Sirius computer or electronic system, including any computer or system using Sirius-related passwords;

4) All documents, including print outs of all emails sent to or received by Sparks relating to Sirius, including any emails containing information about customers or employees of Sirius or being by, between or about, any customers or employees of Sirius.

5) All computer disks, CDs, DVDs, jump drives, flash drives, key drives, or any other portable electronic devices containing any information that refers or relates to Sirius, its customers, or its employees;

6) Sparks' home and cell phone records since May 1, 2014.

7) Any personal computer owned by Sparks since May 1, 2014.

8) Any personal email account owned or operated by Sparks since May 1, 2014.

It is FURTHER ORDERED, that due to the exigency of the circumstances, this Order be served on Defendant by hand delivery or electronic mail as soon as practicable.

SIGNED and ENTERED on August 6, 2015.

Judge Peter Sakai<br>
225th District Court<br>
Bexar County, Texas

JUDGE PRESIDING

Entry Requested By:

SCHMOYER REINHARD LLP
17806 IH 10 West, Suite 400
San Antonio, Texas 78257
Telephone: 210/447-8033
Facsimile: 210/447-8036

Annalyn G. Smith
State Bar No. 18532500
asmith@sr-llp.com
Christine E. Reinhard
State Bar No. 24013389
creinhard@sr-llp.com

**ATTORNEYS FOR PLAINTIFF**
**SIRIUS COMPUTER SOLUTIONS, INC.**

2

EXHIBIT "II-2"

GUARANTY OF LEASE AGREEMENT BY AND BETWEEN
The Point Shopping Center, LP AS LANDLORD AND Rose McLaughlin, AS TENANT

Alfred W. Rhode ("GUARANTOR") whose address is _H 5℃ 3 Nhu Mills_ _H 3 20    San Antonio_ San Antonio, TX as material inducement to and in consideration of The Point Shopping Center, LP entering into a written Lease Agreement (the "Lease") and First Lease Amendment with Rose McLaughlin ("Tenant"), unconditionally guarantees and promises to and for the benefit of Landlord that Tenant shall perform the provisions and covenants of the Lease and First Lease Amendment that Tenant is to perform.

If Guarantor is more than one person, Guarantor's obligations are joint and several and are independent of Tenant's obligations under the Lease. A separate action may be brought or prosecuted against any Guarantor whether the action is brought or prosecuted against any other Guarantor or Tenant, or all, or whether any other Guarantor or Tenant, or all, are joined in the action.

Guarantor waives the benefit of any statute of limitations affecting Guarantor's liability under this Guaranty.

The provisions of the Lease may be changed by Agreement between Landlord and Tenant at any time, or by course of conduct, without the consent of or without the consent of or without notice to Guarantor. This Guaranty shall guarantee the performance of the Lease as changed. Assignment of the Lease (as permitted by the Lease) shall not affect this Guaranty.

This Guaranty shall not be affected by Landlord's delay or failure to enforce any of its rights under the Lease or this Guaranty.

If Tenant defaults under the Lease, Landlord can proceed immediately against Guarantor or Tenant, or both, or Landlord can enforce against Guarantor, or Tenant, or both any rights that it has under the Lease or pursuant to applicable laws. If the Lease terminates and the Landlord has any rights it can enforce against Tenant after termination, Landlord can enforce those rights against Guarantor without giving previous notice to Tenant or Guarantor, or without making any demand on either or them.

Guarantor waives the right to require Landlord to (1) proceed against Tenant; (2) proceed against or exhaust any security that Landlord holds from Tenant; or (3) pursue any of the remedy in Landlord's power. Guarantor waives any defense by reason of any disability of Tenant, and waives any other defense based on termination of Tenant's liability from any cause. Until all of Tenant's obligations to Landlord under the Lease have been discharged in full, Guarantor has no right of subrogation against Tenant. Guarantor waives its right to participate in any security now or later held by Landlord. Guarantor waives all presentments, demands for performance notices of non-performance, protest, notice of protest, notice of dishonor, and of acceptance of this Guaranty, and waives all notice of existence, creation or incurring of new or additional obligations.

If Landlord disposes of its interest in the Lease, "Landlord", as used in this Guaranty, shall mean Landlord's successor and assigns of the Lease.

If Landlord is required to enforce Guarantor's obligations by legal proceedings, Guarantor shall pay to Landlord all cost and expenses incurred by Landlord in enforcement of this Guaranty Agreement, including, without limitation, reasonable attorney's fees and court costs.

Page 5 of 6 

Guarantor's obligations under this Guaranty Agreement shall be binding upon Guarantor, Guarantor's heirs, executors, successors and assigns.

Tenant's and/or guarantors total reimbursement liability shall not exceed the amount of total rent and expenses due for the remainder of the Lease at the time the Replacement Tenant's lease is signed by both parties.

EXECUTED this _11_ day of _____, 2014

X _____

Name: Alfred W. Rhode

Title: Individual

EXHIBIT "I-1"

GUARANTY OF LEASE AGREEMENT BY AND BETWEEN
The Point Shopping Center, LP AS LANDLORD AND Rose McLaughlin, AS TENANT

Helotes Town Centre, LP ("GUARANTOR") whose address is 11503 NW Military Hwy, #310 San Antonio, TX as material inducement to and in consideration of The Point Shopping Center, LP entering into a written Lease Agreement (the "Lease") and First Lease Amendment with Rose McLaughlin ("Tenant"), unconditionally guarantees and promises to and for the benefit of Landlord that Tenant shall perform the provisions and covenants of the Lease and First Lease Amendment that Tenant is to perform.

If Guarantor is more than one person, Guarantor's obligations are joint and several and are independent of Tenant's obligations under the Lease. A separate action may be brought or prosecuted against any Guarantor whether the action is brought or prosecuted against any other Guarantor or Tenant, or all, or whether any other Guarantor or Tenant, or all, are joined in the action.

Guarantor waives the benefit of any statute of limitations affecting Guarantor's liability under this Guaranty.

The provisions of the Lease may be changed by Agreement between Landlord and Tenant at any time, or by course of conduct, without the consent of or without the consent of or without notice to Guarantor. This Guaranty shall guarantee the performance of the Lease as changed. Assignment of the Lease (as permitted by the Lease) shall not affect this Guaranty.

This Guaranty shall not be affected by Landlord's delay or failure to enforce any of its rights under the Lease or this Guaranty.

If Tenant defaults under the Lease, Landlord can proceed immediately against Guarantor or Tenant, or both, or Landlord can enforce against Guarantor, or Tenant, or both any rights that it has under the Lease or pursuant to applicable laws. If the Lease terminates and the Landlord has any rights it can enforce against Tenant after termination, Landlord can enforce those rights against Guarantor without giving previous notice to Tenant or Guarantor, or without making any demand on either or them.

Guarantor waives the right to require Landlord to (1) proceed against Tenant; (2) proceed against or exhaust any security that Landlord holds from Tenant; or (3) pursue any of the remedy in Landlord's power. Guarantor waives any defense by reason of any disability of Tenant, and waives any other defense based on termination of Tenant's liability from any cause. Until all of Tenant's obligations to Landlord under the Lease have been discharged in full, Guarantor has no right of subrogation against Tenant. Guarantor waives its right to participate in any security now or later held by Landlord. Guarantor waives all presentments, demands for performance notices of non-performance, protest, notice of protest, notice of dishonor, and of acceptance of this Guaranty, and waives all notice of existence, creation or incurring of new or additional obligations.

If Landlord disposes of its interest in the Lease, "Landlord", as used in this Guaranty, shall mean Landlord's successor and assigns of the Lease.

If Landlord is required to enforce Guarantor's obligations by legal proceedings, Guarantor shall pay to Landlord all cost and expenses incurred by Landlord in enforcement of this Guaranty Agreement, including, without limitation, reasonable attorney's fees and court costs.



Guarantor's obligations under this Guaranty Agreement shall be binding upon Guarantor, Guarantor's heirs, executors, successors and assigns.

The undersigned personally represents and warrants that he or she has the authority to execute this Lease Amendment, which binds the company, corporation or partnership to all liabilities, obligations and duties as herein stated.

Tenant's and/or guarantors total reimbursement liability shall not exceed the amount of total rent and expenses due for the remainder of the Lease at the time the Replacement Tenant's lease is signed by both parties.

EXECUTED this _11_ day of _____, 2014

Helotes Town Centre, LP

X _____

Name: _____

Title: _____

## FIRST LEASE AMENDMENT

This First Lease Amendment (the "First Amendment") of that certain Commercial Lease Agreement dated July 7, 2012 (collectively referred to as the "Lease"), for certain real property containing approximately 2,370 square feet located at 6565 Babcock, Suite 23 SAN ANTONIO, TX 78249 (hereinafter referred to as the "Premises"), by and between The Point Shopping Center, LP (the "Landlord") and Rose McLaughlin (the "Tenant").

WHEREAS; Landlord and Tenant desire to further amend the Lease;

NOW, THEREFORE, ITS IS HEREBY AGREED AS FOLLOWS;

1) Landlord grants Tenant permission to close its business at The Point Shopping Center;

2) Tenant will continue to pay monthly rent and its pro-rata share of common area maintenance, property taxes and property insurance directly to Landlord through the end of the Lease, which expires on 8/31/2015;

3) Heloise Centre, Ltd and Alfred W. Rohde III, (the "Guarantors"), are hereby added as guarantors of the Lease pursuant to the terms of Exhibit "G-1" and Exhibit "G-2" attached hereto;

4) Landlord will use its best efforts to secure a tenant for the premises, known as the "Replacement Tenant". Pursuant to Landlord securing a replacement tenant, Tenant agrees to pay Landlord for all leasing expenses related to signing replacement Tenant to a lease agreement. All such reimbursements shall not exceed the prorated rent per the term remaining on Tenant's existing lease." 

Tenant's and/or guarantors total reimbursement liability shall not exceed the amount of total rent and expenses due for the remainder of the Lease at the time the Replacement Tenant's lease is signed by both parties. 

5) Tenant's hereby forfeits its security deposit to Landlord.

The undersigned personally represents and warrants that he or she has the authority to execute this Lease Amendment, which binds the company, corporation or partnership to all liabilities, obligations and duties as herein stated.

All other terms, covenants and conditions of the Lease shall remain in full force and effect. In the event of any conflicts between the terms and conditions of the Lease and the terms and conditions of the Amendment, the terms and conditions of this Amendment shall prevail.

RM

**EXHIBIT**

**1**

LANDLORD:
The Point Shopping Center, LP

By: _Morton Forsham_

Name: MORTON FORSHEAN

Title: _____

Date: _____

TENANT:
Rose McLaughlin

By: _Rose McLaughlin_

Name: ~~Rose~~ Rose McLaughlin

Title: owner

Date: _____

Holetes Town Centre, LP

X _____

Name: Alfred W Roh Ec.

Title: Manager

Guarantor

By: _____

Name: Alfred W Roh Ec.

Title: _____

Date: 4/11/14

# SHOPPING CENTER LEASE

THE STATE OF TEXAS
THE COUNTY OF BEXAR

This lease is entered into as of the _7_ day of _July_, 2012, by and between the
Landlord and Tenant hereinafter named.

## ARTICLE I. 1.1

(a)"Landlord":        THE POINT SHOPPING CENTER, LP

(b)Landlord's Address:  c/o 18585 Sigma, #106, SAN ANTONIO, TX 78258
                        3966 LAS FLORES CANYON RD., MALIBU, CA 90265

(c)"Tenant":          Rose McLaughlin

(d)Tenant's Address:   11823 Broadwood St, San Antonio, TX 78249
                       6565 Babcock, San Antonio, TX 78249

(e)Tenant's trade name: KOOL KIDS RESALE

(f)"Demised Premises": in THE POINT SHOPPING CENTER (herein referred to as the
   "Shopping Center") in the city of San Antonio, Bexar County, Texas, and more fully
   described as 6565 BABCOCK (legal description: NCB 16840 LOT 81 BABCOCK PLAZA)
   a store unit approximately 2,370 square feet in area, said premises being known as SUITE 23 + 22
   and reflected on the attached site plan Exhibit "D".

(g) Lease term:  Commencing

   ☒ on the 1st day of July, 2012;

   The "Commencement Date" shall continue for three (3) years and two (2) month;
   provided that if the Commencement Date is a date other than the first day of a calendar
   month, the lease term shall be extended for said number of years and months in addition
   to the remainder of the calendar month following the Commencement Date. Tenant, at
   the request of the Landlord, shall execute and deliver a short form of lease specifying the
   date of commencement and expiration of the lease term within thirty (30) days after the
   lease term commences, identical to Declaration of Lease Term attached hereto as Exhibit
   "C".

(h) Minimum guaranteed rental:

Months 1 - 2 @ $0 per month, payable in advance.
Months 2-38 @ $2,010.00 per month, payable in advance. Plus pass thru rents (taxes, insurance CAM)

(i) Prepaid amount(s): $0.00 being rental, common area maintenance, tax and insurance charges
   for the month(s) of August 2011 of the Lease term.

(j) 1. Percentage rental rate: _____%
    2. Base gross sales amount: $_____

(k) Estimated Common area maintenance payment: $350.00 per month, payable in advance.

(l) Estimated monthly tax payment: $400.00

(m) Estimated monthly insurance payment: $40.00

(n) Security deposit: $1,656.00 (transferred from Suite 12)

1

Initials: Tenant: RM    Landlord: [signature]

(o) Permitted use: <u>Retail sales of children's clothing, toys and related items and no other use.</u>

1.2 Each of the foregoing definitions and basic provisions shall be construed in conjunction with and limited by the references thereto in the other provisions of this lease.

## ARTICLE II.
## GRANTING CLAUSE

2.1 Landlord hereby demises and leases unto Tenant and Tenant hereby takes from Landlord, for the consideration and upon the terms and conditions herein set forth, the demised premises for the term specified in Article I, Section 1.1, commencing on the date fixed by Article I, Section 1.1.

## ARTICLE III.
## ACCEPTANCE OF PREMISES

3.1 Upon opening the demised premises for business, Tenant shall be deemed to have accepted the same as in full compliance with Landlord's covenants and obligations herein. As a material part of the consideration for this Agreement, Landlord and Tenant agree that Tenant is taking the demised premises "AS IS" with any and all latent and patent defects and that there is no warranty by Landlord that the demised premises are fit for a particular purpose, including any and all covenants and obligations for the performance of the Landlord's Work referenced in Exhibit "A". Tenant acknowledges that it is not relying upon any representation, statement or other assertion with respect to the condition of the demised premises, or of the performance of the Landlord's Work referenced in Exhibit "A", but is relying upon its own examination, or that of Tenant's representative, of the demised premises and the performance of the Landlord's Work referenced in Exhibit "A". Tenant accepts the demised premises, and the performance of the Landlord's Work referenced in Exhibit "A", under the express understanding there are no express or implied warranties regarding the condition of the demised premises, or of the performance of the Landlord's Work referenced in Exhibit "A", and Tenant thereupon waives any and all deviations or deficiencies regarding the demised premises and its condition as well as those of the performance of the Landlord's Work referenced in Exhibit "A."

## ARTICLE IV.
## RENT

4.1 Tenant shall pay to Landlord as minimum rental the sum per month specified in Article I, Section 1.1, payable in advance on the first day of each calendar month throughout the lease term without any right of offset or deduction, whatsoever. On the first rental installment date, Tenant shall also pay the minimum rent due for any portion of the preceding calendar month that may be included in the lease term.

~~4.2 In addition to minimum rental, Tenant shall pay, as percentage rental, that sum by which the percentage specified in Article I, Section 1.1 of gross sales, as gross sales are herein after defined, made in each lease year, shall exceed the Base Gross Sales Amount specified in Article I, Section 1.1, made in such lease year. Percentage rental shall be payable as required by Article V, hereof.~~

~~4.3 The term "gross sales" as used herein shall include the entire amount of the sales price, whether for cash or otherwise, of all sales of merchandise (including gift and merchandise certificates), services, and other receipts whatsoever of all business conducted in or from the demised premises. Each sale upon installment or credit shall be treated as a sale for the full price in the month during which such sale was made, irrespective of the time when Tenant shall receive payment from its customer. No deduction shall be allowed for uncollected or uncollectible account.~~

~~Gross sales shall not include, however, any sums collected and paid for any sales or excise tax imposed by any duly constituted governmental authority where the amount of such tax is separately charged to the customer, nor shall it include the exchanges of merchandise between the stores of Tenant, if any, where such exchanges are made solely for the convenient operation of the business of Tenant and not for the purpose of consummating a sale which has therefore been made at, in, from or upon the demised premises, nor sales of Tenant's fixtures.~~

4.4 All rental due herein shall be paid to Landlord at the address specified in Article I, Section 1.1 hereof or such other address as may be specified by Landlord by notice.

2

Initials: Tenant: _RM_    Landlord: _____



4.5 All rents and assessments are due on the first day of each month, in advance. All moneys that are not received by the Landlord by the fifth (5th) day of each month shall be subject to a late charge in an amount equal to five (5%) percent of such installment; and the failure to pay such amount within ten (10) days after demand thereof shall be in addition to all of Landlord's other rights and remedies herein or at law and shall not be construed as liquidated damages or as limiting Landlord's remedies in any manner.

4.6 If Tenant fails in two consecutive months to make rental payments within ten (10) days after due, Landlord, in order to reduce its administrative costs, may require, by giving written notice to Tenant (and in addition to any late charge or interest accruing pursuant to this Lease, as well as any other rights and remedies accruing pursuant to Article 21 below, or any other provisions of this Lease or at law), that Minimum Guaranteed Rentals are to be paid quarterly in advance instead of monthly and that all future rental payments are to be made on or before the due date by cash, cashier's check, or money order and that the delivery of Tenant's personal or corporate check will no longer constitute a payment of rental as provided in this Lease. Any acceptance of a monthly rental payment or of a personal or corporate check thereafter by Landlord shall not be construed as a subsequent waiver of said rights.

## ARTICLE V.
## SALES REPORTS AND RECORDS

5.1 Within ten (10) days after the expiration of each calendar month of each year, the Tenant shall prepare and deliver to Landlord, at the place where rent is payable, a statement of gross sales made during such calendar month (or partial calendar month).

5.2 Within sixty (60) days after the expiration of each Lease year and within sixty (60) days after the termination of this Lease, if this Lease should not terminate at the end of a Lease year, Tenant shall prepare and deliver to Landlord, at the place where the rent is then payable, a consolidated statement of all reports (as prepared in Section 5.1 above) of gross sales made during such Lease year (or partial Lease year) preceding the due date of such statement, certified to be correct by an independent certified public accountant, together with percentage rent payment due if any.

5.3 Tenant shall keep in the demised premises a permanent accurate set of books and record of all sales of merchandise and revenues derived from business conducted in the demised premises or at such other location as theretofore specified by written notice.

5.4 In the event Landlord is dissatisfied with the statement of gross sales as submitted by Tenant, Landlord shall have the right to have a certified public accountant make a special audit of all books and records, wherever located, pertaining to sales made in or from the demised premises. If such statements are found to be incorrect to an extent of more than three (3%) percent over the figures submitted by Tenant, Tenant shall pay for such special audit; otherwise, the cost of such audit shall be paid by Landlord. Tenant shall promptly pay to Landlord any deficiency as the case may be, which is established by such audit.

## ARTICLE VI.
## COMMON AREAS

6.1 The term "Common Area" is defined for all purposes of this Lease as that part of the Shopping Center intended for the common use of all tenants, including among other facilities (as such may be applicable to the Shopping Center) parking area, private streets and alleys, landscaping, curbs, loading area, sidewalks, malls and promenades (enclosed or otherwise), lighting facilities, drinking fountains, meeting rooms, public toilets, and the like but excluding space in buildings (now or hereafter existing) designed for rental for commercial purposes, as the same may exist from time to time, and further excluding streets and alleys maintained by a public authority. Landlord reserves the right to change from time to time the dimensions and location of the Common Area, as well as the dimensions, identity and type of any buildings in the Shopping Center. Tenant shall not solicit business within the Common Area or take any action which would interfere with the rights of other persons to use the Common Area. Landlord may temporarily close any part of the Common Area for such periods of time as may be necessary to make repairs or alterations or to prevent the public from obtaining prescriptive rights.

6.2 Landlord shall be responsible for the operation, management, and maintenance of the Common Area, the manner of maintenance and the expenditures therefore to be in the sole discretion of Landlord.

6.3 Tenant agrees to pay as additional rental, upon demand, a proportionate share of all Common

3

Initials: Tenant: _RM_   Landlord: _____

Area Maintenance cost paid by Landlord but not less than four dollars and ninety cents ($4.90) per annum, computed on the ratio that the total floor area of the demised premises bears to the gross leasable area included on Landlord's Tract (it being agreed that no part of common area shall be included in the gross leasable area). Within ten (10) days from Tenant's receipt from Landlord of a statement of the actual Common Area Maintenance costs for such lease year, Tenant shall pay to Landlord the amount of the excess, if any, between Tenant's actual Pro Rata shares of Common Area Maintenance costs over the estimated amount theretofore paid by Tenant for such period. If Tenant's actual Pro Rata share of Common Area Maintenance costs for any lease year during the Lease Term is less than the estimated amount theretofore paid by Tenant for such year, such excess amount paid by Tenant shall (i) be credited against the next maturing installments due from Tenant to Landlord for Tenant's actual Pro Rata share of Common Area Maintenance costs, or (ii) if paid for the last year of the Lease term, be refunded by Landlord to Tenant upon termination of Lease.

6.4 Landlord may from time to time adjust the estimated monthly Common Area Maintenance payment as stated in Article I, Section 1.1 to more accurately reflect the actual Common Area Maintenance costs incurred by Landlord.

6.5 As used in this lease, the term "Common Area maintenance costs" shall mean the total of all items of expense relating to operating, managing, equipping, policing and protecting (if Landlord so elects), lighting, repairing, replacing and maintaining the utility of the common facilities in the same condition as when originally installed (normal wear and tear excepted and excluding items of a capital nature). Such costs and expense shall include, but not be limited to, removal of rubbish, dirt and debris; costs of planting, replanting, and replacing flowers and landscaping, and supplies required therefore, costs of seasonal and permanent decorating, costs of painting and striping the parking lot and curbing, and all costs of utilities used in connection therewith, including, but not limited to, all costs of maintaining speed ramps (if any), lighting facilities, and storm drainage systems; the costs of heating and cooling the enclosed malls (if any), and all premiums for liability, property damage, and Worker's Compensation insurance; wages, unemployment taxes, social security taxes, and personal property taxes; fees for required licenses and permits together with an administrative fee for Landlord equal to five percent (5%) of the total gross income received during the calendar year.

## ARTICLE VII.
## USE AND CARE OF PREMISES

7.1 The demised premises may be used and occupied only for the purpose or purposes specified in Article I, Section 1.1 and for no other purpose or purposes without the prior written consent of Landlord. Tenant shall not at any time leave the premises vacant, but shall in good faith continuously throughout the term of this lease conduct and carry on in the entire demised premises the type of business for which the demised premises are leased and will keep open and do business in and on the Demised Premises during customary business hours established by Lessor.

7.2 Tenant shall not conduct within the demised premises any fire auction or bankruptcy sale. Tenant shall not permit any objectionable or unpleasant odors to emanate from the premises; nor place or permit any radio, television, loud speaker or amplifier or sign or devices emitting flashing lights or odors on the roof or outside the demised premises or where the same can be heard, seen or smelled from outside the building; nor place any antenna, awning or other projection on the exterior of the demised premises.

7.3 Tenant shall not, without the Landlord's prior written consent, keep anything within the premises nor use the premises for any purposes which increases the insurance premium cost or invalidates any insurance policy carried on the demised premises or other parts of the Shopping Center. If the Landlord should consent to such use and occupancy by Tenant, Tenant shall pay on demand, as additional rent, the additional insurance premiums resulting from such use and occupancy. All property kept or stored or maintained within the premises by Tenant shall be at Tenant's sole risk.

## ARTICLE VIII.
## MAINTENANCE AND REPAIR OF PREMISES

8.1 Landlord, at its sole cost and expense, shall keep in good order, condition and repair the entire exterior of the building on the demised premises including the roof, foundation and exterior walls but excluding entrances, window(s) and store front glass and window moldings.

8.2 Tenant shall not abuse the demised premises and shall suffer no waste. Tenant, at its sole cost and expense, shall keep in good order, condition and repair (including replacement) the remainder of the demised premises, including (a) exterior entrances; (b) window(s) and store front glass and window

4

Initials: Tenant: _RM_   Landlord: _____

moldings; (c) all floor coverings, ceilings, interior walls and doors; and (d) fixtures, equipment and appurtenances thereto, including lighting, heating, plumbing fixtures, escalators, elevators and air conditioning systems; and shall keep the demised premises in a neat and clean condition and free from rubbish.

8.3 Tenant shall not make any alterations, additions or improvements to the demised premises without the prior consent of Landlord, except for the work described in Exhibit "B" and the installation of unattached movable trade fixtures which may be installed without drilling, cutting or otherwise defacing the premises. Upon Landlords request and upon the termination of this lease agreement or any extension thereof, any alterations made by tenant, approved or not approved by Landlord, shall be removed by tenant at tenants expense and any resulting damage to the demised premises shall be repaired and placed in its original condition, reasonable wear and tear excepted.

8.4 If there be any conflict between the provisions of the above Sections of this Article VIII and the provisions of Articles XII, XIII, XVI, XX, the provisions of said Articles XII, XIII, XVI, XX shall control.

## ARTICLE IX.
### LANDLORD'S RIGHT OF ACCESS; USE OF ROOF

9.1 Landlord shall have the right to enter upon the Demised Premises at any time for the purpose of inspecting the same, or of making repairs to the Demised Premises, or of making repairs, alterations or additions to adjacent premises, or of showing the demised premises to prospective purchasers, lessees or lenders.

9.2 Use of the roof above the Demised Premises is reserved to Landlord.

## ARTICLE X.
### SIGNS; STORE FRONTS

10.1 Tenant shall not, without Landlord's prior written consent (a) make any changes to the store front or (b) install any exterior lighting decorations, paintings, awnings, canopies or the like or (c) erect or install any signs, window or door lettering, placards, decorations or advertising media of any type which can be viewed from the exterior of the demised premises, excepting only dignified displays of customary type for its display windows. All signs, lettering, placards, decorations and advertising media shall conform in all respects to the sign criteria established by Landlord for the Shopping Center from time to time in the exercise of its sole discretion, and shall be subject to the prior written approval of Landlord as to construction, method of attachment, size, shape, height, lighting, color and general appearance. All signs shall be kept in good condition and in proper operating order at all times.

## ARTICLE XI.
### UTILITIES

11.1 Tenant shall promptly pay all charges and deposits for electricity, water, gas, telephone service, sewage service and other utilities furnished to the demised premises.

## ARTICLE XII.
### INDEMNITY AND PUBLIC LIABILITY INSURANCE

12.1 Tenant shall keep all buildings and Tenant improvements located, or being constructed on, the leased premises insured against loss or damage by fire, with extended coverage endorsement or its equivalent. This insurance shall be carried by insurance companies authorized to transact business in Texas, selected by Tenant and approved by Landlord. The insurance shall be paid for by Tenant and shall be in amounts not less than ninety-five percent (95%) of the fair insurable value of the buildings and other improvements. Such policy or policies of insurance shall name both Landlord and Tenant as a named insured and shall provide that This Lease is made upon the express condition that at all times during the term of this lease, any loss of $5,000.00 or less shall be payable solely to Tenant, which sum Tenant shall use for repair and restoration purposes, and any loss over $5,000.00 shall be made payable jointly to Landlord and Tenant. In addition, all such policies shall contain endorsements providing for 30 days notice of termination or cancellation to the Landlord, and its mortgagee, if any.

Liability Insurance

5

Initials: Tenant: _RM_    Landlord: _____

12.2 Tenant shall, at its own expense, procure and maintain, at all times during the term of this lease, liability insurance for any and all claims for property damage and personal injury. This insurance shall be carried by one or more insurance companies duly authorized to transact business in Texas, selected by Tenant and approved by Landlord, and shall be paid for by Tenant. The insurance provided pursuant to this section shall be in the amount of not less than $1,000,000.00 for property damage and not less than $1,000,000.00 for one person and $2,000,000.00 for one accident for personal injury. This insurance shall protect Landlord and Tenant against liability to any employees or servants of Tenant and to any other person or persons whose property damage or personal injury arises out of or in connection with the occupation, use, or condition of the demised premises. Tenant expressly agrees that Landlord shall be named as a primary co-insured under the policy and that Tenant=s insurance described herein shall be primary. In addition, all such policies shall contain endorsements providing for 30 days notice of termination or cancellation to the Landlord, and its mortgagee, if any.

## Construction Liability Insurance

12.3 Tenant agrees to obtain and maintain (to the extent reasonably procurable) construction liability insurance at all times when demolition, excavation, or construction work is in progress on the demised premises. This insurance shall be carried by insurance companies authorized to transact business in the State of Texas, selected by Tenant and approved by Landlord, and shall be paid for by Tenant. The insurance shall have limits of not less than $1,000,000.00 for property damage and $1,000,000.00 for one person and $2,000,000.00 for one accident for personal injury and shall protect Landlord and Tenant, as well as any other person or persons Tenant may designate, against all liability for injury or damage to any person or property in any way arising out of demolition, excavation, or construction work on the premises. Tenant expressly agrees that Landlord shall be named as a primary co-insured under the policy and that Tenant=s insurance described herein shall be primary. In addition, all such policies shall contain endorsements providing for 30 days notice of termination or cancellation to the Landlord, and its mortgagee, if any.

## Certificates of Insurance

12.4 Tenant shall furnish Landlord with certificates of all insurance evidencing all coverage required by this article. Tenant agrees that if it does not keep this insurance in full force and effect, Landlord may notify Tenant of this failure, and if Tenant does not deliver to Landlord certificates showing all such insurance to be in full force and effect within ten (10) days after this notice, Landlord may, at its option, take out and/or pay the premiums on the insurance needed to fulfill Tenant's obligations under the provisions of this article. Upon demand from Landlord, Tenant shall reimburse Landlord the full amount of any insurance premiums paid by Landlord pursuant to this section, with interest at the rate of eighteen percent (18%) per annum from the date of Landlord's demand until reimbursement by Tenant.

12.5 Fifteen days prior to the expiration of any policy of insurance required under the terms of this Lease, the Tenant shall deliver to Landlord a binder renewing each such policy of insurance which binder shall provide that at lease 30 days written notice of any change in or cancellation of the insurance shall be given by the insurance company to the Landlord and Landlord's mortgagee, if any. The Tenant shall promptly pay the premiums for the renewal of insurance and deliver to the Landlord, or Landlord's mortgagee, the original policy and duplicate receipt evidencing payment thereof.

12.6 All liability, fire and extended coverage insurance and boiler insurance carried either by Landlord or Tenant covering losses arising out of the destruction or damage to the demised premises or its contents or to other portions of the Shopping Center shall provide for a waiver of rights of subrogation against Landlord and Tenant on the part of the insurance carrier.

## INDEMNIFICATION OF LANDLORD

12.7 TENANT AGREES TO DEFEND, INDEMNIFY AND HOLD LANDLORD HARMLESS FROM AND AGAINST ANY CLAIMS OR CAUSES OF ACTION FOR ANY LOSS, DAMAGE, OR INJURY OF ANY KIND OR CHARACTER, TO ANY PERSON, ENTITY OR PROPERTY, ARISING FROM ANY USE OF THE DEMISED PREMISES, OR ANY PART OF THE DEMISED PREMISES, OR CAUSED BY ANY DEFECT IN ANY BUILDING, STRUCTURE, IMPROVEMENT, EQUIPMENT, OR FACILITY ON THE DEMISED PREMISES OR CAUSED BY OR ARISING FROM ANY ACT OR OMISSION OF TENANT, OR ANY OF ITS AGENTS, EMPLOYEES, LICENSEES, OR INVITEES, OR BY OR FROM ANY ACCIDENT, FIRE OR OTHER CASUALTY ON THE LAND OR OCCASIONED BY THE FAILURE OF TENANT TO MAINTAIN THE PREMISES IN A SAFE CONDITION. TENANT/

6

Initials: Tenant: _RM_   Landlord: _____

eminent domain, or by private purchase in lieu thereof, this Lease shall not terminate, however the minimum guaranteed rental (but not percentage or additional rental) payable herein during the unexpired portion of this Lease shall be reduced in proportion to the area taken, effective on the date physical possession is taken by the condemning authority and Landlord shall make all necessary repairs or alterations within the scope of Landlord's original work necessary to make the demised premises an architectural whole.

## ARTICLE XV.

WAIVES ALL CLAIMS AND DEMANDS ON ITS OWN BEHALF AGAINST LANDLORD FOR ANY SUCH LOSS OR DAMAGE OR INJURY. TENANT LIKEWISE AGREES TO DEFEND, INDEMNIFY AND HOLD LANDLORD HARMLESS FROM ALL LIABILITY ARISING FROM THE LANDLORD'S ALLEGED NEGLIGENCE, REGARDLESS OF THE TYPE OF NEGLIGENCE ALLEGED. TENANT'S DUTY OF INDEMNIFICATION TO LANDLORD SHALL COVER ANY CLAIMS OR CAUSES OF ACTION BROUGHT AGAINST LANDLORD, EVEN THOSE ALLEGED TO ARISE FROM THE LANDLORD'S NEGLIGENCE, COMPARATIVE NEGLIGENCE, CONTRIBUTORY NEGLIGENCE, SOLE NEGLIGENCE, JOINT NEGLIGENCE, GROSS NEGLIGENCE OR ANY OTHER ACT OR OMISSION ON THE ON THE PART OF THE LANDLORD.

12.8 Landlord shall carry insurance for fire, extended coverage, vandalism, malicious mischief and other endorsements deemed desirable by Landlord insuring the Shopping Center wherein the demised premises are located, excluding therefrom Tenant's merchandise, trade fixtures, furnishings, personal property and plate glass, in such amounts and with such deductibles as may be deemed desirable by Landlord. Tenant shall carry insurance for amount and with such deductibles as may be deemed desirable by Landlord. Tenant shall carry insurance for fire, extended coverage, vandalism and malicious mischief and other endorsements deemed desirable by Tenant covering the demised premises and items excluded from coverage by the Landlord in the full insurable amount thereof.

12.9 If the cost of maintaining such insurance by Landlord should increased in any year subsequent to the Base Year (as specified in Article I Section 1.1), Tenant agrees to pay as additional rental, upon demand, a proportionate share of such increase, computed on the ratio that the total floor area of the demised premises bears to the gross leasable area included within the Shopping Center.

## ARTICLE XIII.
### DAMAGES BY CASUALTY

13.1 If the demised premises shall be damaged by fire, the elements, unavoidable accident or other casualty, but are not thereby rendered untenantable in whole, or part, Landlord shall at its own expense cause such damage to be repaired, and the rent shall not be abated. If by reason of such occurrence the demised premises shall be rendered untenantable only in part, Landlord shall at its own expense cause the damage to be repaired, and the fixed minimum rent meanwhile shall be abated proportionately as to the portion of the demised premises rendered untenantable. If the demised premises shall be rendered wholly untenantable by reason of such occurrence, the Landlord shall at its own expense cause such damage to be repaired, and the fixed minimum rent shall abate until the demised premises have been restored and rendered tenantable, or Landlord may at its election terminate this Lease and the tenancy hereby created by giving to Tenant within the sixty (60) days following the date of said occurrence, written notice of Landlord's election so to do and, in the event of such termination, rent shall be adjusted as of such date.

13.2 In the event that fifty (50%) percent or more of the rentable area of the Shopping Center shall be damaged or destroyed by fire or other cause, notwithstanding that the demised premises may be unaffected by such fire or other cause, Landlord may terminate this Lease and the tenancy hereby created by giving to Tenant five (5) days prior written notice of Landlord's election so to do, which notice shall be given, if at all, within the sixty (60) days following the date of said occurrence. Rent shall be adjusted as of the date of such termination.

(f) Tenant shall desert or vacate or shall commence to desert or vacate the demised premises or any substantial portion of the demised premises or shall remove or attempt to remove, without the prior written consent of Landlord, all or a substantial value of Tenant's goods, wares, equipment, fixtures, furniture, or other personal property.

(g) Tenant shall do or permit to be done anything which creates a lien upon the premises.

17.2 A Security Deposit specified in Article I, Section 1.1 (n) shall be held by Landlord without interest as security for the performance by Tenant's covenants and obligations under this Lease, it being expressly understood that such deposit is not an advance payment of rental or a measure of Landlord's damages in case of default by Tenant. Upon the occurrence of any event of default by Tenant, Landlord may, from time to time, without prejudice to any other remedy provided by law, use such fund to the extent necessary to make good any arrears of rent and any other damage, injury, expense or liability caused to Landlord by such event of default and Tenant shall pay to Landlord on demand the amount so applied in order to restore the security deposit to its original amount. If Tenant is not then in default herein, any remaining balance of such deposit shall be returned by Landlord to Tenant upon termination of this Lease.

17.3 Upon the occurrence of any such events of default, Landlord shall have the option to pursue the following remedy:

Without any notice or demand whatsoever, Landlord may enforce the performance of this Lease in any manner provided by law. At its option, Landlord may terminate or forfeit the Lease if such default continues for a period of ten (10) days after Tenant receives written notice from Landlord of such default and their intention to declare the Lease forfeited, such notice to be sent by certified United States mail, return receipt requested, to Tenant at the address stated herein. After such ten (10) day period shall have expired, unless Tenant shall have completely removed or cured said default (or unless such default is of such a nature that it is incapable of being remedied within such ten (10) day period, and provided that Tenant diligently prosecutes the remedy of such default until same is completely corrected), this Lease shall cease and come to an end as if it were the day originally fixed herein for the expiration of the term, except that Tenant shall remain liable for all defaults, and Landlord's agent or attorney shall have the right, without further notice or demand, to reenter upon the premises and remove all persons and property therefrom without being guilty of, or liable for, any manner of trespass and without prejudice to any remedy for arrears of rent or breach of covenant; and Landlord's agent or attorney may rent or lease the premises for any rent obtainable for the account of Tenant, and Tenant shall remain liable to Landlord for any deficiency. It is expressly agreed that in the event Tenant shall continue to hold the premises after demand therefore at the termination of this Lease or for default or breach of this Lease, that Landlord shall be entitled to secure a mandatory injunction to recover possession thereof. This remedy, however, shall be cumulative of and not in lieu of any other rights and remedies granted herein or by law. In the event of any default by Tenant herein, Landlord may remedy such default and/or bring suit for damages and Tenant shall reimburse Landlord upon demand for all expenses including, without limitation, attorney's fees in connection therewith, which shall not, in any case, be less than ten (10%) percent of the sum to be recovered.

## ARTICLE XVIII.
### LANDLORD'S CONTRACTUAL SECURITY INTEREST

18.1 Landlord shall have a first lien upon, and security interest in, all of the fixtures, furniture, equipment, stock, goods, merchandise and other property placed on the demised premises during the term of the Lease, to secure the payment of rentals and other sums due herein for the entire term of the Lease. In addition to the remedies granted by law, Landlord shall have and may exercise with respect to said collateral, all of the rights, remedies and powers of a secured party under the Uniform Commercial Code, including, without limitations, the right and power to sell at public or private sale or sales, or otherwise dispose of, lease or utilize, the collateral and any part of parts thereof in any manner authorized or permitted under said code upon default by Tenant. Tenant agrees that Landlord may, at any time during the term of this Lease and without the prior written approval of Tenant, prepare and file a financing statement appropriate for use under the Uniform Commercial Code.

## ARTICLE XIX.
### HOLDING OVER

19.1 In the event Tenant remains in possession of the demised premises after the expiration of this Lease and without the execution of a new lease, it shall be deemed to be occupying said premises as a tenant from month to month at a rental equal to the rental (including any percentage rental) herein

9

Initials: Tenant: _RM_  Landlord: _[signature]_

provided plus fifty (50%) percent of such amount and otherwise subject to all the conditions, provisions and obligations of this Lease insofar as the same are applicable to a month to month tenancy.

## ARTICLE XX.
## SUBORDINATION; ATTORNMENT

**20.1** This Lease is and shall always be subordinate to any mortgage or mortgages which now or shall at any time be placed upon the demised premises or any part thereof, and the Tenant agrees to execute and deliver any instrument, without cost, which may be deemed necessary to further effect the subordination of this Lease to any such mortgage or mortgages. However, this subordination agreement shall be on the express condition that this Lease shall be recognized by the mortgagee and that the Tenant's rights shall remain in full force and effect during the term of this Lease so long as Tenant shall continue to perform all of the covenants and conditions to this Lease.

**20.2** In the event a mortgage or prospective mortgagee should so require, Tenant shall deliver to Landlord, from time to time, for delivery to such mortgagee:

(a) An acknowledgment of the assignment of rentals and other sums due herein to the mortgagee and agreement to be bound thereby.

(b) An agreement requiring Tenant to advise the mortgagee of damage to or destruction of the demised premises by fire or other casualty requiring its reconstruction and/or requiring Tenant to give the mortgagee written notice.

(c) Landlord is hereby irrevocably appointed and authorized as the agent and attorney-in-fact of Lessee to execute and deliver any such written statement on Tenant's behalf if Tenant fails to do so within seven (7) days after the delivery of a written request from Landlord to Tenant Landlord may declare an event of default.

## ARTICLE XXI.
## MERCHANTS ASSOCIATION

**21.1** Tenant agrees that it will join and maintain membership in the merchants association, if any is formed, will pay such dues and assessments as may be fixed and determined from time to time by the association and will comply with such other bylaws, rules and regulations as adopted from time to time by the association.

## ARTICLE XXII.
## NOTICES

**22.1** Whenever any notice is required or permitted herein such notice shall be in writing. Any notice or document required or permitted to be delivered herein shall be deemed to be delivered when actually received by the designated addressee, or, if earlier and regardless of whether actually received or not, when deposited in the United States Mail, postage prepaid, Certified Mail, Return Receipt Requested, addressed to the parties hereto at the respective addresses set out in Article I, Section 1.1 above (or at Landlord's option, to Tenant at the demised premises), or at such other addresses as they have theretofore specified by written notice.

## ARTICLE XXIII.
## REGULATIONS

**23.1** Landlord and Tenant acknowledge that there are in effect federal, state, county and municipal laws, orders, rules, directives and regulations (collectively referred to hereinafter as the "Regulations") and that additional Regulations may hereafter be enacted or go into effect, relating to or affecting the demised premises or the Shopping Center, and concerning the impact on the environment of construction, land use, maintenance and operation of structures, and conduct of business. Subject to the express rights granted to Tenant under the terms of this lease, Tenant will not cause, or permit to be caused, any act or practice, by negligence, omission, or otherwise, that would adversely affect the environment, or do anything to permit anything to be done that would violate any of said laws, regulations or guidelines. Moreover, Tenant shall have no claim against Landlord by reason of any changes Landlord may make in the Shopping Center or the demised premises pursuant to said Regulations or any charges imposed upon customers or other invitees pursuant to same.

10

Initials: Tenant: _RM_    Landlord: _____

## ARTICLE XXIV.
## MISCELLANEOUS

24.1 For the purposes of Article V, Article VI, Article XII, Article XVI, the Lease year shall be defined as the period between January 1st through December 31st, the first Lease year being the partial or full year from Commencement Date through December 31st and the last lease year being the partial or full year from January 1st through the termination Date.

24.2 Nothing herein contained shall be deemed or construed by the parties hereto, nor by any third party, as creating the relationship of principal and agent or of any partnership or of joint venture between the parties hereto, it being understood and agreed that neither the method of computation of rent, nor any other provision contained herein, nor any acts of the parties hereto, shall be deemed to create any relationship between the parties hereto other than the relationship of Landlord and Tenant.

24.3 One or more waivers of any covenant, term or condition of this Lease by either party shall not be construed as a waiver of a subsequent breach of the same covenant, term or condition. The consent or approval by either party to or of any act by the other party requiring such consent or approval shall not be deemed to waive or render unnecessary consent to or approval of any subsequent similar act.

24.4 The laws of the State in which the demised premises are located shall govern the interpretation, validity, performance and enforcement of this Lease. If any provision of this Lease should be held to be invalid or unenforceable, the validity and enforceability of the remaining provisions of this Lease shall not be affected thereby. Venue for any action under this Lease shall be the county in which rentals are due pursuant to Article I, Article IV of this Lease.

24.5 The captions used herein are for convenience only and do not limit or amplify the provisions hereof.

24.6 Whenever herein the singular number is used, the same shall include the plural, and words of any gender shall include each other gender.

24.7 The terms, provisions and covenants contained in this Lease shall apply to, inure to the benefit of and be binding upon the parties hereto and their respective heirs, successors in interest and legal representatives except as otherwise herein expressly provided.

24.8 If the Tenant executing this Lease is a corporation, then the undersigned officer personally represents and warrants that the Board of Directors of such corporation, in a duly held meeting, has extended to said officer the authority to execute this Lease and therefor to bind such corporation to all liabilities, obligations and duties as herein stated.

24.9 In the event of the discovery of the presence of toxic or hazardous substances, or contamination therefrom on the Premises which are found to have been caused by or resulted from acts which occurred after the Commencement Date of this Lease Agreement, and found to have been caused by or resulted from the actions of, or permitted by, Tenant, then Tenant shall be liable for any and all loss, damages, fines, costs expenses, in order to restore the premises to its non-contaminated original condition, causes of action, suits, claims of judgments arising from the presence of toxic or hazardous substances or the contamination therefrom on or about the premises. The Landlord agrees to indemnify and hold harmless the Tenant from and against any liability for hazardous materials that were on the demised premises prior to the commencement date or which was caused by the Landlord, its agents or employees. The covenants set forth in this paragraph shall survive the termination or expiration of this Lease.

24.10 Landlord reserves the right and option, upon at least thirty days written notice to Tenant to relocate Tenant to another location within the Shopping Center of equal or greater square footage as the space leased herein, at the same rental provided herein. If Landlord elects to so relocate Tenant, the new location will be chosen by Landlord in its sole discretion and shall thereafter constitute the premises covered by this lease. In the event of such relocation, Landlord shall pay for all of Tenant's moving costs and for the construction of improvements in the new location comparable to those in Tenants original location. In the event Landlord elects to relocate Tenant as provided above, Tenant shall have the right an option of terminating the lease, which option to terminate must be exercised by written notice to Landlord within fifteen days after Landlord mails its notice of relocation. Such termination of Lease shall take effect on the last day of the month next following the date of Tenant's exercise of its option to terminate. Tenant shall continue to pay rent and other charges under the lease to the effective date of termination.

11

Initials: Tenant: _RM_    Landlord: _____

**24.11** Any controversy or claim arising out of, or relating to this Shopping Center Lease, shall first be mediated prior to the institution of any legal action being instituted in any court. The parties agree that mediation expenses will be shared equally.

**24.12** This Lease contains the entire agreement between the parties, and no agreement shall be effective to change, modify or terminate this Lease in whole or in part unless such is in writing and duly signed by the party against whom enforcement of such change, modification or termination is sought. Landlord and Tenant hereby acknowledge that they are not relying on any representation or promise of the other, or of the Agent, except as may be expressly set forth in this Lease.

**24.13** This Lease consists of <u>Twenty-four</u> articles and <u>six</u> attached pages, including Exhibits "<u>A</u>" through "<u>F</u>" and any space left blank will be deemed to have been completed with the word "none". With the exception of Article III and Article IV, in the event any provision of an exhibit or other attached page(s) shall be inconsistent with a provision in the body of the Lease, the provisions as set forth in the exhibit shall be deemed to control.

**CONSULT YOUR ATTORNEY**

THIS COMMERCIAL LEASE IS INTENDED TO BE A LEGALLY BINDING CONTRACT. THIS FORM IS MERELY BEING FURNISHED TO THE PARTIES FOR SUBMISSION TO THEIR RESPECTIVE ATTORNEYS PRIOR TO ITS EXECUTION AND FOR NO OTHER REASON. YOU SHOULD CONSULT YOUR ATTORNEY BEFORE EXECUTING THIS COMMERCIAL LEASE. NO REPRESENTATION IS BEING MADE AS TO THE LEGAL VALIDITY OR ADEQUACY OF THIS COMMERCIAL LEASE OR ANY PROVISION THEREOF, INCLUDING PRINTED PROVISIONS OR ANY TYPED OR WRITTEN ADDITIONS THERETO. BY EXECUTION HEREOF, THE UNDERSIGNED PARTIES ACKNOWLEDGED THAT THEY HAVE BEEN ADVISED TO CONSULT THEIR OWN ATTORNEYS, AND THE UNDERSIGNED AGREE THAT <u>The Point Shopping Center, LP</u> OR ITS OFFICERS, AGENTS AND EMPLOYEES, SHALL NOT BE LIABLE BY VIRTUE OF THE WORDING OF ANY PROVISION HEREOF OR BY VIRTUE OF THE ABSENCE OF ANY PROVISION NOT CONTAINED IN THIS FORM. IN

**EXECUTED AS OF THE DATE HEREINABOVE STATED.**

Lessor: <u>The Point Shopping Center, LP</u>

By: _____

Address: <u>3966 Las flores Canyon Rd</u>
<u>Malibu, CA 90265</u>

Date: <u>7/11/12</u>

Tenant: <u>Rose McLaughlin</u>

By: _____

Address: <u>6565 Babcock #12 , San Antonio, TX 78249</u>
<u>11823 Broadwood St, San Antonio, TX 78249</u>

Phone: _____

Date: _____

Initials: Tenant: _____ Landlord: _____

# EXHIBIT A"

## Description of Landlord's Work

### Article I.

Without waiver of Article III, section 3.1 of the Lease Agreement, Landlord hereby agrees to perform the following work to the premises:

1) Add hot water heater
2) Cap any open sewer vent
3) Install hot water safety valves
4) Install light switch
5) Repair any outlets that are not working
6) Repair heater.

As a material part of the consideration for this Agreement, Landlord and Tenant agree that Tenant is taking the demised premises "AS IS" with any and all latent and patent defects and that there is no warranty by Landlord that the demised premises are fit for a particular purpose, including any and all covenants and obligations for the performance of the Landlord's Work referenced in Exhibit "A". Tenant acknowledges that it is not relying upon any representation, statement or other assertion with respect to the condition of the demised premises, or of the performance of the Landlord's Work referenced in Exhibit "A", but is relying upon its own examination, or that of Tenant's representative, of the demised premises and the performance of the Landlord's Work referenced in Exhibit "A". Tenant accepts the demised premises, and the performance of the Landlord's Work referenced in Exhibit "A", under the express understanding there are no express or implied warranties regarding the condition of the demised premises, or of the performance of the Landlord's Work referenced in Exhibit "A", and Tenant thereupon waives any and all deviations or deficiencies regarding the demised premises and its condition as well as those of the performance of the Landlord's Work referenced in Exhibit "A."

Initials: Tenant: _RM_    Landlord: _____

# EXHIBIT "B"

## TENANT'S ARCHITECTURAL AND CONSTRUCTION WORK

### Article I.

A.  Tenant shall secure Landlord's written approval of all designs, plans, specifications and contracts for work to be performed by Tenant before beginning the work, and shall secure all necessary licenses and permits to be used in performing the work. Tenant's finished work shall be subject to Landlord's approval and acceptance.

B.  Should Tenant require and Landlord approve any variation in the store front and/or interior finishing of the demised premises, and if such items are a part of Landlord's Work as described on Exhibit "A" of this lease, said variation shall be incorporated in the aforesaid plans to be furnished by Tenant, and Landlord agrees to reimburse Tenant for that part of the cost thereof equal to the cost of those parts of Landlord's Work described on Exhibit "A" of this lease. The amount of said reimbursement shall be determined at the time of Landlord's approval of designs, plans, specifications and contracts, and shall be incorporated within the approval.

C.  Upon Landlords request and upon the termination of this lease agreement or any extension thereof, any alterations made by tenant, approved or not approved by Landlord, shall be removed by tenant at tenants expense and any resulting damage to the demised premises shall be repaired and placed in its original condition, reasonable wear and tear excepted.

### Article II.

A.   Signs:  Tenant shall pay for all signs and the installation thereof, subject to the provisions of Section 10.1 of the lease.

B.   Utilities:  All service deposits shall be made at Tenant's expense.

C.   All work undertaken by Tenant shall be at Tenant's expense, and shall not damage the building or any part thereof. Any roof penetration shall be performed by Landlord's bonded roofer and shall be effected only after Landlord has given consent, which consent shall in part be conditioned upon Tenant's plan to include redwood runners, or similar material acceptable to Landlord, in order to spread the weight of the equipment being installed.

14

Initials: Tenant: _RM_    Landlord: _____

**BUILDING RULES AND REGULATIONS**

1. CONDITION OF PROPERTY: Landlord desires to maintain the comfort and convenience of the Tenant of the Shopping Center. It would be appreciated if any undesirable conditions or lack of courtesy or attention are reported directly to the management.

2. INSTALLATION SERVICES: tenant will refer all contractors, contractors' representatives and installation technicians, rendering any service on or to the Demised Premises for Tenant , Landlord for contractual service. This provision shall apply to all work performed at the Shopping Center including installation of telephones, telegraph equipment, electrical devices and attachments and installations of any nature affecting floors, walls, woodwork, trim, windows, ceilings, equipment or any other physical portion of the Shopping Center.

3. OCCUPATION: No Tenant shall at any time occupy any part of the Shopping Center as sleeping or lodging quarters.

4. HAZARDOUS USE: Tenant shall not place, install or operate on Demised Premises at or in any part of the Shopping Center, any engine, machinery, or conduct mechanical operations or cook thereon or therein, or place or use in about the Demised Premises any explosives, gasoline, kerosene, oil, acids, caustics, or any other inflammable, explosive, or hazardous material without prior written consent of the Landlord.

5. RESPONSIBILITY FOR LOSS: Landlord will not be responsible for lost or stolen personal property, equipment, money or jewelry from Lessee's area or public rooms regardless of whether such loss occurs when area is locked against entry or not.

6. ANIMALS: No birds, fowl, dogs, animals or pets of any kind shall be brought into or kept in or about the Demised Premises.

7. PASS KEYS: Landlord will not permit entrance to tenant's premises by use of pass keys controlled by Landlord to any person at any time without written permission by Tenant, except employees, contractors, or service personnel directly supervised or employed by Landlord, unless necessary for after hours emergency access.

8. OBSTRUCTION OF ENTRIES: None of the storefront entries, passages, or doors shall be blocked or obstructed, or any rubbish, litter, trash, or material of any nature placed, emptied or thrown into these areas, or shall such areas be used at any time except for ingress or egress by Tenant, Tenant's agents, employees or invitees.

9. SIGNS: tenant and its agents, employees and invitees shall observe and comply with any driving and parking signs or markers on the Shopping Center grounds and surrounding areas.

10. SERVICE DELIVERIES: All deliveries of other than hand carried items must be made via the service entrance.

11. OBSTRUCTIONS: No signs, draperies, shutters, window coverings, decorations, hangings or obstructions at any time shall be placed on any skylight or on any doors or windows which are visible from outside the Demised Premises without the prior written consent of the Landlord.

12. TRADE NAME: Tenant will always conduct Tenant's operations in the Demised Premises under Lessee's assumed or trade name, unless Landlord expressly consents to another name in writing.

13. STORAGE: tenant will not use any portion of the Demised Premises for storage or other services except as customary for Tenant's operations in the Demised Premises in accordance with the use provisions of the Lease.

14. WALKWAYS: No person will use any walkway or mall except as a means of egress from or ingress to the commercial area within the Shopping Center, or adjacent public sidewalks. Such use will be in an orderly manner in accordance with directional or other signs or guides installed by Landlord. No walkway or mall shall be used for other than pedestrian travel.

15. COMMON AREAS: No person shall use any utility, truck court, or other Common Area for use in

15

Initials: Tenant: _RM_     Landlord: _____

connection with the conduct of business except for the specific purpose for which permission to use such area is given. The Common Areas are not public ways, but are for the use of the Shopping Center Tenant and the public transacting business with them. Landlord will in all cases retain the right to control access to the Common Areas by all persons whose presence, in the judgment of Landlord, would be injurious to the safety, character, reputation, and interests of the Shopping Center; however, such access will be permitted to persons with whom any Tenant normally deals in the ordinary course of its business, unless the presence of such persons is deemed to be injurious. In the case of invasion, mob, riot, public excitement, or other circumstances rendering such action advisable in the judgment of Landlord, Landlord may prevent access to the Shopping Center by such action as Landlord may deem appropriate, including closing entrances.

16. DELIVERIES: Except for small parcel deliveries, each Tenant shall use such Tenant's best efforts to cause all trucks servicing such Tenant's retail facilities to load and unload at such hours in the areas and through the entrances as may be designated by the Landlord. Tractor trailers which must be unhooked or parked must use steel plates under dolly wheels to prevent damage to the paving surface. In addition, wheel blocking must be available for use. Tractor trailers are to be removed from the loading areas after unloading. Fork-lift trucks, tow trucks or any other powered machines for handling freight will be used only in such manner and areas of the Shopping Center as may be approved in writing by Landlord.

17. SAFE PREMISES: The Demised Premises, including vestibules, entrances, and returns, doors, fixtures, windows, and plate glass shall be maintained in a safe, neat, and clean condition.

18. REMOVAL OF TRASH: All trash, refuse, and waste materials will be regularly removed from the Demised Premises, and until removal will be stored: (a) in adequate containers, which containers will be located so as not to be visible to the general public shopping at the Shopping Center, and (b) so as not to constitute any health or fire hazard or nuisance to any occupant. No burning of trash, refuse, or waste materials will be permitted. All trash and refuse deposited outside the Shopping Center must be placed in sufficient receptacles as agreed. All receptacles must be kept neat. No loose trash or debris shall be deposited in any alley or kept in the Shopping Center. Tenant agrees to promptly rectify any unclean condition after notification by Landlord.

19. PLUMBING FACILITIES: No foreign substances of any kind shall be thrown in the plumbing, and the expense of any breakage, stoppage, or damage resulting from a violation of this provisions shall be borne by Tenant. The water closets and other water fixtures shall not be used for any purpose other than those for which they were constructed. No person shall waste water by interfering with the faucets or otherwise.

20. RADIUS OF ADVERTISING: No advertising medium will be utilized which can be heard or experienced outside of the Demised Premises, including, without limiting the generality of the foregoing, flashing lights, searchlights, loudspeakers, phonographs, radios, or television or placed on light standards in the parking lot.

21. CLOSE-OUT PROMOTIONS: No auction, fire, bankruptcy, or going-out-of-business sale shall be conducted in, at, on or about the Shopping Center or any portion or portions of the Shopping Center.

22. GENERALLY NON-PERMITTED USES: No use will be made of the Shopping Center or any portion or portions which would: (a) violate any law, ordinance, or regulations; (b) constitute a nuisance; (c) constitute an extra hazardous use, or (d) violate, suspend or void or increase the premiums for any policy or policies of insurance on any stores or the Shopping Center. In the event of fire or code problems, Lessees shall comply with said requirements.

23. UNAUTHORIZED ACTIVITIES: No person without the prior written consent of Landlord will in or on any part of the Common Area:

(a) Vend, peddle, or solicit orders for sale or distribution of any merchandise, device, service, periodical, book, pamphlet, or other matter whatsoever;

(b) Exhibit any sign, placard, banner, notice, or other written material except for material approved by Lessor;

(c) Distribute any circular, booklet, handbill, placard, or other material;

(d) Solicit membership in any organization, group, or association or contribution for any purposes;

16

Initials: Tenant: _RM_   Landlord: _M_

(e) Parade, patrol, picket, demonstrate, rally, or engage in any conduct that might tend to interfere with or impede the use of any of the Common Areas by any permittee, or create a disturbance, attract attention, or harass, annoy, disparage, or be detrimental to the interest of any of the retail establishments within the Shopping Center;

(f) Use any Common Area for any purpose when none of the retail establishments within the Shopping Center is open for business or enjoyment;

(g) Throw, discard, or deposit any paper, glass or extraneous matter of any kind, except in designated receptacles or create litter or hazards of any kind;

(h) Use any musical instrument or sound-making device of any kind or create or produce in any manner noise or sound that is annoying, unpleasant, or distasteful to occupants or permittees;

(i) Deface, damage, or demolish any sign, light standard or fixture, landscaping material, or other improvement within the Shopping Center or the property of customers, business invitees, or employees situated within the Shopping Center; or

(j) Erect any sign, antenna, aerial or other device on the roof or exterior wall of the Demised Premises or the Shopping Center without first obtaining in each instance written consent from Landlord. Any sign, antenna, aerial or device installed without such written consent shall be subject to removal by Landlord at Tenant's expense without notice at any time.

(k) Tenant shall not use or occupy any portion of the Demised Premises at anytime for any immoral, lewd, indecent, obscene or disreputable business, purpose, activity or use. Use or occupancy of any portion of the Demised Premises as a sexually oriented business, adult theater or bookstore, cabaret, dance hall, massage parlor, establishment employing topless or exotic dancers and/or employees dressed or uniformed in an objectionable revealing manner, or any other endeavor which involves lewd, lascivious, indecent or obscene products, merchandise, activity or conduct shall be strictly prohibited. Lessee shall not conduct or permit activities that might constitute a nuisance, are not generally considered appropriate for regional shopping centers conducted in accordance with good and generally accepted standards of operation, may tend to injure the reputation or reflect poorly on the image of the Shopping Center, or otherwise are offensive, improper or contrary to law or ordinance. The determination of a violation and the enforcement of this paragraph 23 of these Rules and Regulations shall be in the sole judgment of Landlord.

(l) Consumption of alcoholic beverages on the Demised Premises by any person shall not be permitted without the Landlord's prior written consent; nor shall any person, including Tenant, be permitted to remain on the Demised Premises if such person is deemed to be in an intoxicated condition.

24. FIRE EXITS: Tenant acknowledges that it will use reasonable best efforts to insure that Tenant, its employees, guests and invitees use any door designated for use as an emergency exit equipped with alarm devices only for the purpose of emergencies.

25. PARKING: Tenant and its employees, agents and invitees shall park their vehicles, i.e., cars, trucks, semi-trailers, only in those parking areas designated by Landlord. Tenant shall not leave any vehicle in a state of disrepair (including without limitation, flat tires, out of date inspection stickers or license plates) on the Demised Premises or Shopping Center. If Tenant or its employee, agents or invitees park their vehicles in areas other than the designated parking areas or leave any vehicle in a state of disrepair, Landlord, after posting written notice on the vehicle of such violation, Landlord shall have the right to remove such vehicle at vehicle owner's expense. Tenant and its agents, employees and invitees shall observe and comply with any driving and parking signs or markers on the Shopping Center grounds and surrounding areas.

26. Lessee agrees that all employees employed by it and associated with its business shall use the area for parking to be designated by Lessor. All trash and refuse shall be deposited by Lessee in neat and adequate containers, or in a neat and orderly manner where containers are impracticable.

27. ROOF: Tenant shall not make penetrations or alterations to the roof, exterior walls or the foundation without express written consent from Landlord and all such penetrations or alterations shall only be performed by Landlord's contractor. No equipment, antenna of any kind may be installed on any portion of the roof or exterior portion of the Shopping Center without express written consent from

17

Initials: Tenant: _RM_    Landlord: _____

the Landlord.

28. LANDLORD'S REMEDIES: Landlord will have the right to remove or exclude from or to restrain (or take legal action to do so) any unauthorized person from, or from coming upon, the Shopping Center or any portion thereof, and to prohibit, abate, and recover damages arising from any unauthorized act, whether or not such act is in express violation of the rules and regulations set forth above.

29. INTENT: The listing of specific items as being prohibited is not intended to be exclusive, but to indicate in general the manner in which the right to use the Common Areas solely as a means of access and convenience in shopping at the retail establishments in the Shopping Center is limited and controlled by Landlord. Landlord reserves the right to amend, modify, or supplement these Rules and Regulations as in Landlord's judgment may be necessary for the safety, cleanliness, preservation of order, and the efficient operation of the Shopping Center. A copy of the order, Building Rules and Regulations, as the same are from times to time amended, will be posted at the Management Office of the Shopping Center. In the event of any conflict, inconsistency, or other difference between the terms and provisions of these Rules and Regulations and this Lease, the terms and provisions of this Lease shall control.

Initials: Tenant: _RM_    Landlord:

EXHIBIT "D"

DECLARATION OF LEASE TERM

In accordance with Article I, Section 1.1(g) of one certain Lease dated the _____ day of _____,

2010, by and between The Point Shopping Center, LP as Landlord and _____ as Tenant, the

following dates hereby reflect the date of commencement and expiration respectively:

Commencement: 1st day of July, 2011.

Expiration: 31th day of July, 2014.

Executed this _____ day of _____, 20___.

Lessor: The Point Shopping Center, LP

By: _M. Mortar Ardy_____

Address: 3966 Las flores Canyon Rd
Malibu, CA 90265

Date: 7/11/12

Tenant: Rose McLaughlin

By: Rose McLaughlin

Address:
6565 Babcock #12 , San Antonio, TX 78249
11823 Broadwood St, San Antonio, TX 78249

Phone: _____

Date: 7/3/12

19

Initials: Tenant: RM   Landlord: ___

EXHIBIT "E"

SITE PLAN



Initials: Tenant: _RM_   Landlord: _____

TENANT SIGNAGE CRITERIA

### THE POINT SHOPPING CENTER

#### PREFACE

These sign criteria are hereby set forth by Landlord, to govern any and all signage by tenants leasing space in the above referenced shopping center.

These criteria serve to protect you the Tenant from signs of poor quality. They also insure the centers owners an attractive center with coordinated signage that is of good quality.

#### REQUIREMENTS-ALLOWANCES-RESTRICTIONS

Your sign contractor should be given a copy of this criteria to serve as his guide in preparing a design, and cost estimates for you.

After you have approved the sign you must submit three copies of the design to the offices of the Lessor. These drawings must clearly show the sign on the buildings facade and delineate all construction techniques and materials. It must state the center's name, tenant's name and location of the lease space in the center.

The Tenant shall be held liable and shall bear all cost for removal and/or correction of signs, sign installation and damage to building by signs that do not conform to sign criteria as put forth in these specifications and accompanying drawings. This is at the discretion of the center's owner.

No sign may be erected without first securing the written approval of the Lessor.

All signs are to be constructed and installed at Tenant's expense.

All permits for signs and their installation shall be obtained by the Tenant or his sign contractor.

Sign companies must conform to the following criteria.

1.    They must be licensed by the City of San Antonio under their own name.

2.    They must be capable of manufacturing signs according to the basic criteria for this center.

3.    They must be capable of manufacturing signs according to the criteria set forth by the National Electrical Code in Article 600.

Signs shall be wired back to Tenant's electrical panel.

"Channel Lume" type, channel letters utilizing "Armor Ply" plywood as letter backs are prohibited for use on the shopping center's facade.

Flashing; occulting or moving signs are prohibited.

Sign text shall consist of store name only.  Description of service, products, or trade names are prohibited.

Visible sign company names are prohibited.

Box type signs are prohibited.

Banner flags or pennants prohibited.

Trailer, marquee type signs are prohibited.  Any such signs installed on the premises of this center will be removed by Landlord at Tenant's expense.

#### FACADE SIGNAGE

21

Initials: Tenant: _RM_    Landlord: _____

## Configuration:

All Tenants must have an exterior illuminated sign that conforms with this sign criteria.

All signs are to be located on the shopping center's facade. Signs shall be in the form of individual full metal channel letters internally illuminated, mounted on a full metal raceway which is attached to the building's facade.

Tenants must use a clean, readable letter style. Tenant letters may vary between a minimum of 1' - 3" high and a maximum of 3' - 0" high. Sign letters are to be 5" deep.

Raceway shall contain all secondary wiring and transformers. Raceways dimensions shall measure 8" in height and 7" in depth except as follows:

Raceways containing letters ranging in height from 25" to 30" shall have a raceway measuring 9" in height and 7" in depth. Raceways containing letters ranging in height from 30" to 36" shall have a raceway measuring 10" in height and 7" in depth.

The overall maximum length of a sign shall not exceed 80% of the premises frontage.

Signs mounted on the facade as follows:

The bottom of each raceway will be installed at a point measuring 12" from the lowest point of the fascia. At shopping centers containing continuous accent stripes built into the fascia, the bottom of the raceway will be installed at a point measuring 6" above the top of the stripe.

## Fabrication

The individual letters are to be either Imron Enamel over steel or Baked Enamel over aluminum. Note: These letters may take six to eight weeks to fabricate. Raceway to be of similar construction.

Fabricated steel letters to be 18 gauge steel with interrupted welded construction. Aluminum letters are to be .063 gauge aluminum with interrupted Heliarc electric welding, or .040 gauge aluminum with returns pop riveted to the back of the letter with no pop rivets visible. Raceway to be of similar construction.

Letters larger than 2' 0" high shall have two rows of neon, 13mm. Letters smaller than 2' 0" shall have single row 13mm. neon.

## Neon shall be 6500 K with 30 m.a. transformers.

All letters shall have a Plexiglas face of 3/16" thick Plexiglas. The Plexiglas shall be retained with a 1" "Jewel Lite", or equal, acrylic over metal trim molding.

All fasteners, screws, bolts and spacers use in the fabrication of signs shall be nonferrous and/or non corrosive.

The following specifications apply to this center.

1. Plexiglas color _____     4. Cap color: _____
2. Neon color _____          5. Interior of letter: _____
3. Letter return color _____  6. Raceway color: _____

## Installation:        (Use colors above or equal)

The sign will be attached to the building facade by having the raceway attached to the facade as per accompanying drawings.

Wiring from the letters will pass first through conduit through facade to the tenant's electrical panel. Where facade is penetrated for mounting and conduit, these penetrations shall be sealed to be made watertight. This is the responsibility of the sign contractor.

Initials: Tenant: _RM_    Landlord