IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| SIRIUS COMPUTER SOLUTIONS, INC. | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| V. | § | Civil Action No. 5:15-cv-698 |
| | § | |
| JASON SPARKS, | § | |
| | § | |
| *Defendant*. | § | |

**PLAINTIFF'S SECOND SUPPLEMENTAL EVIDENCE & BRIEF IN SUPPORT OF
APPLICATION FOR PRELIMINARY INJUNCTIVE RELIEF**

On August 28, 2015, the parties deposed Defendant Jason Sparks and his former supervisor, Brian Pixton.  In light of those depositions, Plaintiff Sirius Computer Solutions, Inc. ("Sirius") files this Second Supplemental Evidence & Brief in Support of its Application for Preliminary Injunctive Relief, and in support thereof, it submits the following.[1]

## I.      INTRODUCTION

Sirius moves to enjoin Defendant Jason Sparks ("Sparks"), a former Storage Solutions Sales Specialist who resigned in May 2015, from doing three things:  (1) using and disclosing Sirius' confidential information obtained during his employment; (2) directly or indirectly contacting, soliciting, employing or otherwise engaging any Sirius employee to leave employment with Sirius; and (3) directly or indirectly soliciting or providing services or products to any existing or potential customers of Sirius with whom Sparks dealt in his ten-plus months of employment. As evidenced by his own deposition testimony, Sparks has:

---

[1] As stated in Paragraph 8 of their Joint Motion for Continuance of Hearing on Plaintiff's Application for Temporary Injunction, the parties agreed Sirius could supplement its evidence in support of that Application following the depositions, and that Sparks in turn could submit his own briefing and evidence in opposition, subject to the Court's Scheduling Order or other guidance from the Court concerning these matters.

(1) taken Sirius's confidential and proprietary information, used and disclosed it in his subsequent employment, and will in all probability continue to use and disclose this information, whether to his own benefit or the benefit of his subsequent employer;

(2) directly and indirectly contacted, solicited, and otherwise engaged Sirius employees to leave their employment with Sirius; and

(3) directly and indirectly provided services and products to Sirius customers and solicited for his new employer Sirius customers with whom he had personal contact and did business while employed with Sirius.

Based on Sparks' post-employment conduct, Sirius is entitled to a preliminary injunction. Indeed, without such relief, Sirius will suffer irreparable harm from Sparks' wrongful use and disclosure of its confidential information, may continue to lose valuable employees, and will have its goodwill and business reputation irreparably harmed by Sparks' continued wrongful solicitation of Sirius customers. As more fully explained in detail below, this Court should grant Sirius' request for preliminary injunctive relief and enjoin Sparks from engaging in the conduct specified above until a full trial on the merits can be held and a permanent injunction issued.

## II.    SECOND SUPPLEMENTAL EVIDENCE

Attached hereto is the following second supplemental evidence being submitted for this Court's consideration:

- Exhibit 11 – Excerpts from the deposition of Jason Sparks

- Exhibit 12 – Excerpts from the deposition of Brian Pixton

- Exhibit 13 – Excerpts from the deposition of Debbie Contreras

- Exhibit 14 – Excerpts of text messages obtained from Jason Sparks

- Exhibit 15 – Declaration of Imran Salim

- Exhibit 16 – E-mail string of May 6-7, 2015 (relative to Customer Washington County)

- Exhibit 17 – E-mail string of May 7, 2015 (relative to Customer Washington County)

- Exhibit 18 – Declaration of Justin Sobey

- Exhibit 19 – Jason Sparks' Resignation Letter dated April 27, 2015

### III.   DISCUSSION OF SUPPLEMENTAL EVIDENCE

#### A. *Evidence Establishes Sparks Signed and Accepted Non-Solicitation Agreement*.

Sirius is a national IT solutions integrator of technology-based business solutions headquartered in San Antonio, Texas. Sirius maintains sales locations throughout the United States, including in the Pacific Northwest and more specifically in Lake Oswego, Oregon. All sales employees with Sirius, such as Sparks, are required to enter into a "Confidentiality, Protection of Customer Relationships and Non-Solicitation Attachment A Agreement" ("Attachment A Agreement") as a condition of employment with Sirius, unless otherwise approved by the Executive Vice-President of Sales. The Attachment A Agreement contains an obligation not to disclose confidential information and not to solicit Sirius' customers and employees:

> 2.    **Protection of Customer Relationships.** For purposes of this paragraph, "Sirius' customers" shall include every person, business or other entity which, during Employee's last 24 months of employment at Sirius, either purchased or committed to purchase any service or product from Sirius or its respective subsidiaries, affiliates or successors, and with whom Employee did business and had direct personal contact as an employee of Sirius. For a period of one (1) year after ceasing to be employed by Sirius, regardless of whether Employee's employment ends voluntarily or involuntarily, Employee shall not, directly or indirectly, as an employee or independent contractor, alone or in association, with, on behalf of, or for the benefit of any third party, provide or solicit to provide any service or product to any of Sirius' customers, which service or product is similar to or competitive with any service or product offered by Sirius, or the provision of which could adversely affect Sirius' business relationship with such customer. After Employee's employment with Sirius ceases, to the extent Employee is uncertain as to whether Employee may be violating this paragraph, Employee shall identify in writing to Sirius any person, business or other entity that Employee

intends to solicit and request confirmation from Sirius as to whether that particular person, business or other entity qualifies as a Sirius customer and Sirius will confirm to Employee within seven (7) business days of Employee's request whether the contact is a Sirius customer.

3.      **Non-Solicitation of Employees.**  During Employee's employment with Sirius, and for a period of on (1) year thereafter, Employee will not directly or indirectly contact for the purpose of soliciting employment, solicit, employ or otherwise engage any of the employees of Sirius or any of its respective subsidiaries, affiliates or successors to leave his or her employment to work for any business, individual, company, firm, corporation, or other entity then in competition with the business of Sirius or any subsidiary, affiliate or successor of Sirius (for the purpose of this Paragraph the term "employee" shall include any person having such status with regard to Sirius or any of its respective subsidiaries and affiliates at any time during the six (6) months preceding any solicitation in question).  If Employee engages in the solicitation of employees prohibited under this paragraph, it will disrupt, damage or impair Sirius' business or the business of its present of future subsidiaries or affiliates, as the case may be, and will necessarily involve the use of Confidential information which Employee acknowledge Employee are prohibited from disclosing.

For his part, Sparks was hired as a Storage Solutions Sales Specialist in June 2014. Although for reporting purposes he was associated with Sirius' Lake Oswego, Oregon office, Sparks was considered a work-at-home employee, thereby allowing him to work at his home located in Vancouver, Washington.  Ex. 18, Sobey Decl.; See Ex. 11, p. 143:7-25.  Until his resignation in May 2015, Sparks was responsible for, among other things, interacting with and soliciting customers, both prospective and current, to purchase IT business solutions in the Pacific Northwest.  Immediately following his resignation from Sirius effective May 8, 2015, Sparks went to work for Nordisk, a direct and admitted competitor.[2]

---

[2] When asked if Nordisk and Sirius were competitors, Sparks responded, "yes and no."  Ex. 11, Sparks Dep. at 9:18-20.  He then stated they offered the same services (computer configurations and data storage) and the industry would see them as competitors, but the companies were different in size and scope.  *Id.* at 9:21-25; 58:23-25; 59:1-19.  The size of the companies and the size of their customers, however, are not determinative of whether they are competitors and, by Sparks' own admission, Nordisk and Sirius offer the same services and are viewed in the industry as competitors.  Moreover, Sparks and his employer, Nordisk, already have judicially admitted through their affirmative pleading that Sirius and Nordisk are direct competitors.  *See* Pls.' Compl., Case No. 315CV01540HZ, U.S. District Court, Portland, Oregon, Dkt. 4-1, ¶ 25.

4

Sparks now claims that Sirius, through his supervisor, Brian Pixton, and Pixton's superior, Imran Salim, agreed he would not have to sign a non-compete or non-solicitation agreement. The three—Sparks, Pixton, and Salim—did have a meeting in on June 12, 2014 at a San Jose restaurant during which non-competition and non-solicitation prohibitions were discussed. Ex. 11, Sparks Dep. at 28-31. According to Sparks, he left that meeting with the impression he would not have to sign an agreement with these provisions. *Id.* at 31:2-11. Salim, however, recalls that, while he told Sparks he would not have to sign a non-compete, he did not discuss or make any representations as to a non-solicitation agreement. Ex. 15, Salim Decl. Sparks nevertheless admitted in his deposition that he had no other conversations with any Sirius employee or representative about a non-solicitation agreement until he received the actual Attachment A Agreement on June 17, 2014. Ex. 11, Sparks Dep. at 33:23 to 34:5, 40:20 to 41:4.

On June 17, 2014, Sparks received an employment package from Stacye Schill, Sirius' current Director of Recruiting. The package included his Sirius Incentive Compensation Plan to which the Attachment A Agreement was appended. Sparks signed and returned all documents in the employment package, including the Attachment A Agreement. In May 2015, a week after his resignation, Spark initially claimed he told a Danielle Fuentes[3] at Sirius that the non-solicitation provisions should be stricken per his oral discussions with Salim and Pixton at the San Jose meeting. *See* Ex. 12, at 195:19 to 196:24. He later changed his story to state it was Debbie Contreras whom he told the non-solicitation provisions should be stricken. *See* Pl.'s Compl, Case No. 315CV01540HZ, U.S. District Court, Portland, Oregon, Dkt. 4-1, at 2-14. Contreras was deposed on August 26, 2015, and she testified that she never had any discussions with Sparks prior to his employment regarding the Attachment A Agreement or removing or striking any portion of

---

[3] Sirius has checked his employee roles and has found no record of a Danielle Fuentes being employed in Human Resources or its Sales organization during the timeframe in question. Ex. 18, Sobey Decl.

5

it.  Ex. 13, Contreras Dep. at 84:18 to 89:2.  In light of Contreras' testimony, Sparks settled upon

Schill at this deposition as the person whom he allegedly discussed striking or carving out the non-

solicitation provisions. Ex. 11, Sparks Dep. at 41:5 to 43.  Schill, however, is adamant that Sparks

never indicated to her that he would not accept all provisions of the Attachment A Agreement or

desired that any provisions be removed, struck, or otherwise carved out.  Dkt. 6-1 at 3 ¶ 6.

Schill in fact received an e-mail from Pixton immediately prior to sending the employment

package containing the Plan and Attachment A Agreement to Sparks.  Dkt. 6-7 at 59.  In the email,

Pixton indicates that he talked to Sparks and that Sparks would be signing the documents "as is."

*Id.*, Dkt. 6-1 at 3, ¶ 4; Ex. 12, Pixton Depo. – Ex. 11 thereto.  At his deposition, Pixton testified

that he called Sparks to tell him there was an options available.  Ex. 12, Pixton Dep. at 101:8-20.

Pixton then recalled a second phone call where Sparks told him, as reflected in his email sent that

same day, that he would sign the documents "as is."  *Id.* at 100:19-25 to 101:3.  Significantly,

Sparks did in fact return the Attachment A Agreement signed, not once by twice.  In doing so, he

included the following e-mail message and made **no mention** of the non-solicitation provisions

being stricken or somehow removed:

> Hello Stacye,
>
> I hope you are doing well today.  Thank you for the documents.  I have signed the
> document pages that required signatures and have them attached.  Please let me
> know if this will be acceptable or if I need to put the documents in order.  I will be
> happy to do either or.  Thank you for your work and assistance in putting this
> package together.  I have been told that this was an unusually fast event and I
> sincerely appreciate your participation.
>
> Please let me know what the next steps will be.  I look forward to your response.

Dkt. 6-1 at 3 ¶ 4; Dkt. 6-7 at 109.  Notably, Sparks admits he never asked for a revised copy of the

Attachment A Agreement or otherwise followed up on whether the alleged revisions ever were

made.  Ex. 11, Sparks Dep. at 46.

Sparks now asks this Court to believe:  (1) he was adamant at all times that he would not sign a non-solicitation agreement but nonetheless signed an agreement with these provisions, and (2) that he only signed the Attachment A Agreement based on Schill verbally stating that she would check with Salim and Pixton on whether the non-solicitation provisions should be struck.  Sparks' story is simply not credible.  If not signing a non-solicitation provision was of such importance to him, why would he sign the agreements without crossing through the offending provisions or, better yet, at least state his understanding in the twice return e-mail to Schill?  At a minimum, he could have requested a copy of the final agreement with the alleged offending provisions struck at any time during the ten months he worked for Sirius, but he did not.

### B. Sparks Received Confidential Information, Thereby Providing Sufficient Consideration for Non-Solicitation Provisions.

Sparks' belatedly crafted story is all an effort to avoid the obligations to which he became bound when he signed and returned the Attachment A Agreement and its enforceability under Texas law.  *See* Arguments & Authorities, Dkt.6, at 7-13.  In his Answer filed on August 31, 2015, Sparks appears now also to challenge not only the content of the Agreement, but also the consideration he received.  However, in doing so, he ignores current Texas law, which holds that mere access to confidential information and customer contact creates the necessary nexus to a legitimate and protectable business interest of the company for purposes of enforcing any restraint on trade, be it a non-compete or non-solicitation agreement.  *See Marsh USA, Inc. v. Cook*, 354 S.W.3d 764, 775 (Tex. 2011).  In other words, under *Marsh*, this Court need not evaluate Sirius' business management decision as to the compensation of its sales force, including Sparks, as there is sufficient consideration for the non-solicitation provisions contained in the Attachment A Agreement by virtue of the fact Sirius provided Sparks with confidential information, customer

contact, and even training.  Thus, his newest attempt to avoid the Attachment A Agreement bears absolutely no merit.

### C. Sparks Violated His Confidentiality Covenant.

Unlike the non-solicitation provisions, Sparks admits he is bound by the confidentiality obligations contained in the Attachment A Agreement.  Ex. 11, Sparks Dep. at 53:20 to 54:5.  As a Storage Solutions Sales Specialist, Sparks was indisputably privy to confidential and proprietary information belonging to Sirius, including but not limited to, customer information and records which included registrations with manufacturers who supplied equipment for the computer configurations designed by Sirius.  Ex. 15, Salim Decl.  Sparks cavalierly testified at his deposition that he took all customer registrations with him when he left Sirius:

> Q.   Let me show you what I've marked as Exhibit 15.  Is Greenbriar a Sirius customer?
> A.   Yes.
> Q.   And tell me what you were doing on July 21st through this email.
> A.   I was showing Rory, who is Nordisk's inside sales manager, what a registration request should look like for EMC [equipment manufacturer].
> Q.   Was this intended for the Greenbrier Company's refresh?
> A.   No.  It's a template to use that he – the information required by a distributor to get this – to input a registration request for EMC.
> Q.   Okay.  And did you create this template?
> A.   No.
> Q.   And where did you get it?
> A.   It's either – it's either a document that Sirius had or Arrow had or somebody. My guess based on the fact that it says Greenbrier is it probably came – the same template that I used when I was at Sirius.
> Q.   So you used on July 21st a template from Sirius, correct?
> A.   Sure.  Yeah.
> Q.   How did you get access to it?
> A.   I have copies of every registration request I ever created for Sirius.
> Q.   Did you provide those to us in response to request for production?
> A.   I don't believe so.  They're on my onedrive.

Ex. 11, Sparks Dep. at 162:6 to 163:12.  Through this testimony, Sparks himself admits he took confidential and proprietary information of Sirius, used it in working with and training a Nordisk

employee, and failed to provide copies of the registration requests in response to Sirius' expedited document requests.[4]

Sirius registrations were not the only documents Sparks took with him when he left Sirius. Sparks also downloaded approximately 245[5] files from Sirius' website, using his employee log in. Dkt. 6-2 at 3 ¶ 11; Ex. 11, Sparks Dep. at 75-77:8.  Sirius has since discovered that many of the files were downloaded by Sparks on Friday, April 24, 2015.  Ex. 18, Sobey Decl.  Sparks gave his two weeks' notice on Monday, April 27, 2015.  *See id.*; Ex. 19, Sparks Resignation Letter.

Sparks testified in his deposition that these downloaded files were used by Sirius for customer presentations and that many were simply PowerPoint presentations, templates, and worksheets.  Ex. 11, Sparks Dep. at 62-75.  Apparently, Sparks takes the position that a client presentation or a document shared with a client somehow no longer maintains its confidential or proprietary nature.  Although that is not the law in the least, the documents Sparks downloaded were available **only** to Sirius employees with log in access.  The documents, moreover, contained information this confidential and proprietary to Sirius.  *See* Ex. 18, Sobey Decl. (explaining the confidential nature of some of the files accessed).  In fact, many of the files would be confidential

---

[4] Sparks suggests it is Sirius' fault he has Sirius' confidential information.  According to him, he gave two weeks' notice and if Sirius was worried about the documents, "they had two weeks in which they could have come to me and we could have rendered that a moot point, but I'm certainly not going to do it after I'm off the clock."  Ex. 11, Sparks Dep. at 60:4-9.  Yet, Sirius tried to set up an exit interview – Sparks' wife texted him even about Sirius calling to set-up up the exit interview.  Ex. 14, Text Msgs. at 12, 5/8/15 16:32.  Sparks also texted the owner of Nordisk on May 8, 2015, his last day with Sirius, and told him that he does not do exit interviews.  *Id.* at 13, 5/8/15 9:04.  Nevertheless, an exit interview was ultimately conducted on May 15, 2015 at which confidentiality and return of documents was discussed.  Ex. 13, Contreras Dep. at 50-54.  Sirius also sent a letter to Sparks on May 11, 2015, reminding him of his confidentiality obligations.  Ex. 12, Pixton Dep. – Ex. 17 thereto.  The letter specifically reminded Sparks of his obligation to return all of Sirius's confidential information, regardless of the form in which it was maintained.  All this said, even if Sirius had not inquired about confidential information remaining in Sparks' possession, keeping it and removing it from Sirius violated his non-disclosure obligations as an employee and under the Attachment A Agreement.

[5] Forensic Expert Joel Brillhart indicated there were 294 files he found to have been deleted by Sparks.  However, in conducting his review, Sirius' Corporate Counsel, Justin Sobey, noted that the list had only 245 file names.  Thus, Sobey's review was constrained to those 245 files.  *See* Ex. 18, Sobey Decl.

and proprietary to Sirius and its customers because Sirius' analysis would provide its customer with a competitive advantage over others in its particular industry. *See* Ex. 12, Pixton Dep. at 133:5-22.

Notably, at his deposition, it was clear Sparks was intimately familiar with the files he downloaded and took with him when he departed Sirius. Indeed, when asked specifically about the files just by referencing the file name, Sparks, without hesitation, could describe the contents of the majority of the files. Ex. 11, Sparks Dep. at 62-75. Sparks, moreover, admitted he deleted all the files on August 10, 2015. *Id.* at 179:17 to 181:14. He interestingly claims he was required to do so under the Temporary Restraining Order served on him, which by its terms ordered him not to "use or retain" Sirius' confidential information. However, he did not interpret the phrase "not to retain" in its ordinary meaning, i.e., that he should return all confidential information. He instead equated "not to retain" with delete or destroy. In short, he ignored the letter from Sirius dated May 11, 2015 which instructed him as follows:

> "To the extent that you are still in possession of any of Sirius's Confidential Information, do not destroy this information, rather you should contact Tony Perales, (210) 369-0683 immediately to discuss steps to return that property to Sirius …To be clear, you should not destroy, tamper with, alter, delete or otherwise change any documents in your possession, custody or control relating to your employment with or belonging to Sirius."

*Id.* at 144-146, Ex. 12, Pixton Dep. – Ex. 17 thereto. He also ignored the Preservation Order served on him at the same time as the Temporary Restraining Order, which specifically and undeniably commanded him to preserve all evidence. Ex. 11, Sparks Dep. at 79:25 to 82:3; Ex. 12, Pixton Dep. – Ex. 30 thereto. Importantly, logically following Sparks' belief that the TRO required him to delete all Sirius confidential information, and that he then identified the 245 or so files as files which should be deleted, his subsequent deletion of those files is thus a clear admission by Sparks

that the files were indeed confidential and proprietary documents of Sirius, contrary to his belatedly-created deposition position that the files were not confidential in nature.

### D. *Sparks Violated his Non-Solicitation of Customers Covenant*.

There can be no dispute that Sirius and Nordisk are direct competitors. Thus, the integrity and enforcement of the Attachment A Agreement with Sparks is of utmost importance to Sirius' business interests, goodwill, and reputation. Sirius would not have put Sparks in a position of trust and confidence, provided him with confidential, proprietary data, and paid him a premium commission rate, but for his express written promise and assurance that he would not disclose confidential information or solicit customers and employees of Sirius for a period of one year after leaving the employ of Sirius. The following evidence demonstrates Sparks' wrongful solicitation of Sirius' customers since his departure from Sirius and employment with Nordisk:

- Sparks states in a text message that he was "*deeply engaged with Mid-Columbia.*" Ex. 14, Text Msgs. at 8, 5/29/15 14:02. At his deposition, Sparks asserted Mid-Columbia was not a Sirius customer with whom he worked, but he admitted he received commissions for Mid-Columbia's purchases. Ex. 11, Sparks Dep. at 169-170.

- On May 13, 2013, Sparks sent an e-mail to Shawn Williams at Premier Press, introducing a Nordisk account manager, Matt Walty, because Sparks was dispersing "his accounts." Dkt. 6-13 at 4. On that same day, Sparks e-mailed Walty contact information for Premier Press and told Walty to contact Shawn. Dkt. 6-13 at 5. Sparks admitted in his deposition that Premier Press is a Sirius customer. Ex. 11, Sparks Dep. at 109-112.

- On May 11-13, 2015, Sparks facilitated a sale to Kokosing, whose prior purchase for the same type of equipment was from Sirius. Dkt. 6-13 at 2-3; Ex. 11, Sparks Dep. at 102:9-19 & 103:18-24.

- On May 14, 2015, Sparks sent an e-mail to Simon Senger of Klarquist. "*I have left Sirius as of last week. Please find below my new contact information. Let me know if you have some time to catch up on the things you have been working on.*" Dkt. 6-13 at 9. Klarquist is a Sirius customer as admitted by Sparks. Ex. 11, Sparks Dep. at 116:10-11. Although Sparks claimed Klarquist reached out to him, Klarquist's inquiry to Sparks took place while Sparks was still employed by Sirius on May 7, 2015. Ex. 11, Sparks Dep. at 117:6-18.

- Although Sparks portrays his last two weeks at Sirius as him serving as a loyal employee, he actually was actively working to sabotage Sirius' relationships with its customers. For instance, a May 6 and 7, 2015 e-mail string reflects an inquiry by Kelly Garcia of Sirius to Tom Morris at manufacturer Avnet about a purchase order for Washington County. Tom Morris relates that another manufacturer, EMC, "stole" the registration and he was trying to get it fixed. EMC reports that the registration was declined "*per the request of Jason Sparks at Sirius.*" When asked about the registration, Sparks responds on May 7 at 10:11 a.m., *"I am not sure what has happened to this particular registration. But we need it back in place. Avent has been trying to place the order since Tuesday when the customer PO came it. I have not rescinded this registration, and in fact it needs to be in place, since we have the order and are processing it."* Ex. 16, May 6-7 Emails. Yet, earlier on May 7, EMC asked Sparks directly if he would like the registration extended, to which Sparks responded, *"Please let it expire."* Ex. 17, May 7 Email. Once at Nordisk, Sparks sought out Washington County. In fact, on May 21, 2015 Sparks sent an e-mail to Brendan Dunn with Washington County, following up on a disk upgrade he sold Washington County before he left Sirius. Dkt. 6-13 at 10; Ex. 11, Sparks Dep. at 119: 5 to 120:10. Washington County is a Sirius customer as admitted by Sparks. Ex. 11, Sparks Dep. at 119:11-12. Later, on July 27, 2015, Sparks texted David Karabin, an employee of EMC, the address for Washington County, further indicating his efforts to solicit Washington County as a customer for Nordisk. Ex. 14, Text Msgs. at 2, 7/27/15 14:25.

- On May 29, 2015, Sparks sent an e-mail to Richard Depas at Jefferson General Health, stating: *"I left you a voice mail this morning to see how things might be going."* Dkt. 6-13 at 11. Jefferson was a Sirius customer that Sparks sold a "solution" to while at Sirius. Ex. 11, Sparks Dep. at 120:11 to 121:3.

- Sparks set up a meeting with J.H. Kelly, a customer of Sirius, for June 19, 2015. Dkt. 6-13 at 14; Ex. 11, Sparks Dep. at 127:18 to 128:14. Kevin Farley of J. H. Kelly reached out to him and asked him to come out and speak about the capabilities of Nordisk. "Since I've known the man for eight years, I figured I should go." Ex. 11, Sparks Dep. at 128:13-14.

- Sparks met with Office Ally on July 31, 2015. Dkt. 6-13 at 21. Office Ally has a managed service contract with Sirius. Ex. 11, Sparks Dep. at 130:6 to 131:1.

- On April 30, 2015, before Sparks left Sirius, he spoke on behalf of Nordisk and its business plans when he responded to a question from a manufacturer about a proposal to the State of Oregon. Ex. 11, Sparks Dep. – Ex. 13 thereto. Asked if Nordisk would be responding to the proposal, he responded, *"Yes, sir, indeed."* *Id.*

In sum, Sparks, both prior to and since his resignation of employment, has solicited customers of Sirius in direct violation of his Attachment A Agreement.  To date, at least one client, Kokosing, has ordered equipment from Nordisk instead of Sirius.  Ex. 11, Sparks Dep. 102:9-19.  Further businesses losses and irreparable harm to Sirius' goodwill and reputation may occur if Sparks is not enjoined from his continuing wrongful solicitation.  Because of this threat of irreparable harm, this Court should preliminarily enjoin Sparks and mandate he abide by the non-solicitation of customers provision contained in the Attachment A Agreement he signed.

### E.   Sparks Violated his Non-Solicitation of Employees Covenant.

Just as he argues that customers are fair game if they contact you first, Sparks takes the same position and maintains he did not violate the employee non-solicitation prohibition in the Attachment A Agreement.  According to Sparks, the Sirius employees at issue, Scott MacKinnon, JP Kvale, and Heng Him, either initiated the contact with him or were already in discussions with Nordisk (e.g., Scott MacKinnon in particular).  Sparks, however, ignores the clear language and requirements of the non-solicitation clause contained in the Attachment A Agreement and in the Employee Handbook for which he signed an acknowledgment:  "...Employee will not directly or indirectly contact for the purpose of soliciting employment, solicit, employ or otherwise engage any of the employees of Sirius ... to leave his or her employment to work for ... any company .... in competition with the business of Sirius..."

Although Scott MacKinnon may have been discussing job opportunities with Nordisk previously, it was Sparks who met with him after May 8, 2015, discussed benefit plans and compensation with him, and answered his wife's questions.  Indeed, it was Sparks who MacKinnon thanked for "*bringing him aboard*."  Ex. 14, Text Msgs. at 1, 7/7/15 19:37.  MacKinnon also told Sparks he appreciated that Sparks had a spot for him.  *Id.* at 6, 6/22/15 8:39.  Sparks responded to

that message with, *"I am super stoked to get you running*." *Id.* at 6, 6/22/15 9:39.  Sparks went a step further and even counseled MacKinnon to get a backup of all his contacts before deleting his Sirius email account from his phone.  *Id.* at 3, 7/1/15 19:32.  He also advised Mackinnon on June 12, 105 that Nordisk would not provide the signing bonus requested.  *Id.* at 7, 6/12/15 16:52. E-mails to and from Sparks and MacKinnon further evidence that:

- MacKinnon advised Sparks on May 27, 2015 of the customers from whom he would be blocked out when he left Sirius.  Dkt. 6-12 at 2.

- On May 27, June 8 and June 11, 2015, MacKinnon asked Sparks about his salary, medical and other benefits, including requesting guarantee pay and a start-up bonus.  Dkt 6-12, at 3, 5, 6.

- Sparks sent MacKinnon a compensation plan to review.  Dkt. 6-12 at 7.

As to employee Heng Him, Sparks claims Him reached out to him, evidently believing that any contact or solicitation thereafter was not prohibited.  Heng, however, texted Sparks on May 22, 2015 indicating that he was at Sparks' office.  Ex. 14, Text Msgs. at 10, 5/22/15 10:51.  Sparks' text messages also reflect communication with phone number 5412258687, which is the cell number for MacKinnon.  Ex. 11, Sparks Dep. at 165:1-3, 11-15.  In his text, MacKinnon tells Sparks that Matt Mac Donald is moving back to Florida but staying with Sirius.  He then states *"Heng is now the network king again …"*  Ex. 14, Text Msgs. at 11, 5/14/14 10:14.  A few minutes later, Sparks texts Him, *"How does Matt's decision effect you and what you want to do*."  *Id.* at 11, 5/14/15 11:16.  When questioned Sparks testified in his that he was just asking Him if his decision to come to Nordisk was affected.  Ex. 11, Sparks Dep. at 164:13-23.  But text messages on May 28, 2015 indicate Sparks was soliciting Him for part of his team.  Scott MacKinnon in fact texted Sparks on May 28, 2015 and said, *"Hi Jason … Just had a quick chat with Heng … All good.  BTW I have no concerns if he is part of my "future team" … You are smart for including him*."  Ex. 14, Text Msgs. at 9, 5/28/14 8:36.  Sparks responds to this MacKinnon text with: *"Nice thank you for*

*this follow up.  It's important to me to have a coherent team.*"  The day before, May 27, 2015, Sparks also emailed Him a compensation plan, Dkt. 6-12 at 4, and the following day, May 28, 2015, Sparks provided Him's e-mail address to the owner of Nordisk, Deney Dentel who apparently had not been in contact with Him before.  Ex. 14, Text Msgs. at 8, 5/28/15 17:21. Scott MacKinnon who was to join Nordisk July 2 further texted Sparks about Him on June 23, 2015, expressing worry that Him would say something to Sirius before MacKinnon was on board.  Sparks in response discusses Him "blowing it" with Deney, the owner of Nordisk, indicating Sparks was well aware of and a participant in Nordisk's solicitation of Him.  *Id.* at 5, 6/23/15 12:30.

  Regardless of who contacted whom first, there is no question Sparks actively solicited and contacted Sirius employees for the benefit of Nordisk.  In this regard, he clearly has violated the non-solicitation provision in the Attachment A Agreement, and he very well may continue to do so.  In this regard, like with the customer non-solicitation provision, Sirius has shown a threat of irreparable harm, thereby supplying this Court with ample proof and support to enjoin Sparks temporarily from further damaging and destroying the employment relationships Sirius has with its employees.

## V. PRAYER FOR RELIEF

  Plaintiff Sirius Computer Solutions, Inc. prays that the Court grant its request for a preliminary injunction to prevent irreparable injury to Sirius.  The evidence submitted demonstrates that there is a substantial likelihood that Sirius will be successful on the merits and a substantial threat of irreparable injury if an injunction does not issue.  Sparks is free to continue working with his current employer; he will only be restrained from (1) using or disclosing Sirius' confidential and proprietary information; (2) solicitation of Sirius' customers with whom Sparks

did business and had direct personal contact for the ten months he worked at Sirius; and (3) solicitation of Sirius' employees.  Sirius prays for all other relief to which it may be entitled.

Respectfully submitted,

SCHMOYER REINHARD LLP
17806 IH 10 West, Suite 400
San Antonio, Texas 78257
Telephone:      210/447-8033
Facsimile:      210/447-8036

/s/ Christine E. Reinhard
Christine E. Reinhard
State Bar No. 24013389
creinhard@sr-llp.com
Annalyn G. Smith
State Bar No. 18532500
asmith@sr-llp.com

**ATTORNEYS FOR PLAINTIFF**
**SIRIUS COMPUTER SOLUTIONS, INC.**

## CERTIFICATE OF SERVICE

On September 10, 2015, a true and correct copy of this document was filed electronically, notice of the filing was served on all counsel of record by operation of the Court's electronic filing system, and all parties may access this filing through the Court's electronic filing system.

/s/ Christine E. Reinhard
Christine E. Reinhard