IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| SIRIUS COMPUTER SOLUTIONS, INC., | § | CV. NO. 5:15-CV-698-DAE |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| JASON SPARKS, | § | |
| | § | |
| Defendants. | § | |
| _____ | § | |

ORDER: (1) GRANTING PLAINTIFF'S MOTION TO SEVER, TRANSFER,
AND CONSOLIDATE, (2) DENYING DEFENDANT'S MOTION FOR
CHANGE OF VENUE, (3) GRANTING PLAINTIFF'S APPLICATION FOR
PRELIMINARY INJUNCTION, (4) DENYING PLAINTIFF'S MOTION TO
STRIKE, AND (5) DENYING DEFENDANT'S MOTION TO STRIKE

Before the Court is (1) Plaintiff's Motion to Sever, Transfer, and

Consolidate in Part Second-Filed Action Pending in the U.S. District Court for the

District of Oregon (Dkt. # 4); (2) Defendant's Motion for Change of Venue (Dkt.

# 15); (3) Plaintiff's Supplemental Application for Preliminary Injunction (Dkt.

# 6); (4) Defendant's Motion to Partially Strike Declaration of Jason Sobey (Dkt.

# 19); and (5) Plaintiff's Motion to Strike in Part Declaration of Jason Sparks (Dkt.

# 22).  The Court held a hearing on these motions on October 1, 2015.  At the

hearing, Christine Reinhard represented Plaintiff Sirius Computer Solutions, Inc., and Dawn Finlayson represented Defendant Jason Sparks.

Upon careful consideration of the arguments asserted in the supporting and opposing memoranda, as well as the arguments presented at the hearing, the Court finds that (1) Plaintiff's Motion to Sever, Transfer, and Consolidate in Part Second-Filed Action Pending in the U.S. District Court for the District of Oregon (Dkt. # 4) should be **GRANTED**; (2) Defendant's Motion for Change of Venue (Dkt. # 15) should be **DENIED**; (3) Plaintiff's Supplemental Application for Preliminary Injunction (Dkt. # 6) should be **GRANTED**; (4) Defendant's Motion to Partially Strike Declaration of Jason Sobey (Dkt. # 19) should be **DENIED**; and (5) Plaintiff's Motion to Strike in Part Declaration of Jason Sparks (Dkt. # 22) should be **DENIED**.

<u>BACKGROUND</u>

I.     <u>Factual Background</u>

Plaintiff Sirius Computer Solutions, Inc. ("Sirius") is a technology based solutions provider with headquarters in San Antonio, Texas.  (Dkt. # 1-1 at 9.)  Sirius maintains sales locations throughout the United States.  (<u>Id.</u>)  In June 2014, Defendant Jason Sparks ("Sparks") was hired as a Storage Solutions

Sales Specialist in Sirius's Lake Oswego, Oregon office.[1]  (Id. at 10.)  As part of

his duties, Sparks was responsible for interacting with and soliciting customers,

both prospective and current, to purchase information technology ("IT") business

solutions in the Pacific Northwest.  (Id.)

According to Sirius, all of its sales employees who receive a premium

commission rate under its incentive plan, such as Sparks, are required to enter into

a "Confidentiality, Protection of Customer Relationships and Non-Solicitation

Agreement" (the "Agreement").  (Id. at 9.)  The Agreement contains two sections

entitled "Protection of Customer Relationships" and "Non-Solicitation of

Employees," which discuss an employee's obligation not to disclose confidential

information and not to solicit Sirius's customers and employees both during

employment and for a period of one year after termination from employment.  (Id.)

The Agreement also contains a forum-selection clause, entitled "Applicable Law

and Venue," which states that disputes arising under the Agreement "shall be

brought solely and exclusively in a court sitting in San Antonio, Bexar County,

Texas," and that the employee "irrevocably accepts the jurisdiction of the federal

and state courts of the State of Texas for such disputes."  (Dkt. # 6-7 at 45.)  Sirius

maintains that Sparks agreed to abide by these provisions when he signed the

Agreement upon his employment with Sirius.  (Id.)

---

[1] Sparks is a resident of Washington.  (Dkt. #1-1 at 8.)

Sparks resigned from Sirius on May 8, 2015. (Dkt. # 14-2 at 3.) Thereafter, Sparks began employment with Nordisk Systems ("Nordisk"), located in the Portland, Oregon area. (Dkt. # 6-7 at 45.) Sirius contends that it is in direct competition for business solutions with Nordisk. (Id.) According to Sirius, Sparks, both prior to and since his resignation, solicited customers and fellow employees of Sirius in direct violation of the Agreement. (Id. at 12.)

II.   Procedural Background

On August 6, 2015, Sirius filed suit in the 438th Judicial District Court of Bexar County, Texas, alleging claims against Sparks for (1) breach of contract; (2) breach of fiduciary duty, including breach of the duties of confidentiality and loyalty; (3) tortious interference with contractual relations, prospective business advantage, and employment relations; and (4) injunctive relief, including a temporary restraining order, and a temporary and permanent injunction. (Dkt. # 1-1.) The same day, the state court granted Sirius's request for a temporary restraining order. (Id. at 28.) On August 17, 2015, Sparks removed the suit to this Court, in the Western District of Texas, invoking the Court's diversity jurisdiction. (Dkt. # 1.)

On August 14, 2015, eight days after Sirius filed suit against Sparks, Sparks and Nordisk filed suit against Sirius in the United States District Court for

4

the District of Oregon, alleging claims for (1) declaratory judgment; (2) breach of contract; and (3) unfair competition (the "Oregon Litigation"). (Dkt. # 4-1.)

On August 24, 2015, Sirius filed a motion to consolidate, sever, and transfer the Oregon Litigation to this Court. (Dkt. #4.) On September 8, 2015, Sparks filed his response to the motion to consolidate. (Dkt. # 14.) On September 15, 2015, Sirius filed its reply. (Dkt. # 21.) On August 26, 2015, Sirius also filed a motion for preliminary injunction. (Dkts. # 6, 16.) Sparks filed his response on September 23, 2015. (Dkt. # 28.) On September 8, 2015, Sparks filed a motion to change the venue of the case. (Dkt. # 15.) Sirius filed a response to that motion on September 15, 2015. (Dkt. # 23.) Sparks filed its reply on September 22, 2015. (Dkt. # 25.) Also pending are two motions to strike declarations. (Dkts. ## 19, 22.) All of the pending motions are addressed below.

## SIRIUS'S MOTION TO SEVER, TRANSFER, AND CONSOLIDATE

Sirius contends in its motion to sever, transfer, and consolidate that the Oregon Litigation overwhelmingly overlaps with the legal questions and fact issues in this case. (Dkt. # 4.) It argues that the parties' contractual forum-selection clause and the first-to-file rule adopted by the Fifth Circuit, require that the Oregon Litigation be severed from that suit, transferred to this Court, and consolidated with the instant action. (Id.)

5

In response, Sparks agrees that the instant litigation should be consolidated with the Oregon Litigation; however, Sparks asserts that venue of the consolidated cases should be in Oregon, and not in this Court, as argued by Sirius. (Dkt. # 14 at 6; Dkt. # 15.)  Sparks also contends that the first-to-file rule is inappropriate in this case because there is a compelling interest in having the venue of this case in Oregon.  (Id.)

I.      Applicable Law

The Fifth Circuit adheres to the "first to file" rule, which provides that when related cases are pending in two district courts, the court with the later-filed action can refuse to hear the case if the issues raised by both cases "substantially overlap."  Cadle Co. v. Whataburger of Alice, Inc., 174 F.3d 599, 603 (5th Cir. 1999).  The first to file rule is a discretionary doctrine, the application of which is reviewed for abuse of discretion.  Int'l Fidelity Ins. Co. v. Sweet Little Mex. Corp., 665 F.3d 671, 678 (5th Cir. 2011).  When deciding whether the issues raised in the two cases substantially overlap, the Fifth Circuit has looked to whether "the core issue was the same" or "if much of the proof adduced would likely be identical." Id.  The cases in each district "should be more than merely related."  Buckalew v. Celanese, Ltd., No. Civ. A. G-05-315, 2005 WL 2266619, at *2 (S.D. Tex. Sept. 16, 2005).  However, substantial overlap between cases does not require that the parties and issues be identical.  Save Power Ltd. v. Syntek Fin. Corp., 121 F.3d

6

947, 950 (5th Cir. 1997).  The two actions only need "involve closely related questions or common subject matter."  Rooster Prods. Int'l, Inc. v. Custom Leathercraft Mfg. Co., No. SA-04-CA-864-XR, 2005 WL 357657, at *2 (W.D. Tex. Feb. 1, 2005); see also W. Gulf Mar. Ass'n v. ILA Deep Sea Local 24, 751 F.2d 721, 728–29 (5th Cir. 1985).

 The principles of comity and sound judicial administration underlie the first to file rule, the aim of which is "to avoid the waste of duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result."  Save Power, 121 F.3d at 950 (quoting W. Gulf Mar. Ass'n, 751 F.2d at 729).  If the court in the later-filed action finds that the issues involved are likely to substantially overlap, it is up to the first-filed court to resolve the question of whether both cases should proceed.  Mann Mfg., Inc. v. Hortex, Inc., 439 F.2d 403, 408 (5th Cir.1971); Cadle Co., 174 F.3d at 606 ("the 'first to file rule' not only determines which court may decide the merits of substantially similar issues, but also establishes which court may decide whether the second suit filed must be dismissed, stayed, or transferred and consolidated").  Once housed in the first-filed court, the court is "entitled to determine which forum should hear [the] dispute"; the court may subsequently transfer the suit.  Wells Fargo Bank, N.A. v. W. Coast Life Ins. Co., 631 F. Supp. 2d 844, 847 (N.D. Tex.2009); Hortex, 439 F.2d at 407 ("Absent compelling

circumstances, the court that initially obtains the controversy should be the one to decide whether it will try it.").

However, when "compelling circumstances" exist, the first-filed court may disregard the first-to-file rule.  See Mann Mfg., Inc. v. Hortex, Inc., 439 F.2d 403, 407 (5th Cir. 1971).  Compelling circumstances exist "where a court determines that a party engaged in bad faith conduct, by inducing an opposing party to delay filing of a lawsuit, so that he could file a preemptive lawsuit." Chapa v. Mitchell,  No. A-05-CV-769-JN, 2005 WL 2978396, at *2 (W.D. Tex. Nov. 4, 2005).

II.     Analysis

As previously stated, Sparks appears to concede that substantial overlap exists between the Oregon Litigation and the matters in this Court.  (Dkt. # 14, at 6.)  The Court agrees.  The parties are substantially the same in both cases, mainly "switching sides," as the defendant in this case has initiated the Oregon action against the plaintiff in this case.  Additionally, both lawsuits arise out of Sparks's employment with Sirius, the facts underlying the two suits are mostly identical, and the core issues presented in both suits are substantially the same, i.e., whether Sparks breached the Agreement.  Further, the same evidence will likely be presented by the same witnesses in both actions.  Accordingly, the Court finds that the Oregon Litigation and the instant case substantially overlap.

8

The second inquiry is which of the two courts should take the consolidated case.  As discussed above, "[t]he Fifth Circuit adheres to the general rule that the court in which an action is first filed is the appropriate court to determine whether subsequently filed cases involving substantially similar issues should proceed."  Save Power, 121 F.3d at 950.  Here, there is no dispute that the instant suit was filed in state court on August 6, 2015, although it was not removed to federal court until August 17, 2015.  (Dkt. #1.)  The Oregon litigation was filed on August 14, 2015.  (Dkt. # 4-1.)  Because courts in this district consider the date of filing in state court as the relevant benchmark for determining which suit was filed first, then the Court finds that the instant lawsuit, filed in state court and subsequently removed to this Court, was first-filed.  See, e.g., Bank of Am. v. Berringer Harvard Lake Tahoe, No. 3:13–CV–0585–G, 2013 WL 2627085, at *3 (N.D. Tex. June 12, 2013); Poche v. Geo–Ram, Inc., No. 96–1437, 1996 WL 371679, at *2 (E.D. La. July 2, 1996); Igloo Products Corporation v. The Mounties, Inc., 735 F.Supp. 214, 217 (S.D. Tex. 1990) (citing Federal Deposit Insurance Corporation v. Taylor, 727 F. Supp. 326, 329 (S.D. Tex. 1989)).

Sparks argues however that this action falls within an exception to the first to file rule.[2]  (Dkt. # 14 at 7.)  Sparks contends that the facts and law of the

---

[2] Sparks's arguments against application of the first-filed rule mainly address venue.  (See Dkt. # 14 at 8–11.)  Because Sparks has also filed a motion for change

case are undisputedly grounded in Oregon because the employment relationship was negotiated in Oregon, Sparks's allegations of fraud originate in Oregon, and all of the witnesses reside in Oregon.  (Id. at 8.)  Sparks also argues that venue in Texas would "depriv[e] Nordisk a reasonable opportunity to participate" because it "has no offices or employees in the State of Texas, and is headquartered and has its principal place of business in" Oregon.  (Id. at 6.)

Sirius, on the other hand, argues that while the parties do not dispute that Nordisk is not a party to the Texas Litigation and was not a party to the Agreement in question in this case, Nordisk's involvement in this case is not necessary to resolve its claims against Sparks or vice versa, and that therefore Nordisk's claims should be severed from Sparks's claims.  (See Dkt. # 21 at 5.) Sirius also contends that, while it may be more efficient to dispose of the entire case, including Nordisk's claims, in one forum, Sparks cannot ignore that he agreed to the forum selection clause in the Agreement.  (Id.)  The Court agrees.

Summarized above, the forum-selection clause in the Agreement entitled "Applicable Law and Venue," signed by Sparks, states that:

> Sirius and Employee agree that any dispute arising out of or relating to this Agreement or the Plan which cannot be amicably settled, shall be brought solely and exclusively in a court sitting in San Antonio, Bexar County, Texas, and Employee irrevocably

---

of venue, the full merits of the venue arguments will be analyzed below in the Court's ruling on that motion.

10

> accepts the jurisdiction of the federal and state courts of the State
> of Texas for such disputes.  The Plan and the Agreement were
> entered into and are performable in San Antonio, Bexar County,
> Texas.  The parties further agree that sole and exclusive venue for
> such court proceeding shall be in a court sitting in San Antonio,
> Bexar County, Texas.

(Dkt. # 21-1 at 14.)  As more fully discussed below in Sparks's motion to transfer

venue, the Court agrees with Sirius that the mandatory venue language in the

Agreement dictates that Sparks's claims arising under the Agreement be heard in

San Antonio, Texas.

       Still, in support of his contention regarding the inconvenience to

Nordisk if the case remains in this Court, Sparks cites a district court case from

Nebraska, Sirius Computer Solutions, Inc. v. Evans, No. 8:11-CV-439 (D. Neb.

Apr. 23, 2012), with similar facts to the present suit.  (Dkt. # 25 at 4.)  The

Nebraska court held, in denying Sirius's motion to retain venue in Nebraska in

opposition to a forum-selection clause and the first-filed rule, that the convenience

of the parties in having all claims heard in one forum, among other concerns,

would promote the interests of justice.  Evans, No. 8:11-CV-439, at 24.

       Evans is distinguishable from the facts of this case.  Most importantly,

the forum-selection clause at issue in Evans was permissive, not mandatory.

Additionally, neither Sirius nor the plaintiff in that case were located in Sirius's

desired forum, as Sirius had moved its headquarters to Texas subsequent to the

11

agreement at issue in that case.  As such, the holding in <u>Evans</u> is not persuasive to

the instant action where a mandatory forum-selection clause was signed by both

parties, and where Sirius maintains its headquarters in San Antonio, Texas.

As previously noted, when there are "compelling circumstances," the

court may disregard the first to file rule.  <u>See</u> <u>Mann Mfg.</u>, 439 F.2d at 407.  Sparks

has not provided sufficiently compelling circumstances that would warrant an

exception to the first-filed rule.   He has not provided any evidence of Sirius's bad

faith in filing the first suit in state court, nor has he demonstrated that Sirius filed it

in a preemptive attempt to avoid Sparks's filing suit in a different forum.  <u>See</u>

<u>Chapa</u>, 2005 WL 2978396, at *2.  On the contrary, Sirius filed suit in accordance

with the mandatory forum-selection clause in the Agreement.  Additionally, while

Nordisk's claims certainly relate to and to some extent overlap with the claims in

this case, Sparks has not shown sufficient justification for overcoming the forum-

selection provision as applied to his claims against Sirius.

Accordingly, the Court finds that (1) the first to file rule

applies, (2) this Court received the first filing, and (3) this Court should decide

whether venue is proper in this district.  The Court concludes that Sparks's claims

should be severed from Nordisk's claims in the Oregon Litigation; Sparks's claims

in the Oregon Litigation should be transferred and consolidated with the instant

case.

III.    Conclusion

        For the foregoing reasons, Plaintiff's Motion to Sever, Transfer, and

Consolidate in Part Second-Filed Action Pending in the U.S. District Court for the

District of Oregon (Dkt. # 4) is **GRANTED**.  It is **ORDERED** that Sparks's

claims pending in the Oregon Litigation be **SEVERED** from Jason Sparks &

Nordisk Systems, Inc. v. Sirius Computer Solutions, No. 3:13-cv-01540-HZ in the

U.S District Court for the District of Oregon, **TRANSFERRED**, and

**CONSOLIDATED** with the claims in this case.

SPARKS'S MOTION FOR CHANGE OF VENUE

        Subsequent to Sirius's motion to sever, transfer, and consolidate,

Sparks filed his own motion to transfer venue of the case from this Court.  (Dkt.

# 15.)  Sparks argues in his motion that the "only way to avoid risk of prejudice to

all parties, both in the Texas and Oregon matters is to transfer venue to Oregon."

(Dkt. # 15 at 6.)  In support, Sparks contends that Oregon is the best location

because it is where the performance and relevant activities of the Agreement

occurred.  (Id. at 7.)  He also asserts that he is not a resident of Texas, and that

Nordisk maintains its offices in Oregon.  (Id. at 8.)  Additionally, Sparks contends

that Oregon law will apply, and that Sirius's basis of venue solely on the forum

selection clause in the Agreement is inappropriate because the relevant factors

pertaining to venue weigh in favor of the transfer of venue to Oregon.  (Id. at 8.)

13

In response, Sirius argues that there is no dispute that Sparks signed the Agreement, and therefore that he agreed to its mandatory forum-selection clause.  (Dkt. # 23 at 2.)  As such, Sirius asserts that Sparks is bound by the terms of the Agreement concerning forum selection in San Antonio, Texas.  (Id. at 5.)  Additionally, Sirius contends that Texas law, and not Oregon law, governs this case.  (Id. at 3.)  Finally, Sirius again argues that Nordisk's involvement in this case is irrelevant to enforcement of venue in this Court.  (Id. at 10.)

I.    Applicable Law

Where jurisdiction and venue are proper, transfer of venue is governed by 28 U.S.C. § 1404.  Under the plain language of § 1404(a), a venue transfer may be made to either any district where the action might have been brought, or to any other district to which all parties have consented.  28 U.S.C. § 1404(a).  A court is not limited to these factors, but must consider all relevant factors and examine the particular circumstances in the case at hand.  Generally, a court weighs "the relevant factors and decide[s] whether, on balance, a transfer would serve 'the convenience of parties and witnesses' and otherwise promote 'the interest of justice.'"  Atl. Marine Constr. Co., Inc. v. U.S. Dist. Court for W. Dist. of Tex., __ U.S. __, 134 S. Ct. 568, 579 (2013) (quoting § 1404(a)).

"The calculus changes, however, when the parties' contract contains a valid forum-selection clause, which 'represents the parties' agreement as to the most proper forum.'"  Id. (quoting Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 31 (2004)).  The "enforcement of valid forum-selection clauses, bargained for by the parties, protects their legitimate expectations and furthers vital interests of the justice system."  Stewart, 487 U.S. at 33.  As such, "when the parties have agreed to a valid forum-selection clause, a district court should ordinarily transfer [or retain] the case to the forum specified in that clause," and a proper application of §1404(a) mandates that the forum-selection clause be "given controlling weight in all but the most exceptional cases" unrelated to the convenience of the parties.  Atlantic Marine, 34 S. Ct. at 581.  Therefore, "[t]he presence of a valid forum-selection clause requires district courts to adjust their usual § 1404(a) analysis."  Id. at 581.

        The Supreme Court has held that one of the ways a court must adjust the § 1404(a) analysis in forum-selection clause cases is not to consider arguments about the parties' private interests.[3]  Id. at 582.  "When parties agree to a forum-selection clause, they waive the right to challenge the preselected forum as

---

[3] There are two other factors that courts should consider; however, neither of the other factors are applicable in this case because it is the defendant, and not the plaintiff, who seeks not to enforce the forum-selection clause.  Cf. Atlantic Marine, 34 S.Ct. at 581 (analyzing all three factors based on plaintiff's desire not to enforce the forum selection clause).

inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation." Id. "A court must deem the private-interest factors to weigh entirely in favor of the preselected forum." Id. Accordingly, a court may only consider arguments concerning public-interest factors. Id. The practical result of this application "is that forum-selection clauses should control except in unusual cases." Id.

When determining whether extraordinary circumstances exist that warrant transfer, or denial of transfer, only the public-interest factors of a traditional § 1404(a) analysis may be considered, including: (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of law of the application of foreign law. Id. at 581–82. "[T]he party acting in violation of the forum-selection clause . . . must bear the burden of showing that public-interest factors overwhelmingly disfavor a transfer." Id. at 583.

II.   Analysis

As an initial matter, Sparks does not appear to challenge the validity of the forum-selection clause in the Agreement nor does he dispute that its language concerning venue is mandatory.  (See Dkt. # 15 at 3, Dkt. # 25 at 1–2.) See, e.g., First Nat'l of N. Am., LLC v. Peavy, No. 3-02-CV-0033BD(R), 2002

16

WL 449582, at *1 (N.D. Tex. Mar. 21, 2002) (noting that when an agreement contains clear language showing that jurisdiction is appropriate only in a designated forum, the clause is mandatory).  Additionally, he does not appear to disagree that he contractually agreed to that provision when he signed the Agreement.  (Dkt. # 15 at 3.)  Instead, Sparks contends that this case warrants an exception to the mandatory forum selection provision.  Because the Court may consider only the public-interest factors, and not Sparks's private interests in having venue transferred to Oregon,[4] the Court considers them below.

      A.    <u>Administrative Difficulties Flowing from Court Congestion</u>

      The speed with which a case can come to trial and be resolved quickly is a factor in the transfer analysis.  A proposed transferee court's "less congested docket" and "[ability] to resolve this dispute more quickly" is a factor to be considered.  <u>In re Hoffman-LaRoche</u>, 587 F.3d 1333, 1336 (Fed. Cir. 2009).  This factor is very speculative, and in situations where other relevant factors weigh in favor of transfer and others are neutral, then the speed of the transferring district should not by itself outweigh the other factors.  <u>Id.</u>

---

[4] Sparks argues, among other contentions, that the selected forum would be grossly inconvenient for trial because the customer and employee witnesses that are critical to his case are located in Oregon, and that it would be inconvenient for these witnesses to appear in a Texas court.  (Dkt. # 25 at 6; Dkt. # 15 at 8.)  As stated above, the Court does not consider Sparks's private interests factors because he contractually agreed to the forum.  <u>See</u> <u>Atl. Marine</u>, 34 S. Ct. at 582.

Here, the parties have made no arguments regarding the speed at which either court could resolve the dispute. Because it is highly speculative, the Court determines that this factor weighs neutral in consideration of the proper venue for this case.

B.   Local Interest in Having Localized Interests Decided at Home

This factor considers the interest of the locality of the chosen venue in having the case resolved there. In re Volkswagen AG, 371 F.3d 201, 205 (5th Cir. 2004). This consideration is based on the principle that "[j]ury duty is a burden that ought not to be imposed upon the people of a community [that] has no relation to the litigation." Id.

In its brief discussion of this factor, Sparks argues that there are "a number of Pacific Northwest customers that Sparks is alleged to have had business dealings with and solicited" business, as well as "a number of former employees of Sirius [living in Oregon] that Sparks is alleged to have solicited for work at Nordisk." (Dkt. # 15 at 8–9.) He contends that "Oregon would be vastly more accessible for all involved." (Id.)

Sparks does not demonstrate a sufficient local interest in having the case decided in Oregon. Instead, his arguments in favor of this factor appear to weigh more in favor of his private-interests in having venue of the case in Oregon. Aside from the fact that there is no argument that Sparks contractually agreed to

18

the forum, the headquarters of Sirius lies in San Antonio and that is where the contract at issue was born.  Therefore, an argument could be made that a local interest is most definitely apparent in retaining venue in this Court in San Antonio, especially as it pertains to any potential impact Sirius might have on the local economy.  This factor weighs in favor of retaining venue in this Court.

      C.    <u>Familiarity of the Forum with the Law that Will Govern the Case</u>

      The familiarity of the forum state with governing law should only be considered a public-interest factor weighing in favor of transfer if the governing law is "exceptionally arcane."  <u>See</u> <u>Atl. Marine</u>, 34 S. Ct. at 584.  The Supreme Court has held that "federal judges routinely apply the law of a State other than the state in which they sit."  <u>Id.</u>

      The parties in this case dispute whether Texas or Oregon law applies to the issues in this case.  Sparks asserts that Oregon law governs the claims in this case, and that this factor therefore weighs heavily in favor of transfer to Oregon.  (Dkt. # 15 at 9; Dkt. # 25 at 2.)  As support, Sparks argues that the Agreement was performable only in Oregon where Sparks worked and where he interacted with fellow employees and customers.  (Dkt. # 25 at 2.)  Sirius disagrees, stating that Texas law governs this matter.  (Dkt. # 23 at 3.)  It argues that Sparks contractually agreed that Texas law governs claims arising from the Agreement in the provision discussing forum selection.  (<u>Id.</u>)  As evidence, Sirius

19

argues that the heading of the provision, "Applicable Law and Venue," as quoted above, clearly means that Texas law will apply to the dispute.  (Id.)

The Court notes at the outset that regardless of which state's law applies to the issues in this case, neither party has demonstrated that the resolution of the claims will involve any thorny or unusual issues of state law, and courts in both venues are equally able to resolve any choice of law issues presented by Sirius's claims.  See Atl. Marine, 34 S. Ct. at 584.  Still, because which state's law is important to deciding the issues in the case, and in particular which law to apply to the preliminary injunction issue discussed below, the Court will conduct the choice of law analysis.

In diversity cases, district courts apply the choice-of-law rules of the forum state.  Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); Int'l Interests, L.P. v. Hardy, 448 F.3d 303, 306 (5th Cir. 2006).  In this case, Texas determines the enforceability of choice-of-law provisions under the Restatement (Second) of Conflict of Laws ("Restatement").  Section 187 of the Restatement states:

> (1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

20

(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

(3) In the absence of a contrary indication of intention, the reference is to the local law of the state of the chosen law.

Restatement § 187.

Accordingly, in this case, under § 187(2), the parties' contractual choice of Texas law controls unless 1) Texas has no substantial relationship to the parties or the transaction, or 2) another state has a materially greater interest than Texas in the enforceability of the agreement, and that state's law would apply "in the absence of an effective choice of law by the parties" under § 188. Section 188 of the Restatement states:

> (1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.

21

(2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place of contracting,
(b) the place of negotiation of the contract,
(c) the place of performance,
(d) the location of the subject matter of the contract, and
(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

(3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§ 189–199 and 203.

Restatement § 188.

As noted earlier, the parties dispute whether the provision titled "Applicable Law and Venue" can be interpreted to mean that the parties contractually agreed that Texas law would govern any disputes arising from the Agreement. (Dkt. # 23 at 3–4.) Sirius argues that this provision's title, along with stating that the "Plan and Agreement were entered into and are performable in San Antonio, Texas," dictates that Texas law should apply to the current dispute. (Id. at 4.) Sparks, on the other hand, argues that this sentence in the provision, along with the provision's heading, does not explicitly direct the application of Texas law and it does not limit the performance of the contract to Texas. (Dkt. # 25 at 2.)

22

While the Court considers the title of the heading of the forum selection provision, "Applicable Law" to be sufficient to put Sparks on notice that Sirius would apply Texas law to any dispute arising from the Agreement, even if it were not sufficient, the other factors of Restatement § 188 weigh in favor of the application of Texas law. The record shows that Texas has a substantial relationship to the parties and the transaction. The parties entered into the Agreement in Texas. Sirius's headquarters is in Texas. Additionally, the parties contractually agreed that the Agreement was "performable in San Antonio, Bexar County, Texas." (Dkt. # 23-1 at 10.) Therefore, because Texas has a substantial relationship with the parties and the transaction, then the Court finds that Texas law should be applied to the instant dispute. As such, this factor of the venue transfer analysis which considers familiarity of the forum state with the law governing the case also weighs in favor of retaining venue in this Court.

D.   Avoidance of Unnecessary Problems of Conflict of Laws or in the Application of Foreign Law

Neither party argues that there will be a conflict of laws or application of foreign law to the claims in this case. This factor is therefore neutral.

E.   Conclusion of Public Factors

The court finds that the public-interest factors do not require the Court to transfer venue of this case to Oregon. Because this is not one of those "most

23

unusual cases" in which the public interest overwhelmingly favors transfer, the Court finds that "the interest of justice," as defined in § 1404(a), "is served by holding [Sparks] to [his] bargain" and retaining venue in this Court in accordance with the parties' mandatory forum-selection clause.  Atl. Marine, 134 S. Ct. at 583.

III.    Conclusion

For the foregoing reasons, Defendant's Motion for Change of Venue (Dkt. # 15) is **DENIED**.

### APPLICATION FOR PRELIMINARY INJUNCTION

Sirius also moves for a preliminary injunction against Sparks which will enjoin him from (1) using and disclosing Sirius's confidential information obtained during his employment; (2) directly or indirectly contacting, soliciting, or otherwise engaging any Sirius employee to leave employment with Sirius; and (3) directly or indirectly soliciting any existing or potential customers of Sirius with whom Sparks dealt with during his employment with Sirius.  (Dkt. # 6 at 1.) Sirius alleges that without the preliminary injunction, it will continue to lose valuable employees and have its goodwill and business reputation harmed by Sparks's actions in contravention of the Agreement.  (Id.)

In response, Sparks argues that preliminary injunctive relief should be denied.  (Dkt. # 27 at 1.)  He contends that the provision in the Agreement concerning the non-solicitation of customers is invalid and unenforceable.  He

24

agrees that he was obligated not to disclose confidential information, but he argues that Sirius's request for injunctive relief pertaining to this issue is irrelevant because he never disclosed such.  (Id.)  Additionally, Sparks denies that he had an obligation not to solicit Sirius employees to leave their employment with Sirius. (Id.)

As summarized above, the relevant provisions of the agreement state:

1.    **Confidentiality**. The Employee will be provided Sirius' Confidential Information during the course of Employee's employment. Employee agrees that without the use of Sirius' Confidential Information, Employee will not be able to perform Employee's job duties. In order to avoid any inadvertent or other disclosure of Sirius' Confidential Information, Employee agrees that when Employee's employment with Sirius ends or whenever requested by Sirius, Employee will immediately return any and all Confidential Information of Sirius' in Employee's possession or control, irrespective of the form in which the information is held or maintained. Specifically, Employee understands that Employee will become knowledgeable of Sirius' Confidential Information through a variety of ways including, without limitation, the training Employee receive (in house or third party), licenses obtained, exposure to Sirius' customers, business practices, and the methodology and process by which it generates sales and leads for new sales. Additionally, Employee agrees to keep secret all Confidential information of Sirius, and not to disclose this information to anyone outside of Sirius including, without limitation, disclosing this information to any customer, account, vendor, or competitor. Employee will only use Employee's knowledge of Sirius' Confidential Information in the ordinary course of Employee's job duties and Employee will not disclose this information to anyone internally who does not have a need to know, nor will Employee disclose it to any person after Employee's employment ends.

2.    **Protection of Customer Relationships**.  For purposes of this paragraph, "Sirius' customers" shall include every person, business or other entity which, during the Employee's last 24 months of employment at Sirius, either purchased or committed to purchase any service or product from Sirius or its respective subsidiaries, affiliates or successors, and with whom Employee did business and had direct personal contact as an employee of Sirius.  For a period of one (1) year after ceasing to be employed by Sirius, regardless of whether Employee's employment ends voluntarily or involuntarily, Employee shall not, directly or indirectly, as an employee or an independent contractor, alone or in association, with, on behalf of, or for the benefit of any third party, provide or solicit to provide any service or product to any of Sirius's customers, which service or product is similar to or competitive with any service or product offered by Sirius, or the provision of which could adversely affect Sirius' business relationship with such customer.  After Employee's employment with Sirius ceases, to the extent Employee is uncertain whether Employee may be violating this paragraph, Employee shall identify in writing to Sirius any person, business or other entity that Employee intends to solicit and request information from Sirius as to whether that particular person, business or other entity qualifies as a Sirius customer and Sirius will confirm to the Employee within seven (7) business days of Employee's request whether the contact is a Sirius customer.

3.    **Non-Solicitation of Employees**.    During Employee's employment with Sirius, and for a period of one (1) year thereafter, Employee will not directly or indirectly contact for the purpose of soliciting employment, solicit, employ or otherwise engage any of the employees of Sirius or any of its respective subsidiaries, affiliates or successors to leave his or her employment to work for any business, individual, company, firm, corporation, or other entity then in competition with the business of Sirius or any subsidiary, affiliate or successor of Sirius (for the purpose of this Paragraph the term "employee" shall include any person having such status with regard to Sirius or any of its respective subsidiaries and affiliates at any time during the six (6) months preceding any solicitation in question).  If Employee engages in the solicitation of employees prohibited under this paragraph, it will disrupt, damage or impair Sirius' business or the

business of its present or future subsidiaries or affiliates, as the case
may be, and will necessarily involve the use of Confidential
information which Employee acknowledges Employee is prohibited
from disclosing.

(Dkt. #15-1 at 11–12.)

I.      Applicable Law

         The grant of injunctive relief is an extraordinary remedy which
requires the movant to unequivocally show the needs for its issuance.  Opulent Life
Church v. City of Holly Springs, Miss., 697 F.3d 279, 288 (5th Cir. 2012); Valley
v. Rapides Parish Sch. Bd., 118 F.3d 1047, 1050 (5th Cir. 1997).  A preliminary
injunction should not be granted unless the movant demonstrates by a clear
showing: (1) a substantial likelihood of success on the merits; (2) a substantial
threat of irreparable harm if the injunction is not granted; (3) that the threatened
injury outweighs any harm that may result from the injunction to the non-movant;
and (4) that the injunction will not undermine the public interest.  Lindsay v. City
of San Antonio, 821 F.2d 1103, 1107 (5th Cir. 1987); Valley, 118 F.3d at 1051.  At
the preliminary injunction stage, the procedures in the district court are less formal,
and the district court may rely on otherwise inadmissible evidence, including
hearsay evidence.  Sierra Club, Lone Star Chapter v. F.D.I.C., 992 F.2d 545, 551
(5th Cir. 1993).  However, even when a movant established each of the four
requirements described above, the decision whether to grant or deny a preliminary

27

injunction remains within the Court's discretion, and the decision to grant a preliminary injunction is treated as the exception rather than the rule. Miss. Power & Light Co. v. United Gas Pipe Line Co., 760 F.2d 618, 621 (5th Cir. 1985).

II.   Analysis

The four elements to consider in granting a preliminary injunction are analyzed below.

A.   Substantial Likelihood of Success on the Merits

The non-solicitation and confidentiality provisions at issue are in essence provisions not to compete. In Texas, a provision not to compete is enforceable if (1) it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made; and (2) the limitations of time, geographical area, and scope of activity are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promise. Tex. Bus. & Com. Code Ann. § 15.50 (West 2009). The burden of proof lies with the employer as the promisee to demonstrate that the provision meets the statutory criteria. Id. § 15.51(b).

Sirius argues that the Agreement and its non-solicitation provisions are valid and enforceable because it was entered into ancillary to Sparks's at-will employment and pursuant to his compensation plan. (Dkt. # 6 at 8.) Sirius also contends that it provided Sparks with confidential information and a higher sales

28

commission as consideration for the Agreement following its execution.  (Id.)
Furthermore, Sirius asserts that the limitations, including the subject matter and
temporal restrictions, identified in the Agreement are reasonable.  (Id. at 9.)

Sparks, on the other hand, contends that the Agreement concerning
the provisions not to solicit Sirius's customers was not valid and therefore
unenforceable.  (Dkt. # 27 at 19–35.)  In support of his contention that this
provision was invalid, Sparks contends that he signed the Agreement containing
the provision based on illegality by Sirius representatives.  (Id. at 19–30.)

The Supreme Court of Texas has noted that "[t]he hallmark of
enforcement is whether or not the [provision] is reasonable."  Marsh v. USA Inc. v.
Cook, 354 S.W.3d 764, 777 (Tex. 2011).  The court warned that, when
determining the enforceability of a provision, a court should not focus on "overly
technical disputes" over whether a provision is ancillary to an agreement, but
should instead inquire "whether the [provision] 'contains limitations as to time,
geographical area, and scope of activity to be restrained that are reasonable and do
not impose a greater restraint than is necessary to protect the goodwill or other
business interest of the promise.'"  Id. (citing Tex. Bus. & Com. Code § 15.50(a)).

Sparks makes no arguments that the non-solicitation provisions
pertaining to Sirius's employees and customers are unreasonable as to the time,
geography, and scope of activity that they prohibit.  Furthermore, Sparks does not

29

dispute that he had an obligation not to disclose confidential information.  (Dkt. #

27 at 1.)  Instead, Sparks's arguments in opposition to the validity of the provisions

focus on whether his signature on the Agreement was obtained by fraudulent

inducement, waiver, unclean hands, estoppel, and apparent authority.  (Dkt. # 27 at

19–35.)  These affirmative defenses to enforceability are discussed below.

　　　　　　　1.　　Fraudulent Inducement

　　　　　Sparks contends that Sirius fraudulently induced him into signing

the Agreement with the inclusion of the provision concerning the non-solicitation

of customers.  (Dkt. # 27 at 19.)  He argues that Sirius made a commitment to him

that he would be able to keep his long-time customer base, however, when it came

time to sign the Agreement, he was of the understanding that Sirius would "fix" the

Agreement so that the provision would be inapplicable to him.  (Id.)  He contends

that he signed the Agreement in form, but not to its contractual meaning regarding

the provision relating to non-solicitation of customers.  (Id.)

　　　　　　To prove a claim for fraudulent inducement under Texas law, a

plaintiff must show that the defendant (1) made a false material representation,

(2) knew the representation was false when made, or made recklessly, without

knowledge of its truth, (3) with intent to induce the plaintiff to act upon the

representation, and (4) the plaintiff justifiably relied upon the representation,

thereby suffering injury.  <u>Bohnsack v. Varco, L.P.</u>, 668 F.3d 262, 277–78 (5th Cir. 2012).

Sparks has not presented sufficient evidence at this stage of the proceedings to demonstrate that Sirius made a false representation, or much less that it knew the representation was false.  His evidence consists of his own deposition testimony describing his dinner conversations with Brian Pixton, Sirius's director of sales and general manager of the Lake Oswego, Oregon office, in which he contends that he was assured that he would not be subject to the non-solicitation agreement regarding customers.  (Dkt. # 27-2 at 9.)  Sparks also provides the deposition testimony of Pixton as evidence that Sirius would not require him to sign the Agreement concerning the non-solicitation of customers. (<u>Id.</u> at 16–18.)  Pixton's testimony, however, is inconclusive as to whether Sirius in fact assured Sparks that he would not have to abide by the non-solicitation provision.  (<u>See</u> <u>id.</u>) Instead, while Pixton's testimony states that he may have informed Sparks that there "was an option available" to deal with Sparks's concerns about the non-solicitation provision in a "satisfactory way" to both, this does not indicate that Pixton made a false representation that he would be excepted from the provision.  (<u>See</u> <u>id.</u> at 17–18.)  Sparks himself admits that he was aware he had an option not to sign the Agreement and take a reduced salary.  (Dkt. # 27

at 8.)  Accordingly, Sparks has not submitted sufficient evidence, at this point in the proceedings, of fraudulent inducement.

        2.    <u>Waiver</u>

        Sparks also contends that even if the Court were to consider the Agreement valid because of his signature on it, Sirius has waived its right to enforce it.  (Dkt. # 27 at 20.)  Specifically, he contends that Sirius unequivocally represented to him that he would not be subject to the non-solicitation of customers provision.  (<u>Id.</u> at 21.)  "Waiver is the intentional relinquishment of a right actually known, or intentional conduct inconsistent with claiming that right."  <u>Ulico Cas. Co. v. Allied Pilots Ass'n</u>, 262 S.W.3d 773, 778 (Tex. 2008).  "The elements of waiver include (1) an existing right, benefit, or advantage held by a party; (2) the party's actual knowledge of its existence; and (3) the party's actual intent to relinquish the right, or intentional conduct inconsistent with the right."  <u>Id.</u>

        Again, Sparks has not provided sufficient evidence of waiver on the part of Sirius.  He bases his allegation on the same evidence he presented for his fraudulent inducement claim, contending that Pixton's action in assuring him that the non-solicitation of customers provision would not be enforceable as to him resulted in Sirius's relinquishment of a known right that was inconsistent with that right.  (Dkt. # 27 at 21.)  However, as discussed above, Pixton's testimony does not indicate that he clearly conveyed any representation to Sparks that he would

32

definitely not be bound to the non-solicitation provision.  (<u>See</u> Dkt. # 27-2 at 17–18).  In such case, Sparks has not provided sufficient evidence of waiver.

3.     <u>Unclean Hands</u>

Sparks also contends that a preliminary injunction should be denied to Sirius because it has come to court with unclean hands.  (Dkt. # 27 at 23.)  He alleges that Sirius's actions in first representing to him that he did not have to sign the non-solicitation provision concerning customers and then attempting to enforce it is unjust.  (<u>Id.</u>)  Unclean hands is an affirmative defense that may bar a party with unclean hands from obtaining equitable relief.  <u>Davis v. Grammer</u>, 750 S.W.2d 766, 768 (Tex. 1988); <u>Truly v. Austin</u>, 744 S.W.2d 934, 938 (Tex. 1988) ("It is well-settled that a party seeking an equitable remedy must do equity and come to court with clean hands.")

Again, Sparks relies on his assertion that he was assured that he did not have to agree to the non-solicitation provision prior to his signing the Agreement.  (Dkt. # 27 at 24.)  However, as discussed above, Sparks has not presented sufficient evidence of any misconduct, including misrepresentation, on the part of Sirius.

4.   Estoppel

Sparks next contends that Sirius is equitably estopped from enforcing the non-solicitation provisions because the entire contract was procured by fraud, deceit, and misrepresentation.  (Dkt. # 27 at 25.)  Similar to his previous arguments, Sparks alleges that Sirius made false representations to him before, during, and after employment which it intended that he act and rely on.

The doctrine of equitable estoppel generally prevents one party from misleading another to the other's detriment or to the misleading party's own benefit, and requires: "(1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of those facts; (3) with the intention that it should be acted on; (4) to a party without knowledge or means of obtaining knowledge of the facts; (5) who detrimentally relies on the representations."  Ulico Cas. Co. v. Allied Pilots Ass'n, 262 S.W.3d 773, 778 (Tex. 2008); Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc., 962 S.W.2d 507, 515–16 (Tex. 1998).

As previously addressed, Sparks has not presented sufficient evidence of any false representation or concealment.  Nor has he presented any evidence of Sparks's lack of ability to obtain knowledge of the facts concerning whether the non-solicitation would be applicable to him.  His evidence for this defense includes Sirius's email communications within its staff concerning Sparks's desire not to

34

sign the non-solicitation agreement.  (Dkt. # 6-7.)  This email details that Sparks had the option of signing the Agreement with a higher commission rate, or taking a lower commission rate in exchange for not signing it.  (Id. at 1.)  An email sent from Sirius's Executive Vice President of Sales, Muditha Karunatileka, states that the commission structure regarding non-solicitation agreements "is consistent with how we treat all new hires, and I am not willing to grant an exception [to Sparks]."  (Id.)  Karunatileka's message also states that "[t]he other option for him is to SIGN the non-solicitation, but with a 'carve out' of his accounts (once we verify that they are not current Sirius customers, and a manageable number of say 10 [or] 15) that are not subject to the non-solicitation."  (Id.)  In response to this email, Sirius's Senior Vice-President of Sales for the Western Region, Imran Salim, informed Karunatileka that he and Pixton would "have discussions with Jason [Sparks]."  (Dkt. # 6-7 at 55.)  Sparks contends that this email exchange allowed an exception for Sparks regarding his former customers, but that Pixton and other Salim did not effectuate and follow-up with this exception for him.  (Dkt. # 27 at 27.)

Sirius, however, has provided the declaration of Pixton wherein he states that subsequent to Karunatileka's email, he had a phone conversation with Sparks regarding Karunatileka's inability to waive the requirement of the Agreement, and that "[a]t the end of that conversation, "Mr. Sparks informed me that he would sign [the Agreement] "as is."  (Dkt. # 6-6 at 2.)  Pixton then notified

Sirius's Recruitment Programs Manager, Stayce Schill, that he spoke with Sparks "and walked him through our non-solicitation/PRA" and that Sparks had agreed to the Agreement "as is." (Id.; Dkt. # 6-7 at 59.)  After sending Sparks the paperwork, Schill notified Pixton that Sparks had signed and accepted the offer without any modifications to the Agreement.  (Dkt. # 6-6 at 2; Dkt. # 6-17 at 60; Dkt. #6-8 at 6.)  Pixton also states that at no time was he aware that Sirius had "agreed to strike or remove any provisions of [the Agreement]."  (Dkt. # 6-6 at 2.)

Nevertheless, Sparks asserts that the "carve-out" exception was applicable to him and his customer base; however, he does not provide sufficient evidence that it was in fact approved and agreed to by him or Sirius in any formal capacity so as to lead the Court to conclude that certain customers of Sparks were in fact excepted from the provision.  He provides no evidence that he contacted anyone or that anyone contacted him regarding its implementation prior to him signing the Agreement.  Nor is there any evidence that Sparks inquired about a revised non-solicitation provision upon his belief that his customer base would be "carved-out," and there is no evidence that a list of Sparks's customer base was created in order for the "carve-out" exception to apply to Sparks.

Without such proof, the Court is unable to conclude that the provision regarding non-solicitation of customers was "carved-out" for Sparks, especially in light of the fact that Sparks signed the Agreement without any revisions, or

36

attachments, to the non-solicitation provisions.  As such, Sparks has not presented sufficient evidence of equitable estoppel.

     5.    <u>Apparent Authority</u>

Sparks also contends that Sirius cannot maintain any argument that Pixton did not have the apparent authority to remove the non-solicitation provision. (Dkt. 27 at 27.)  However, this contention is premature.  Sirius has not made such an allegation and the Court will not consider the merits of this argument.

Overall, Sparks has not presented sufficient evidence at this stage of the proceedings that the Agreement or any of its provisions were invalid or unenforceable.  Additionally, Sparks does not dispute the actual terms of the relevant provisions nor does he dispute that he was provided access to confidential information.  (<u>Id.</u> at 2–3.)  He also does not dispute that he signed the Agreement containing the non-solicitation provisions, although he contends he did so with the understanding that the provision pertaining to non-solicitation of customers would not be applicable to him.  In such case, the Court concludes that the Agreement's restrictions pertaining to the non-solicitation of employees and customers appear reasonable and do not impose a greater restraint than necessary to protect Sirius's business interests, including its confidential information.  <u>See</u> <u>Marsh</u>, 354 S.W.3d at 774 (noting that confidential information is a protectable business interest under Tex. Bus. & Com. Code § 15.50(a)).

Furthermore, the provisions' restrictions still allow Sparks to work in the same industry and pursue a living by only preventing him from disclosing confidential information, from providing similar services to Sirius's customers, and from soliciting Sirius's employees.  See Evans Consoles Inc. v. Hoffman Video Sys., Inc., No. 3:01-CV-1333-P, 2001 WL 36238982, at *8 (N.D. Tex. Dec. 6, 2001) ("One of the factors considered by courts in determining the reasonableness of an agreement is whether the defendant is restricted from earning a living if the agreement not to compete is enforced.").  Accordingly, the Court concludes that the non-solicitation provisions in the Agreement are enforceable and that there is a substantial likelihood that Sirius will prevail on its claims against Sparks.

B.   Irreparable Harm

A plaintiff must be threatened with irreparable injury for a court to issue a preliminary injunction.  Univ. of Tex. v. Camenisch, 451 U.S. 390, 392 (1981).  To show threat of irreparable injury, a plaintiff must demonstrate that "a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm."  Humana, Inc. v. Jacobson, 804 F.2d 1390, 1394 (5th Cir. 1986).  In Texas, injury resulting from the breach of  non-compete "is the epitome of irreparable injury, so enforcement appears to be the rule rather the exception."  Travelhost, Inc. v. Brady, No. 3:11-CV-454-M-BK, 2012 WL 555191 (N.D. Tex. Feb. 1, 2012), report and

38

recommendation accepted as modified, 2012 WL 556036.   "Proof that a highly

trained employee is continuing to breach a non-competition [provision] gives rise

to a rebuttable presumption that the applicant is suffering irreparable injury."

Cardinal Health Staffing Network, Inc. v. Bowen, 106 S.W.3d 230, 236 (Tex.

App.—Hous. [14th] Dist. 2003, no pet.).

       Sirius contends that not only will it experience economic injury if the

preliminary injunction is not granted, but that it will cost the company existing and

potential customer relationships, the loss of company goodwill, and the threatened

release and misuse of its confidential and secret trade information.  (Dkt. # 6 at

10.)  Specifically, Sirius alleges that Sparks will continue to "divulge, misuse, or

impart" confidential and proprietary information to Nordisk and that his

solicitation of Sirius's customers and potential customers threatens loss of business

goodwill.  (Id.)

       Sparks responds that Sirius is unable to establish irreparable injury,

especially because it chose to wait three months before seeking relief by filing its

suit in state court.  (Dkt. # 27 at 5, 35.)  As such, Sparks contends that Sirius stood

still and allowed competition to occur, forfeiting any right to claim a loss of

goodwill.  (Id.)  Additionally, Sparks contends that Sirius cannot claim any injury

after it was prepared to offer Sparks the ability to keep his customer base in

exchange for a reduction in salary, or give up his customer base to receive higher

39

compensation.  (Id.)  Despite Sparks's contentions, because Sirius has come forward with competent evidence concerning the irreparable injury it is likely to suffer if the preliminary injunction is not issued, Sparks's contentions are without merit.

    1. <u>Customers</u>

    As proof that Sparks has violated the provision not to solicit customers and that it will continue to suffer irreparable harm, Sirius has provided evidence of Sparks's communications with Sirius customers after his employment with Nordisk.  (Dkt. # 16 at 11.)  This evidence indicates that on several occasions after his termination from employment at Sirius, Sparks contacted customers in a business capacity that he himself identified in deposition testimony were customers of Sirius.  (<u>See, e.g.</u>, Dkt. # 16 at 11–12; Dkt. #16-11 at 57).  Sirius's evidence also includes at least one email message Sparks sent to Sirius customers informing them of his resignation and providing his new contact information.  (Dkt. # 16 at 11; Dkt. # 6-13 at 4, 7–12.)  Sirius further indicates that at least one client of Sirius has ordered equipment from Nordisk subsequent to Sparks's departure, and that he may be providing quotes from Nordisk to these customers based on quotes from Sirius.  (Dkt. # 16 at 13; Dkt. #6-13 at 3.)  These activities are in direct opposition to those restricted in the Agreement.

2.    Employees

Sirius has also provided evidence that Sparks has violated the

provision not to solicit employees.  (Dkt. # 16 at 13.)  It provides evidence that at

least three employees either contacted Sparks or were contacted by him subsequent

to his resignation in regard to possible employment with Nordisk.  (Id.; Dkt. # 16-4

at 3; Dkt. # 6-12 at 2–3, 5, 6, 7–13.)  Sirius argues that while Sparks alleges that

those employees contacted him and not vice versa, the language in the provision is

clear that he was prohibited from engaging, either directly or indirectly, with

employees of Sirius after his resignation.  (Dkt. # 16 at 13; Dkt. #16-4 at 3.)

Sirius's evidence also indicates that Sparks had a substantial role in the hiring

process for at least two of these individuals, including evidence that at least one of

the employees thanked Sparks for "bringing him aboard" to Nordisk.  (Id.; Dkt.

# 16-4 at 3; Dkt. # 6-12 at 2–3, 5, 6, 7–13.)  Additionally, Sirius has provided

evidence that indicates that Sparks, along with Nordisk coworkers, may be

assembling a team comprised of certain Sirius employees.  (Dkt. # 16 at 14–25;

Dkt. # 16-4; Dkt. 6-12 at 13.)

3.    Confidential Information

Sirius has also provided evidence that Sparks was in possession of

confidential information that was deleted from his computer in violation of the

state court's temporary restraining order.  (Dkt. # 6 at 6; Dkt. # 6-2.)  Sirius's

41

evidence from a forensic computer examiner indicates that at least 294 documents pertaining to Sirius were deleted from Sparks's computer.  (Dkt. # 6-2.)  Sparks disputes this evidence, as discussed below in his motion to strike, contending that the information he had on his computer was not confidential.  (Dkt. # 19.)  Sparks also argues that any deletion was done in accordance with the temporary restraining order issued by the state court.  (Id.)  Nonetheless, Sirius's evidence sufficiently infers that Sparks was in possession of confidential information which he may have used in a capacity contrary to the confidentiality provision of the Agreement.  In such case, Sirius has demonstrated that irreparable harm would be likely should Sparks disseminate any confidential information he obtained from Sirius.

Overall, the Court concludes that Sirius has submitted sufficient evidence to demonstrate a substantial threat of irreparable injury.  Plaintiff's complained of harm is the "epitome" of irreparable, especially as it pertains to its potential lost goodwill, lost employees, and potentially lost confidential and proprietary information.  Sparks cannot overcome the rebuttable presumption that Sirius is suffering irreparable harm.

C.    <u>Balancing the Hardships</u>

"The third factor requires the plaintiff to establish that his irreparable harm is greater than the hardship that the preliminary injunction would cause the defendant." <u>DS Waters of Am., Inc. v. Princess Abita Water, L.L.C.</u>, 539 F. Supp. 2d 853, 863 (E.D. La. 2008) (citing <u>Valley</u>, 118 F.3d at 1051).  Courts engage in a traditional balancing test on this factor.  <u>See, e.g.</u>, <u>Am. Exp. Fin. Advisors, Inc. v. Scott</u>, 955 F. Supp. 688, 693 (N.D. Tex. 1996) (holding the hardships to a signatory to a non-compete from the preliminary injunction do not outweigh those to the company if the signatory were allowed to violate his non-compete and work with former clients for the period covered in the agreement).

Sirius argues that it is not seeking a non-competition agreement that would completely restrict Sparks from working anywhere in the same field or industry as Sirius.  (Dkt. # 6 at 12.)  Instead, it argues that it simply seeks to restrict Sparks from disclosing confidential information, contacting specific, known clients, as well as contacting and communicating with the employees of Sirius for the purpose of soliciting employment for a one-year period.  (<u>Id.</u>)

The loss of business, its goodwill, and potential employee base is significant for Sirius's side of the balancing.  Additionally, the reasonableness of the restriction on Spark's activity works against him for this factor; Sparks may continue to work in same industry and provide the same services as those he

43

performed while employed at Sirius.  Indeed, Sparks's employment at Nordisk, an

undisputed competitor with Sirius demonstrates this.

        Accordingly, the balance of harms under the circumstances discussed

above favors Sirius, and Sirius has therefore met its burden to establish the third

element of the preliminary injunction analysis.  <u>See, e.g.</u>, <u>Oxford Global Res., Inc.</u>

<u>v. Weekley-Cessnum</u>, No. 3:04-CV0330-M, 2005 WL 350580, at *6 (N.D. Tex.

Feb. 8, 2005) (concluding that the balance of interests favored employer when

employee could still solicit business from new customers, although he was

preliminary enjoined from pursuing former customers); <u>Evan Consoles</u>, 2001 WL

36238982, at *10 (noting that harm than an employee occurred due to a

preliminary injunction, which prevented the employee from working in six states

for the noncompetition period of three years, did not outweigh the harm to his

former employer in terms of lost goodwill and business).

    D.    <u>The Injunction Will Not Undermine the Public Interest</u>

        Non-compete clauses are disfavored as a restraint on business in

Texas.  Nevertheless, the Fifth Circuit and courts in Texas uphold them and grant

injunctions enforcing them in some circumstances.  Upholding reasonable non-

competes is within the public interest.  <u>See, e.g.</u>, <u>TransPerfect Translations, Inc. v.</u>

<u>Leslie</u>, 594 F. Supp. 2d 742, 758 (S.D. Tex. 2009); <u>Amerispec, Inc. v. Metro</u>

44

Inspection Serv., Inc., No. 3:01-CV-0946-D, 2001 WL 770999, at *6 (N.D. Tex. July 3, 2001).

Sparks again argues that Sirius failed to negotiate the Agreement in good faith and follow up with him regarding a clear waiver of the non-solicitation provisions.  (Dkt. # 27 at 35.)  He also contends that his customer base's business is threatened, including a potential shut-down of an emergency room's computer operating system if the non-solicitation provisions are enforced against him.  (Id. at 36.)  While certainly a concern, those customers that Sparks considers his customer base, such as the hospital, likely have other options, including possibly re-employing Sirius if needed.  Additionally, these situations are not compelling or unique to the signed non-solicitation agreement at issue here.  Courts continuously grant injunctions in the face of these exact "public interest" concerns.  Accordingly, the Court finds that a preliminary injunction in this case would not undermine the public interest.

III.    Conclusion

For the reasons stated above, Plaintiff's Supplemental Application for Preliminary Injunction (Dkt. # 6) is **GRANTED**.  The Court finds that Sirius has satisfied each of the prerequisites for obtaining a preliminary injunction against Sparks.  It is hereby **ORDERED** that Plaintiff Jason Sparks shall be immediately preliminarily enjoined and restrained during the pendency of this action, from:

1.      disclosing any confidential information to anyone outside of Sirius including, without limitation, disclosing this information to any customer, account, vendor, or competitor;

2.      directly or indirectly, as an employee or an independent contractor, alone or in association, with, on behalf of, or for the benefit of any third party, provide or solicit to provide any service or product to any of Sirius's customers, which service or product is similar to or competitive with any service or product offered by Sirius, or the provision of which could adversely affect Sirius' business relationship with such customer; and

3.      directly or indirectly contact for the purpose of soliciting employment, solicit, employ or otherwise engage any of the employees of Sirius or any of its respective subsidiaries, affiliates or successors to leave his or her employment to work for any business, individual, company, firm, corporation, or other entity then in competition with the business of Sirius or any subsidiary, affiliate or successor of Sirius.

<u>MOTIONS TO STRIKE</u>

Sparks and Sirius have both filed motions to strike certain declaratory evidence used in support of their respective arguments concerning the preliminary injunction.  (Dkts. # 19, 22.)  Sparks has moved to partially strike the declaration of Justin Sobey, General Counsel of Sirius.  (Dkt. # 19.)  Sirius has moved to strike in part the declaration of Sparks.  (Dkt. # 22.)  Each motion is addressed below.

I.   <u>Declaration of Justin Sobey</u>

The relevant portions of Sobey's declaration to which Sparks objects include paragraphs five, six, and seven.  (Dkt. # 19 at 2.)  In these paragraphs, Sobey states that Sirius's forensics expert discovered 245 files containing Sirius's confidential information that were deleted from Sparks computer on August 10, 2015, subsequent to the temporary restraining order ("TRO") issued by the state court.  (Dkt. # 19 at 2; Dkt. # 16-8 at 2–3.)  Sobey includes examples and descriptions of the confidential information the forensics examiner obtained, highlighting the confidential nature of the documents.  (Dkt. # 16-8 at 3.)

Sparks objects to the above paragraphs of the declaration because he contends that the deleted documents are being withheld from Sparks and that Sparks's attorney must be able to review these documents in order to submit any opposition to Sirius's contention that the deleted documents were in fact confidential.  (Dkt. # 19 at 2.)  Sparks contends that he deleted the documents in

accordance with the TRO's order restraining him from retaining any copies of Sirius's confidential information and that he no longer has access to them.  (Id. at 1–2.)  He contends that he requested copies of the deleted documents back from Sirius, but that Sirius refused to provide them citing sensitivity concerns.  (Id. at 3.)

In response, Sirius asserts that Sparks's request to view the deleted documents is baseless because he in fact had access to them prior to their deletion. (Dkt. # 29 at 1.)  It argues that Sparks had access to these documents for nearly four months prior to the issuance of the TRO and that he downloaded the documents only several days before his resignation in April 2015 using his Sirius employee login.  (Id.)  Sirius also argues that Sparks has failed to articulate any legal or evidentiary basis on which to exclude the deleted documents which were once in his possession.  (Id. at 2.)  Sirius asserts that it is willing to submit the documents to the Court for an in camera review if necessary.  (Id. at 3.)

Sobey's statements concerning the deleted documents are descriptions of some of the files deleted from Sparks's computer.  (Dkt. # 16-8 at 2.)  Notably, Sparks does not challenge the descriptions of the files, only whether they are confidential to Sirius.  (See Dkt. # 19.)  Sobey's description of the documents, however, plainly indicate that some of the documents stored on Sparks's computer were likely confidential to Sirius.  (Dkt. # 18-2.)  With reasonable inference, and without any argument from Sirius, the Court can conclude that these files contain

confidential and proprietary information.  Furthermore, because evidence standards

at the preliminary injunction stage are less formal and the court may rely on

otherwise inadmissible evidence, the Court concludes that Sobey's declaration

need not be stricken.  Sierra Club, Lone Star Chapter v. FDIC, 992 F.2d 545, 551

(5th Cir. 1993).

Accordingly, Sparks's Motion to Partially Strike Declaration of Justin

Sobey (Dkt. #19) is **DENIED**.

II.    Declaration of Jason Sparks

Sirius objects to paragraphs four, five, and six of Sparks's sworn

declaration because it contends that it is inconsistent with his prior testimony and

pleadings.  (Dkt. # 22.)  Specifically, Sirius asserts that the declaration is

inconsistent regarding: (1) when and how frequently he informed Sirius he would

not agree to the non-solicitation provisions; (2) which Sirius representatives he

informed of his disagreement with the provisions; (3) which provisions he believed

would be "struck through" after he returned and signed the Agreement; and

(4) whether he agreed to be bound to the remainder of the Agreement, aside from

the non-solicitation provisions.  (Id.)

While the Court notes that some inconsistencies appear throughout

Sparks's pleadings and other documents, especially as they concern which

provisions of the Agreement Sparks's allegedly did not agree to or to whom he

49

communicated his disagreement, these inconsistencies did not detract from the Court's findings that venue should remain in this Court and that a preliminary injunction is warranted.  In such case, Sirius's Motion to Strike in Part Declaration of Jason Sparks (Dkt. #22) is **DENIED**.

<u>CONCLUSION</u>

Based on the foregoing, it is **ORDERED** that:

(1) Plaintiff's Motion to Sever, Transfer, and Consolidate in Part Second-Filed Action Pending in the U.S. District Court for the District of Oregon (Dkt. # 4) is **GRANTED**.  It is **ORDERED** that Sparks's claims pending in the Oregon Litigation be **SEVERED** from <u>Jason Sparks & Nordisk Systems, Inc. v. Sirius Computer Solutions</u>, No. 3:13-cv-01540-HZ in the United States District Court for the District of Oregon, **TRANSFERRED**, and **CONSOLIDATED** with the claims in this case.

(2) Defendant's Motion for Change of Venue (Dkt. # 15) is **DENIED**.

(3) Plaintiff's Supplemental Application for Preliminary Injunction (Dkt. # 6) is **GRANTED**. The Court finds that Sirius has satisfied each of the prerequisites for obtaining a preliminary injunction against Sparks.  It is hereby **ORDERED** that Plaintiff Jason Sparks shall be immediately preliminarily enjoined and restrained during the pendency of this action, from:

(A) disclosing any confidential information to anyone outside of Sirius including, without limitation, disclosing this information to any customer, account, vendor, or competitor;

(B)  directly or indirectly, as an employee or an independent contractor, alone or in association, with, on behalf of, or for the benefit of any third party, provide or solicit to provide any service or product to any of Sirius's customers, which service or product is similar to or competitive with any service or product offered by Sirius, or the provision of which could adversely affect Sirius' business relationship with such customer; and

(C)  directly or indirectly contact for the purpose of soliciting employment, solicit, employ or otherwise engage any of the employees of Sirius or any of its respective subsidiaries, affiliates or successors to leave his or her employment to work for any business, individual, company, firm, corporation, or other entity then in competition with the business of Sirius or any subsidiary, affiliate or successor of Sirius.

(4) Defendant's Motion to Partially Strike Declaration of Jason Sobey (Dkt. # 19) is **DENIED**.

51

(5) Plaintiff's Motion to Strike in Part Declaration of Jason Sparks

(Dkt. # 22) is **DENIED**.

**IT IS SO ORDERED.**

**DATED**: San Antonio, Texas, October 5, 2015.

_____

David Alan Ezra
Senior United States District Judge